JS 44 (Rev. 12/07)(cand rev 1-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS
LISA D. BROWN

**DEFENDANTS**
Contra Costa Cty Sup. Ct.

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)
Contra Costa

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)
CONTRA COSTA

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | **PERSONAL INJURY** | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 362 Personal Injury— Med. Malpractice | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury — Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 442 Employment | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 445 Amer. w/Disabilities – Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 446 Amer. w/Disabilities – Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
USC 42 1983
Brief description of cause:
Civil Rights

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ 25,000.00
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)
☒ SAN FRANCISCO/OAKLAND   ☐ SAN JOSE

DATE 8/8/08
SIGNATURE OF ATTORNEY OF RECORD
Lisa Brown



1  Lisa D. Brown
2  57 Ramona Road
   Danville CA 94526
3  (925) 901-1622

**FILED** **UNITED STATES DISTRICT COURT**

4  AUG - 8 2008 **NORTHERN DISTRICT OF CALIFORNIA**

5  RICHARD W. WIEKING
   CLERK, U.S. DISTRICT COURT
6  NORTHERN DISTRICT OF COURT
   OAKLAND CALIFORNIA          **OAKLAND DIVISION**     **C08 - 03**

7  LISA D. BROWN,                                        Case No.:

                           )  Fraud upon the administration of justice by state court
8       Plaintiff,         )  Misconduct/disability affecting exercise of judicial power
                           )  42 U.S.C. § 1983 Deprivation of rights under color of aw
9    vs.                   )  42 U.S.C. § 1982. Property rights
                           )
10 CONTRA COSTA SUPERIOR COURT,    )  42 U.S.C. § 1985 (2)(3) Obstructing justice
                           )  42 U.S.C. § 1986 Action for neglect to prevent
11 CONTRA COSTA COUNTY SHERRIFF,   )  42 U.S.C. § 1981 (a) (c) Equal rights under the law
                           )
12 CONTRA COSTA COUNTY DCFS,       )  42 U.S.C. § 1988. Proceedings in vindication of civil rights
                           )  Criminal negligence and recklessness by state court
13 MARY COURTENAY - ATTORNEY,      )  Vicarious liability: California State Supreme Court
                           )
14 CALIFORNIA STATE SUPREME COURT, )  Petition for ex-parte writ of habeas corpus
                           )  Vacate sua sponte void orders for fraud upon the court
15       Defendants        )  Vacate sua sponte writ of possession and return property
                           )  Motion in limine limiting defendants' discovery to court
16                         )  records due to destruction of evidence by public officials
                           )
17 _____)  Motion in limine for public transparency & published findings

18

19            Fraud upon the administration of justice by a state court

20       Court misconduct and disability affecting the exercise of judicial power

21  Ms. Brown is challenging the propriety of Contra Costa County Superior Court conspiring to enact local rules of
22  court in violation of state, federal and Constitutional law. This was a pattern and practice of deliberately effecting
    the administration of justice in a significant number of unrelated cases arising out of an illicit motive of
23  expediency. The allegation of court / judicial misconduct and disability arises out of provisions governing the
24  substantive and procedural aspects and is therefore not merits-related. However, since the trial court's rules so
25  infected Ms. Brown's trials with unfairness as to make the resulting judgments a denial of due process Id.(quoting
    Donnelly, 416 U.S. at 643), Ms. Brown is also collaterally attacking the correctness – "the merits" – of arriving at
26  rulings under such illicit and improper motives. This petition includes allegations that Contra Costa County
27  Superior Court treated litigants including Ms. Brown in a demonstrably egregious and hostile manner because
28  they are a member of a particular class of citizens, family law litigants, of which the trial court treated with second
    class justice. The conduct of the Contra Costa Superior Court and its peripheral agencies occurred outside the
29  performance of official duties which had a prejudicial effect on the administration of the business of the courts
30  affecting a substantial and widespread lowering of public confidence in the courts among reasonable people.

Civil Rights, Constitutional Law, Evidence, Habeas Corpus, Government Contracts, Government Law - 1

## 42 U.S.C. § 1985 (3): Conspiracy to interfere with civil rights

*Depriving persons of rights or privileges. If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation.*

In 2007, the California Supreme Court ruled against the state court in Elkins v. Contra Costa Superior Court: *"A trial court is without authority to adopt local rules or procedures that conflict with statutes or with rules of court adopted by the Judicial Council, or that are inconsistent with the Constitution or case law. In sum, local courts may not create their own rules of evidence and procedure in conflict with statewide statutes."*

Ms. Brown's rights to equal protection and due process under the federal Constitution were violated due to established rules of the California State Superior Court of Contra Costa County – for the sake of expediency. It is important to note that these deprivations were part of a pattern and practice routinely discharged by an entire court and its judiciary over the course of several years – as opposed to an exclusive, single event. As a result, a whole new set of injuries and deprivations escalated. This case will serve as a reminder the importance of the due process of law – the foundation from which our legal structure depends.

Conforming with the standard for reviewing facial constitutional challenges as stated by majority opinion in United States v. Salerno (1987) 481 U.S. 739, 745, Ms. Brown will demonstrate that the state court's rules posed a total and fatal conflict with statutory, federal and constitutional prohibitions (Tobe v. City of Santa Ana (1995) 9 Cal.4th 1069, 1084.), and "no set of circumstances exists under which the [rules] would be valid" (People v. Rodriguez (1998) 66 Cal.App.4th 157, 168). Analysis of the underlying facts of these particular two cases in which these rules were applied indicates not only was Ms. Brown deprived of several protected rights (Tobe v. City of Santa Ana, supra, 9 Cal.4th at p. 1084), but that the state court is liable for criminal negligence, willful blindness, and recklessness, proximately and directly caused by their fraudulent misconduct. A fair warning should be given to the world in language that the common world will understand, of what the government intends to do if a certain line is passed by an inferior court.

## 42 U.S.C. § 1983 Deprivation of Rights Under Color of Law

*Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.*

A state court's authority over anyone is restricted by the conception of fair play and procedural justice embodied in the Constitution.' (Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinea, 456 U.S. 694, 702 n. 10 1982). State judicial power is directly limited by individual liberties guaranteed by the Bill of Rights. Ms. Brown therefore asserts her right to challenge improper activities of a state court (local governments ARE persons subject to suit for damages and prospective relief.)

In Elkins v. Contra Costa County Superior Court - August 2007, California State Supreme Court found Contra Costa County Superior Court enacted rules of court conflicting with legal traditions and the conception of fair play and procedural justice. The case that brought it to the attention of the Supreme Court was a pro se litigant who complained exhibits were not allowed. Unfortunately, the case unraveled far more serious problems. While Mr. Elkins' injuries were statutory, Ms. Brown suffered constitutional deprivations as a direct result of the same court and judiciary operating under its own rules of court contrary to state and federal laws, affecting the due process of law, and the chance for an impartial hearing.

- *The court required ONLY written declarations - even if a witness refused to sign them.*
- *Direct, live testimony was normally not allowed - neither was cross-examination.*
- *Factual review of the merits of a case was done by written request.*
- *If written declarations were not timely filed the matter proceeded as a 'default' (without being called a 'default'). These 'under-the-table-defaults' precluded a party from presenting evidence on their behalf, without having 'their day in court', without weighing merits of the case, and without default remedies.*

*Therefore, if one could not file a written declaration, judgment could be rendered ENTIRELY on hearsay by one party, without evidentiary basis or factual findings, without trial on the merits, and without review of the underlying facts. Over several years this lack of accountability and integrity made available new opportunities for adversaries and peripheral agencies to take advantage the structurally defective trial court rules.*

***This type of justice is reminiscent of what inspired our forefathers' two hundred twenty two years ago.***

## Constitutional deprivations directly caused by structural defect of state court

*States may <u>extend</u> the guarantees of the due process of law; they cannot justify specific legislation that upon 'reasonable' consideration might dilute or inhibit the protections of due process.*

When a court, through its own actions, fails to provide a process that adequately protects individual rights, particularly rights as fundamental as the right to due process, right to own property, right to earn an income, right to be a parent, right to be free from cruel and unusual punishment, right to equal protection of the law, right to be free from excessive force, search and seizure, right not to have critical evidence destroyed and personal property stolen (by the hands of public officials), and the right to competent legal counsel, the legitimacy of the judicial system is called into question. Due to structural defect, the court's rules denied Ms. Brown the opportunity to present her cases. The error was "not merely a mistake that hinders a party's ability to present a case effectively," but rather, constituted "a flaw in the systematic framework that denied Ms. Brown the opportunity to be heard at all." (Jasmine G., supra, 127 Cal.App.4th at p. 1116). Ms. Brown asserts federal standing, before a jury of reasonable citizens and United States District Court- Northern California Division - with original jurisdiction over the California State Superior Court of Contra Costa County and named defendants.

The judicial processes were so fundamentally flawed and unfair that a harmless error analysis cannot be performed even if it were so inclined; because the resulting records are entirely limited to one side. Because Ms. Brown was not notified, told to wait in the hallway during the hearing, or prevented from appearing at all, the record contains nothing regarding Ms. Brown's position in either of her cases. Further, the court made no findings, either orally or in writing, to support its ultimate conclusion. This lack of findings is confirmation that the process was entirely one sided and fundamentally unfair.

In analyzing whether a particular error is structural or not, the question whether a proceeding was fundamentally unfair is a completely independent inquiry from any issue of the strength of the evidence or the eventual outcome of the case. There are some errors that go to the fundamental fairness of the underlying process and which, by their very nature, undermine the safeguards otherwise presumed to exist in our judicial system. When such an error occurs, reversal is required regardless of the outcome, because we cannot say that the proceeding itself was fair.

The paucity of cases in which a trial court has terminated such a fundamental right as the right to be heard directly, in a court of law, indicates just how fundamentally unfair the court's rules were. The severity of the "structural" errors involved basic protections, without which the court was unable to reliably serve its function. Contra Costa County deprived citizens of long established rights - knowing they were entitled to them. This was something thousands of litigants including Ms. Brown should not have expected or reasonably foreseen. While citizens understand that our courts may be frustrated with delays that complicate court's calendars and slow judicial processes, there are other ways to deter such conduct that do not place fundamental individual rights at risk and fraudulently affect the administration of justice.

Our adversary system "presupposes" that "accurate and just results are most likely to be obtained through the equal contest of opposed interests. When a party's opportunity to be heard is restricted or terminated, the resulting one-sided participation creates judicial bias. Using unsupported hearsay as facts is court-sponsored witch hunts. Limiting factual review of evidence to written requests invites crime. Requiring litigants to submit written declarations – even if a witness refuses to sign it – suborns perjury. And, conducting "trials by written declaration" invites fraud. In the cases against Ms. Brown, the trial court rules resulted in a miscarriage of justice and constituted a violation of Brown's due process rights. Ms. Brown is asking the court for equitable relief based on structural defect; criminal negligence; willful blindness, recklessness; extrinsic fraud and intrinsic fraud; and a meritorious defense. (In re David H. (1995) 33 Cal.App.4th 368, 380-385.)

Since the Elkins case already established that Contra Costa County enacted structurally defective rules of court impeding opportunities to be heard and the chance for an impartial hearing, and a state court's jurisdiction is limited by due process guarantees of notice and a chance for an impartial hearing, the court was without jurisdiction and matters are void. Since local governments are considered 'persons' subject to suit for damages and prospective relief, Ms. Brown is also seeking damages discussed later in this preface.

### State court should be strictly liable for unlawful structural defect

*Strict liability is the imposition of liability on the court without a finding of fault (although that finding was established in Elkins v. Contra Costa County Superior Court, 2007). Strict liability is imposed for conduct that constitutes a crime by virtue of statute (malum prohibitum) although the court's conduct is also violative of society's standards for allowable conduct (malum in se). Therefore, neither good faith nor the fact that the trial court took precautions is valid. Strict liability applies to those engaged in inherently dangerous ventures.*

There are few things as inherently dangerous as a state court altering legal traditions deeply rooted in our nation's history - targeted at a specific class of citizens - when constitutionally protected liberties are at stake. Under strict liability Ms. Brown needs only to prove that the violations happened and that Contra Costa was responsible, which is a matter of record. Such an offence should be used to deter potential state court offenders from engaging in similarly dangerous behavior. A classic example of strict liability is the owner of a tiger rehabilitation center. No matter how strong the tiger cages are, if an animal escapes and causes damage and injury, the owner is held liable. Similar to strong cages, our country was founded upon a firm guarantee of due process. Contra Costa County thought enough of itself to compromise the strength of that guarantee with a sub-standard alternative. Therefore the court should be held strictly liable for the constitutional injuries Ms. Brown sustained as a direct result.

Taxpayers pay sums of money for courts to protect our rights and uphold the law. A structurally defective product, such as Contra Costa's court and judiciary, should be subject to the same liabilities the courts expect from its citizens. Since claims are usually based on either structural defect or a failure to warn (as separate causes of action) and we have already discussed structural defect, it is important to discuss failure to warn. Although trial court rules were published, it is not reasonable for any person, at any time, under any circumstance, to consider that a local county trial court's rules would trump fundamental state, federal, and constitutional laws especially the right to be heard at a hearing. Under the theory of strict liability the court is held liable regardless. A duty was owed, the court breached that duty, constitutional injuries resulted, and the breach caused Ms. Brown's injuries, period. Strict scrutiny should allow recovery for such injuries by litigants who are at an unfair disadvantage to determine what a court did wrong in its rule-making process. It is presumed that out of all American enterprises, a court of law should know better. They are the country's most powerful agency, better situated to absorb the cost of liability, and should consider such expenses before setting unlawful rules.

## Contradiction: Criminal negligence and recklessness by a state court

*Res ipsa loquitur is referred to as the "scalpel left behind" example of obvious negligence*

1. *The harm would not have occurred without the trial court's negligence*
2. *The "thing" which caused the harm was under exclusive control of the court at the time of the negligent act.*
3. *There must be an absence of a reasonable explanation as to how the harm occurred.*

*The following examples illustrate the many problems contained in this document (an overall summary highlighting the contents of this document follows). It is important to apply the following definitions;*

*__Malfeasance in office, or official misconduct__ "is an act which an officer had no legal right to do at all and that when an officer, through ignorance, inattention, or malice, does that which he has no legal right to do at all, or acts without any authority whatsoever, or exceeds, ignores, or abuses his powers, he is guilty of malfeasance."*

*__Recklessness__ is a 'malfeasance' where the judge knowingly exposed Ms. Brown to the risk of injury. Recklessness arises when the judge is actually aware of the potentially adverse consequences, but has gone ahead anyway, exposing Ms. Brown and her infant to the risk of suffering the foreseen harm (without actually desiring that they be hurt). The accused is considered a social danger because they are gambling with the safety of others and they could have taken steps to avoid the injury from occurring. (The only thing more dangerous to society than a reckless judge is an entire court of reckless or negligent judges disguising unlawful acts as "OK" per trial court rules).*

*__Criminal negligence__ is a 'misfeasance or 'nonfeasance' where the fault lies in the __failure to foresee__ and so allow otherwise avoidable dangers to manifest.*

*__Willful blindness__ describes a situation in which a judge seeks to avoid civil or criminal liability for a wrongful act by intentionally putting themselves in a position where they will be unaware of facts which would render them liable. It represents a link between criminal negligence and recklessness that either the judge deliberately engineered a situation in which they were ignorant of material facts, or that the failure to foresee represented such a danger to Ms. Brown that it must be treated as though it was reckless.*

### The right to counsel, the right to a meaningful hearing, and opportunity to be heard

**Duty Owed:** In Rushen v. Spain (1983) 464 U.S. 114, 117 [104 S.Ct. 453], the court explained that the right to be present during all critical stages of the proceedings and the right to be represented by counsel, "as with most constitutional rights, are subject to harmless-error analysis unless the deprivation, by its very nature, cannot be harmless." (Id. at p. 117, fn.. 2, italics added.). Ms. Brown's rights to property ownership, her right to earn a living, her rights to care for her dependent child, her personal property rights, and rights to her evidence, case information, and records for her defense, are on the top ten list of most harmful deprivations. While the state may have an interest in resolving cases expeditiously, any interest the state had in resolving the matters without delay was insignificant in comparison to Brown's compelling interests.

**Breach of Duty #1:** Ms. Brown had a right be included in her eviction hearing instead of being told to wait in the court's hallway. It is one thing to allow a party who believes counsel will adequately represent his or her interests to be absent in the proceedings, it is quite another to force Ms. Brown's absence and force that reliance on counsel by allowing only Courtenay (Brown's attorney) into the courtroom to represent Brown's fundamental interests. Even if the judge was under the mistaken impression that Ms. Brown was waiting in the hallway voluntarily, Ms. Brown's statements upon entering the courtroom to hear judgment would have contradicted any such impression. Ms. Brown emphatically attempted to raise fundamental, prejudicial, factual, and meritorious issues while Courtenay and the judge were only interested in keeping Brown quiet. Surprisingly, the opposing party's attorney - an Alameda County attorney - came to Brown's defense by adding "Your Honor, are you aware Ms. Brown's business is also located at her residence?"

### 42 U.S.C. § 1982. Property rights of citizens

*All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.*

(The application of this clause constitutes a control on how various classifications - not only those based on race, but also those based on other attributes - can be legitimately used by the government. The same safeguards effecting property rights in other jurisdictions should be equally applied in family law jurisdictions.)

**Breach of Duty #2:** Perhaps this unusual set of circumstances can best be explained after injecting Contra Costa's rules of court in place at the time. Brown first learned of Contra Costa's "trial by written declaration" rule after reading Elkins v. Contra Costa County Superior Court (2007). According to trial court rules hearings were strictly limited to the issues contained in previously filed written declarations - provided they were timely filed. Since Courtenay restricted discussions of Brown's cases to meetings held right before scheduled hearings, it would have been impossible for Courtenay to file the required written responses in Brown's behalf. Without those critical written responses Contra Costa's rules prohibited Brown's issues from being presented directly via live testimony during hearings. This explains; 1) why the judge allowed Brown to wait in the hallway 2) why Brown was denied opportunity to be heard during her eviction hearing, and 3) why Courtenay failed to bring up any of Brown's issues during any of the hearings Courtenay attended (there was a total of three scheduled hearings - 1 for Brown's eviction, 2 for Brown's custody case). As a result Ms. Brown was unable to be heard or participate in any of her hearings, and the trials continued entirely one-sided.

> *The judge remained "willfully blind" to Brown's constitutional right to defend her right to own property, and the resulting injuries such as; unlawful seizure of business, forced indigence, destruction of evidence and personal records (used to blackmail – intimidate – threaten - coerce Brown), and theft of Brown's personal property make the judge and court criminally negligent and reckless.*

**Injury #1:** In 2007, the State Supreme Court established that Contra Costa's trial court rules were unlawful. However, these rules do not explain why Courtenay did not file the required written responses. Mistake, inadvertence, or neglect does not sufficiently explain why Courtenay instructed Brown to wait in the hallway during her eviction hearing. For example, if mistake was in fact the cause, then certainly Courtenay would have tried to file written responses for Brown's subsequent hearings and would have had ample justification to stop Brown's eviction and resulting constitutional deprivations. Lastly, Courtenay's misconduct throughout the entirety of Brown's trials strongly suggests otherwise (as explained in this document, supported by factual evidence and case records).

*With respect to an attorney who attempts to obstruct the proceedings by failing to maintain contact with the client, such conduct should not constitute an implied waiver of Brown's right to be represented or heard.*

**Injury #2:** By the time Brown hired Courtenay the trial court's rules had been in place for some time. Because Contra Costa's defects compromised the integrity of the legal 'structure', large cracks and gaps in the system had also been exposed for the same period of time. In the world of attorneys "time equals money". Clearly, Courtenay had no intention of filing written declarations in Brown's behalf. Why should she? Why waste time writing tedious declarations and responses when she could use that time to double her caseloads – and her paycheck? Further, if she's not planning to file written declarations why waste time meeting with Brown to discuss her cases at all? (Phone records confirm Courtenay did not return any of Brown's calls). All Courtenay had to do was put off meeting with Brown until the filing deadlines expired, and with Brown having 2 cases coming to head at the same time with hearings each week, Brown – who wasn't aware of trial court rules – would understand. Since Brown was prevented from direct, live testimony, the trial court rules provided Courtenay with an excellent profit center - with little, if any, chance of reprisal. Courtenay's only risk was if the court made an exception and Brown was provided opportunity to be heard. Much to Courtenay's surprise, two such exceptions came into play.

**Injury #3:** The first opportunity came when Brown asked the judge for a long cause trial – to the strong objection of Courtenay. The judge granted Brown's request but inconveniently scheduled the trial for July 1st so that Brown was given only one week to prepare (the same week Brown had to also prepare for her eviction and loss of business which was scheduled for June 30 - the day before trial).

**Injuries #4, #5, +  . . . (refer to table below):** Courtenay refused to help Brown with stopping her eviction or preparing for trial. During the eviction, the Sherriff trespassed by turning over Brown's critical evidence and case information to Brown's adversaries (among other things) definitely NOT listed on the writ of possession. The following day, that information was used in front of courtroom doors to coerce Brown into signing Yunker's agreement and agree not to appear at trial. Courtenay, Yunker, and Albright knowingly ... corruptly persuaded ... with intent to cause Ms. Brown to withhold testimony and documents with specific intent to subvert and impede judicial fact-finding in a court proceeding.

### 42 U.S.C. § 1985 (2) Obstructing justice; intimidating party, witness, or juror

*If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully . . . or to influence the verdict . . . or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;*

**Duty Owed:** The right to representation, notice and due process when Yunker filed an ex-parte change of custody / abduction prevention orders on July 21, 2004. Such a request required personal service upon Brown - "service upon attorney is not sufficient" per FC 212. The order was granted on July 23rd.

**Breach #1**: Brown was not notified. Courtenay was notified of the ex-parte petition in sufficient time for either Brown or Courtenay to defend the action, but Courtenay denied receiving the notice when Brown called twice specifically asking if such a petition had been filed. (Courtenay was well aware of Brown's whereabouts as well as the District Attorney's authorization for Brown to take her child to a place of safety). But again, the following balance sheet finds the court equally at fault:

**Breach #2:** Through circumstances beyond her control, and without her knowledge, Brown's attorney failed to appear and failed to notify Brown of Yunker's ex-parte change of custody petition. By proceeding to execute the order when neither Brown nor her attorney were present (proof of service confirmed Brown was not notified), the trial court effectively deprived Brown of her right to counsel and deprived her of any opportunity, let alone a meaningful opportunity, to be heard. Failure to "attempt to give Brown statutorily required notice" of an ex-parte hearing is a structural defect requiring automatic reversal. (Cf. In re Jasmine G. (2005) 127 Cal.App.4th 1109, 1116.

**Injuries:** It was fundamentally unfair to terminate Brown's custody rights when she was legitimately protecting her infant and was not given opportunity to present critical evidence. By depriving Brown of a meaningful opportunity to be heard, the trial court placed the infant and the mother in harm's way, caused irreparable harm, eliminated basic protections necessary to ensure the reliability and legitimacy of proceedings, and became an abettor to Yunker's, Albright's, and Courtenay's criminal activities. And, the trial court denied Brown both her constitutional and statutory rights to due process of law.

If the trial court was concerned about delay the court could have appointed a different attorney for Brown, issued an order to show cause as to Attorney Courtenay's absence and imposed sanctions, or otherwise expressed displeasure with the attorney's failure to attend the hearing. Indeed, a court may utilize these or a number of other methods to deal with a theoretical "obstreperous party". What the court may not do is run roughshod over a parties' fundamental rights to notice and a meaningful opportunity to be heard, by proceeding to terminate custodial rights when neither the parent nor her attorney are present, where the parent has not waived the right to be represented by counsel or the right to be heard. The error is of such magnitude that it is structural - not only requiring automatic reversal, but the matter is void ab initio.

*'But-for' the trial court's interference with the tradition of due process, opportunities for criminal interference would not have been possible. While Courtenay commit fraud upon the court and Ms. Brown, the trial court committed fraud upon the administration of justice and its citizens.*

**Void ab initio (from the beginning): Structurally defective rules are unconstitutional**

*An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed. Norton, 118 U.S. at 442, 30 L. Ed. At 186, 6 S. Ct. at 1125. See People v. Gersch, 135 Ill. 2d 384, 399 (1990)*

While a judge or a court may issue orders to control their court, they have no lawful authority to issue any order which violates the Supreme Law of the Land. The first amendment to the U.S. Constitution states that all entities have the mandatory right of an adequate, complete, effective, fair, full, meaningful and timely access to the court. A judgment may not be rendered in violation of constitutional protections. The validity of a judgment may be affected by a failure to give the constitutionally required due process notice and an opportunity to be heard. Earle v. McVeigh, 91 US 503, 23 L Ed 398. The limitations inherent in the requirements of due process and equal protection of the law extend to judicial branches, so that a judgment may not be rendered in violation of those constitutional limitations and guarantees. Hanson v Denckla, 357 US 235, 2 L Ed 2d 1283, 78 S Ct 1228. A void judgment is not entitled to the respect accorded a valid adjudication, but may be entirely disregarded, or declared inoperative by any tribunal in which effect is sought to be given to it. It is attended by none of the consequences of a valid adjudication. It has no legal or binding force or efficacy for any purpose or at any place. ... It is not entitled to enforcement ... All proceedings founded on the void judgment are themselves regarded as invalid. 30A Am Jur Judgments '' 44, 45.

In this consolidated petition to vacate void orders, quash writ and return property, and writ of habeas corpus, Ms. Brown is specifically challenging the following orders as void for a multitude of reasons, and liability for the

resulting injuries they caused. The following is a snapshot as opposed to an outline, therefore representing a fraction of the problems contained in this document.

| Duty owed | Breach of duty | Injuries |
|---|---|---|
| January 2002<br>Case # D02-0148<br>Albright v Brown<br><br>**OSC was filed with intent to commit fraud** | **Chapter 3:** *Four months after Albright and Brown married, Albright decided to sell their respective properties. Albright netted $85,000 from his condo; Brown netted $240,000 from her home. The couple separated 1 month before the close of escrow on a new home purchase in 2000. The couple shared separate areas of the house for 10 months until Albright could move out. In January 2001, the couple had a paralegal work out the terms of their separation*<br><br>*If the property was sold, after realtor fees, capital gains, etc. were paid, Albright's property interest would be reduced to nothing Albright was certain the real estate market was going to crash and wanted out. Brown, not wanting to take a financial loss, decided to risk the real estate market. The parties agreed that Brown would keep the home and pay Albright back his $85,000 (less $10,000 owed to Brown) in 2-5 years when sufficient equity supported refinance. If after 5 years there was insufficient equity, Brown would sell the property, pay Albright $75,000, and absorb the losses. Albright kept Brown's share of retirement funds to offset interest payments and Albright was not entitled to property deductions since Brown owned the home. They signed an agreement and Albright filed in Contra Costa County for legal separation so they would no longer be responsible for each other's debts. From the date of original purchase, Brown made ALL the mortgage payments / taxes / insurance and paid for upgrades during the entire 4 years she owned the home. And . . . the real estate market did not crash - it flourished.* | |
| July 2004<br>Default Judgment<br><br>**Abuse of process Constitutional right to property violated** | **Chapter 4:** *Greed set in when Albright learned that the value of his former home increased substantially. One can only imagine Brown's surprise, to receive notice after 2.5 years that Albright had a default judgment entered against her. Brown hired an attorney who advised her that in order to present the evidence she owned the home she would have to first set aside the default.*<br><br>*The default judgment was an abuse of process since the default hearing was held 'ex-parte' - without notice and opportunity. Laws were also inequitably applied since required timelines for entering a default judgment had expired by 2+ years and Brown was not afforded the same time extension to respond. Brown is also challenges the constitutionality of default hearings without notice and opportunity when fundamental liberty interests are at issue <u>requiring</u> substantive due process. Further, if a judge determines whether a party is notified and a litigant requests the default, then default hearings without notice is governed entirely by will of men - rather than rule of law. Thus, the statutory default judgment violated Brown's constitutional right to property, substantially affecting the outcomes of BOTH trials.* | 1st Amendment<br>14th Amendment<br>Judicial bias<br>Laws inequitably applied<br>Ex-parte communications without notice |
| August 2004<br>Set aside default denied<br><br>**Abuse of discretion** | **Chapter 5:** *During the hearing to set aside the default, Albright admitted the sole property value he listed for Brown was incorrect in his original complaint - that he 'incorrectly guessed the value in his complaint – and agreed Brown's value should be much higher. Material evidence entered in error should have been sufficient to set aside the default. Instead, the judge allowed the default to stand as well as the incorrect values.* | |

**Motive:** For the sake of expediency (to ease the business of the court and relieve judicial caseloads), Contra Costa County enacted its own rules of court requiring parties to adjudicate matters through the exchange of written declarations. With the custody of children (Yunker v. Brown) and the disposition of a family's entire net worth at stake (Albright v. Brown), Brown's adversaries engineered a plan to insure instant victory.

**Weapon:** Since Contra Costa's "trials by written declaration" meant they were also "trials by mail", Brown's adversaries merely needed to intercept Brown's court documents. If Brown did not receive the documents she would not be able to respond. If Brown did not respond, court rules would not allow her to be heard in the courtroom. The matters would be treated as a default; based on hearsay rather than facts; without cross examination or presentation of facts; without review of the merits; and entirely one-sided. Brown's adversaries could be victorious with very little effort or risk.

**Opportunity:** Since Yunker was aware of Brown's mail delivery schedule; knew Ms. Brown's routine for mail retrieval; and a listening device was already in place offering real-time confirmation of Ms. Brown's whereabouts, plans, activities and conversations (later admitted by Yunker), opportunity quickly presented itself. Yunker no longer had access to Brown's home but he made sure bank statements were still sent to Brown's address. When Brown complained about Yunker parking up the street on a daily basis Yunker told the police he was watching Brown's home "out of concern for the welfare of his child". Unannounced police 'welfare checks' resulted, occurring weekly and bi-weekly for nearly 3 months until an officer caught Yunker listening in from 100 yards away. Welfare checks were immediately terminated and Brown advised to obtain a restraining order. Brown – confident in the legal system - felt restraining orders would only frustrate a hostile situation.

Aware something was amiss, Ms. Brown asked the court clerk for certified mail - but her requests were denied.

The crimes against Ms. Brown were simple, easy to achieve, and were afforded the most efficient protection one could hope for . . . a court judgment. Since a court judgment IS the law, normal remedies of assistance such as law enforcement, FBI, legal counsel; friends, relatives, or support structures were non-existent - because a court of law is THE highest authority. Due to Contra Costa's unlawful rules of court, Ms. Brown's could do nothing to stop her one-sided trials in which her adversaries were provided exclusive opportunity to say and do just about anything they wished.

**Judges should be ministers of peace, not abettors of crime;**

**Protecting the innocent, not suborning mendacity.**

| June 16, 2004 Eviction Hearing<br><br>**Void for personal jurisdiction, subject matter jurisdiction, and exceeded authority** | **Chapter 6:** *Excessive jurisdiction occurred during Brown's eviction trial in June 2004. Eviction, from a home she had 100% ownership interest, a home which Brown paid the entire $200,000 down payment and paid all the monthly insurance / mortgage payments  – a home which the judge also knew housed her successful sole proprietorship and was used to care for her dependant daughter. There are far too many problems to discuss in this brief preface, but suffice to say that Ms. Brown was instructed to wait outside courtroom doors throughout the entire hearing in which she was deprived of constitutionally protected rights to own a home and earn a living. Ms. Brown was only allowed into the courtroom to hear judgment. Not once was Ms. Brown afforded opportunity to provide material evidence that shows she was the sole owner of her home.* | 1st Amendment<br>6th Amendment<br>14th Amendment<br>Right to counsel<br>Last clear chance<br>Tortious interfer<br>Malpractice<br>Eggshell skull<br>Conversion<br>Perjury/Suborn.<br>Harassment |

| June 30, 2004 Eviction **Malicious use of process Trespass Obstruction Deprivation of Rights under color of law** | **Chapter 7:** *Two weeks later, Ms. Brown and her infant daughter were tossed onto the streets with 42 cents and the clothes on their back. Due to the Sheriff's trespass; Brown's personal property was stolen (divided among her 2 primary adversaries, Albright's realtor, and others), her successful proprietorship of 13 years – gone, her million dollar property – gone, her memoirs and photos – gone. Most importantly, all of her personal and business records, exculpatory evidence, pleadings, case information, witness names, contacts, and paperwork were now in the hands of her opponents with her custody trial scheduled the following day. Courtenay was 'unavailable' leaving it to Brown to stop her eviction and prepare for custody trial.* | 4th Amendment Great bodily harm Theft / Burglary IIED Invasion of priv. Assault Restr. of trade Detinue /Trover |

At this point Albright, Yunker, AND Courtenay all shared a unified motive: to keep Brown from testifying at trial July 1st.

| July 1, 2004 Custody Trial (case # D090004 Yunker v Brown) **Void Agreement: Forfeiture by wrongdoing** | **Chapter 7:** (Outside courtroom doors before trial). *Ms. Brown's case files – evidence - records – witness names – and case information (now in the hands of Brown's adversaries) was used to coerce, intimidate and threaten Brown into signing Yunker's custody agreement and agree not to appear or testify in trial. After Brown signed / dated the agreement and left, records indicate Courtenay and Yunker went back into the courtroom and told the judge Ms. Brown did not show up and her whereabouts was unknown. (Even though the signed custody agreement was signed and dated July 1st - it wasn't filed until July 9th).* | Obstruct. justice Threats Coercion Intimidation Persuading Witness not to testify Conspiracy |

**Chapter 8:** One week after her eviction, before the timelines for remedies to re-secure Brown's property expired, and while Ms. Brown was in a protective shelter, her home was sold. Since Brown did not sign off on the grant deed, she is still unable to find out who profited from some $500,000 of her equity. As a final blow, the same court that unlawfully evicted Ms. Brown, forced her and her infant into indigence, and sold her home 5 days later, turned around and took away her infant because the sale of her home was considered an indication of abduction.

**Chapter 8:** Exhibit B is a letter from the District Attorney - Child Abduction Unit, authorizing Ms. Brown to seek protective shelter for her infant due to Yunker's behavior leading up to and immediately following the July 1st trial. Yunker, Albright and Courtenay coerced Brown into signing Yunker's custody agreement and agree not appear in court. They all had something to gain by keeping Brown away – and a lot to lose if Brown could get in front of a judge.
Ms. Brown wishes to depose Danville Police Officer Sutherland who will verify visitation arrangements were known to Yunker BEFORE the ex-parte petition was filed; that he verified the District Attorney's authorization, witnessed Yunker's visitations, and determined Brown was in compliance with custody. And, that Yunker's petition was a complete fraud.

| July 23, 2004 Ex-Parte Change | **Chapter 9:** *Exhibit C indicates the court record where Ms. Courtenay received notice of Mr. Yunker's ex-parte change of custody / abduction request at 1pm on July* | 5th Amendment 6th Amendment |

| | | |
|---|---|---|
| of Custody with Abduction Prevention Orders and Supervised Visitation<br><br>**Void personal**<br>**Void subject matter jurisdiction**<br>**Void excessive jurisdiction** | *21st, yet Ms. Brown was not personally served or notified until 6:30pm, Friday July 23rd – AFTER Yunker picked up the infant for his regularly scheduled visitation – never to return. Brown was never charged with abduction yet she was punished for it, and double jeopardy prevents the sale of her home to be used for two distinctly different cases. Chapter 8 summarizes the many judicial acts prohibited by law in which a judge deprived Ms. Brown of a constitutionally protected liberty interest therefore subjecting both Ms. Brown and her infant daughter to irreparable harm - without due process, without notice, and without requiring a substantive showing of evidence (in Contra Costa – unsupported, hearsay statements was all Yunker needed). All the while . . . factual evidence already existing in the court record would have contravened every single hearsay statement made by Yunker – (if the judge had even glanced at the case file). Besides violating Ms. Brown's right to counsel and due process, perhaps a MINIMUM duty of care should include a cursory review of the facts before terminating parental rights and subjecting an infant to harm. (P.S. Paternity was never established).* | 8th Amendment<br>14th Amendment<br>Right to counsel<br>Kidnapping<br>Duty of care<br>Eggshell skull<br>Great bodily harm<br>Last clear chance<br>Legal<br>Malpractice<br>(IIED)<br>Perjury<br>Harassment |

To prevent Brown from appearing and presenting exculpatory evidence including the District Attorney letter, Yunker used the primary judge's leave of absence to prevent Brown from testifying. Litigants must sign a waiver agreeing or disagreeing to the pro-tem judge. If a party disagrees the matter is continued. Consequently, when Brown appeared Yunker disagreed to the pro tem. On two occasions when Brown was unable to attend a hearing and made prior arrangements with Yunker's attorney, Yunker suddenly agreed to the pro-tem persuading the substitute judge to make determinations including dropping Brown's cross complaint against the July 23rd order. At this point, Brown was very much aware of mail interference but was unable to do anything about it. Then, the court changed its computer system and stopped sending hearing notifications – instead relying exclusively on Yunker to mail Brown court info. This presented a whole new set of problems including late notice, false information, and wrong dates. As a final straw, when the court mediator used his official position to persuade a key witness not to testify and refused to look at Brown's exculpatory evidence – she gave up. Since state, federal and constitutional laws should have protected her, Ms. Brown knew that something was terribly wrong but not once considered the local rules of the county court. In the end, those rules 'estopped' Brown from presenting her case in both of her trials. Brown lost everything by which one measures their life, but she never gave up trying to figure it out. After reading the Elkins case in 2007, she finally got her answer.

*"Freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." (Santosky v. Kramer (1982) 455 U.S. 745, 753 (Santosky).) In an action to terminate parental rights, the private interest at stake is a parent's "fundamental" and "commanding" liberty interest in maintaining a parent-child relationship with the child. (Id. at pp. 758-759.) It is "' plain beyond the need for multiple citation' that a natural parent's ' desire for and right to "the companionship, care, custody, and management of his or her children" ' is an interest far more precious than any property right.*

| | | |
|---|---|---|
| April 10, 2004<br>Final Judgment | **Chapter 10:** *Surprisingly, final judgment permanently restricted Ms. Brown's contact with her daughter to supervised visitation (effectively terminating parental* | 1st Amendment<br>5th Amendment |

| Void Excessive Jurisdiction Void personal & subject matter jurisdiction Void for void July 23rd order | *rights) not due to abduction, but to substance abuse / neglect. Ms. Brown was not provided a hearing, she was not notified, she was never found guilty, and never even charged with a crime. Chances are good that Mr. Yunker, keenly aware of Contra Costa's lack of integrity and accountability, simply 'checked' the box for substance abuse instead of abduction (OOPS!) as the cause for Ms. Brown's supervised visitation requirement. (It was well known that judges sign-off on applications without review, the exception being pro se requests which were given a cursory review by clerk).* | 6th Amendment 8th Amendment (cruel & unusual punishment) 14th Amendment Right to counsel Defamation |
|---|---|---|

**Chapter 6:** Originally, a social worker found Yunker's allegation to DCFS 'unfounded'. Since the law requires corroboration before DCFS can substantiate substance abuse/neglect, three weeks later Yunker held a private meeting with the case worker wherein Yunker presented a falsified criminal history report for Brown. DCFS failed to independently verify Yunker's trumped up report and subsequently "substantiated" Ms. Brown - even though the investigating social worker stated in her report "no corroboration of drugs". Brown was not notified of this change, she did not receive the required notices of the appeal process, there was no hearing, there was no opportunity whatsoever for Brown to correct the error. Ironically, even with Ms. Brown being 'substantiated for substance abuse/neglect, both DCFS and the mediator still recommended the child remain with her mother. Brown was simply 'guilty' and the case closed. (Perhaps notices were 'intercepted' along with 80 other important documents Brown has verified as "missing").

Consider the following: "Case Closure: if the case decision found no need for follow-up services by CPS, or if the family and/or community has addressed all risk factors that lead to the provision of CPS case-management services, or if a family's rights to a child is terminated and the child has been adopted, then the case can be closed." In Ms. Brown's case, a person can be found guilty (substantiated) without consequence while DCFS is allowed to receive funding based on number of substantiated cases. **DCFS' practices violated Brown's 6th Amendment, 4th Amendment rights, and their failure to execute official duty directly resulted in Brown being charged and punished for a crime she did not commit.**

## Moral governors of communities should be held to higher standards

For the sake of a self-serving agenda, the Contra Costa County Superior Court enacted its own rules of court affecting due process, and a chance for an impartial hearing. Judicial officers - cloaked with immunity - were therefore able to disguise corrupt acts and acts expressly prohibited by law as routine judicial functions. Nether a court or its judges should be privileged to violate the rights of citizens unfortunate enough to find themselves in a biased, corrupt, or irresponsible court. When unjust injuries are inflicted by improper judicial acts, the court, its insurers, and judges should be forced to bear the cost of the wrongful act(s).

### A judicial power perverted to such uses should be speedily invaded.

*Clothed with the power of the state and authorized to pass judgment on the most basic aspects of everyday life, a judge can deprive citizens of liberty and property in complete disregard of the Constitution. The injuries inflicted may be severe and enduring. Yet the recent expansion of a judge-made exception to the landmark Civil Rights Act of 1871, chief vehicle for redress of civil rights violations, has rendered state judges immune from suit even for the most bizarre, corrupt, or abusive judicial acts.*

*This sweeping immunity doctrine is at odds both with American legal history and the Constitution. Constitutional supremacy dictates that it must bow before the American idea of procedural justice embodied in the guarantee of due process. Moreover, the immunity doctrine is inconsistent with the due process clause of the Fourteenth Amendment.*

*In the last decade this "doctrine of judicial immunity" has led to a disturbing series of legal precedents that effectively deny citizens any redress for injuries, embarrassment, and unjust imprisonment caused by errant judges The only 'check' against judicial abuse, is that immunity does not protect judges from acts expressly prohibited by law. The actions by the Contra Costa County Superior Court and its judiciary appear to be a convenient way to by-pass this last remaining restriction by shielding unlawful acts behind trial court rules. They broke the letter and spirit of the law, and along the way they invited crème and created danger. Public officials should not be granted such license to engage in abuse of power.*

**. . . If a court or its officers intentionally deprive citizens of a right, knowing them to be entitled to it, they should be guilty of a willful wrong which deserves punishment.**

- The Contra Costa County Sherriff, Court Mediator, and DCFS do not qualify for immunity since they knew that their "unofficial" (criminal) acts violated clearly established law directly in violation of Ms. Brown's constitutional rights. They merely took advantage of the already crippled county court system.
- What needs to be established by a jury, is the extent to which judicial immunity protects judges for acts prohibited by law. Under the current immunity doctrine, any act performed in a "judicial capacity" is shielded from suit. Stump v. Sparkman 435 U.S. 349, 360 (1978). An act is "judicial" if it possesses two traits: first, the act is one normally performed by a judge, and, second, the parties intended to deal with the judge in an official capacity. But is an act still "judicial" if it is expressly prohibited by state, federal, and Constitutional law - yet authorized by the local rules of the trial court?

## 42 U.S.C. § 1986: Action for neglect to prevent

*Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action.*

Should not judicial immunity be limited by due process similar to state courts, if not for constitutional dimension and obligation then at least for congruency?  Then, if the consequences of an 'unreasonable" violation of due process by a judge results in constitutional deprivation, then not only is the court without jurisdiction but the judge should be liable to suit for causing the injury. With opportunities for redress of injuries;

1. A minimum duty of care would require state courts and judges to respect fundamental aspects of justice.
2. Such a 'check' against abuse of power would increase public confidence in the administration of justice.
3. Judicial officers would provide the appropriate "check" against a court – such as Contra Costa County – from enacting rules of court contrary to due process and procedural fairness by stopping the problem before it wreaks havoc or destroys the lives of innocent citizens.

. . . It is better to invade the judicial power of the States than permit it to invade, strike down, and destroy the civil rights of citizens. It is high time to wipe out root and branch the judge-invented and judge-maintained notion that judges can do as they wish with impunity.

## Equal Protection for Family Law Litigants

*In Elkins v. Contra Costa County (2007) the Supreme Court responded. "Family law litigants should not be subjected to second-class status or deprived of access to justice. Litigants with other civil claims are entitled to resolve their disputes in the usual adversary trial proceeding governed by the rules of evidence established by statute. It is at least as important that courts employ fair proceedings when the stakes involve a judgment providing for custody in the best interest of a child and governing a parent's future involvement in his or her child's life, dividing all of a family's assets, or determining levels of spousal and child support. The same judicial resources and safeguards should be committed to a family law trial as are committed to other civil proceedings."*

The application of the equal protection clause constitutes a control on how various classifications (not only those based on race, but also those based on other attributes) can be legitimately used by the government. The issue of equal protection may arise when the government allows people in one classification to do a thing, but denies this right to people in another classification where there is no legitimate and applicable distinction between the classifications. Generally speaking, equal protection is intended to have the government treat people in comparable circumstances similarly. One of its purposes is to prevent discrimination.

It is Ms. Brown's contention that the problems Ms. Brown faced in Contra Costa County were an aggravated version of the overall family law landscape. Not only do her two cases represent "what a court ought not to do" and underscores the importance of due process, but it illustrates how perverted justice can be when laws are not equally applied to ALL litigants. Family law litigants are routinely served second-class justice. In other legal jurisdictions the crimes committed against Ms. Brown and her infant daughter would not have been possible, not even contemplated. This lack of integrity and accountability invites crime rather than protecting citizens. Fundamental justice should be equitably applied to all litigants regardless of jurisdiction and federal safeguards are needed both in the prevention of and consequences from state court lawlessness.  Equal pains and penalties would discourage attractiveness to commit crimes in jurisdictions where there are no investigators, no district attorneys, minimal protection, easy targets, high stakes, and little consequence. Examples:

1. Fourth Amendment should apply to DCFS and Law Enforcement agencies
2. Sixth Amendment should apply to DCFS
3. Federal Rules Evidence should apply to equally in family law trials
4. Prior to offering opinion / testimony in family law trials, mediators and DCFS should be qualified 'experts'
5. Clearly defined protocol and boundaries between police and DCFS official duties
6. Protocol / communication established between District Attorney – Child Abduction Unit and Family Law

Brenda Scott, in her study of CPS concluded, "Child Protective Services is out of control. The system, as it operates today, should be scrapped. If children are to be protected in their homes and in the system, radical new

The irony is unmistakable: those who are the guardians of the Constitution should not be privileged to violate it with corrupt impunity. Any damage inflicted on innocent citizens should not be borne by the victim. With power to abridge liberty and seize property, state-courts and judges are the masters of everyday life in America. They are capable of causing enormous and irremediable harm to someone who, like Ms. Brown, simply is not given a chance to protect his or her own interests before the judges irreparably abridges them. Therefore, Ms. Brown will be asking a jury of public opinion to decide if punitive damages should be awarded in order to reform and deter the defendants (and other government agencies, courts, and public officials) from pursuing similar actions.

| Collateral Damage: | $10 million | Home, business, daughter, future / lost wages, ruined credit, ruined life, etc. |
|---|---|---|
| Punitive Damage: | $40 million | Contra Costa Superior Court (MINIMUM for fraud equals 3 x collateral) |
| | | Court Mediator – Persuading witness not to testify / color of law / misconduct |
| | $10 million | DCFS - Falsifying evidence for profit |
| | $ 5 million | California State Superior Court failure to properly supervise, notify, deter |
| | $ 5 million | Contra Costa County Sherriff - destruction of evidence, records |
| | $ 5 million | Attorney malfeasance / fraud upon the court / conspiracy to defraud |
| | $20 million ?? | Judicial Malfeasance |
| | $20 million??? | Criminal negligence, willful blindness, recklessness |

❧

The Rule of Law asserts that men should not be trusted to govern others unless their rule is just, tempered by fixed laws to prevent tyranny, laws that keep those in high office from exercising power over the populace without restraint, laws that deny the majority power to act without due regard for the rights and well-being of individuals who are a minority, laws that prevent the powerful from plundering the weak. To this end, the state court rules became acts of despotism instead of an extending arm of justice. There's some officials around believe they can do anything they're big enough to do, no matter how it tramples on others' rights. That I don't favor. In some courts you can arbitrate - you can reason a thing out and settle it fair and square. Others figure to profit by what other people do, and I don't aim to stand by in silence. The line between good and evil, hope and despair, does not divide the world between us and them or your and I. It runs down the middle of all of us. I do not want your sympathy, I want your muscle. As the wagon driver said when they came to a long, hard hill, "them that's going on with us get out and push. Them that ain't get out of the way." If we sit secure at this hour, this day, it is because the walls of the law stand between us and evil. Jolt of the earth, terrorism, or even a violent upset in our own government can reduce all to chaos, leaving civilized men exposed as I am now.

Dated this 8th day of August, 2008


Lisa D. Brown
Pro Se Litigant
57 Ramona Road
Danville CA 94526

guidelines must be adopted. At the core of the problem is the antifamily mindset of CPS. Removal is the first resort, not the last. With in-sufficient checks and balances, the system that was designed to protect children has become the greatest perpetrator of harm" (Scott, Brenda (1994) Out of Control. Who's Watching Our Child Protection Agencies?)

### 42 U.S.C. § 1981 (a) (c): Equal rights under the law

*__Statement of equal rights__. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. __Protection against impairment__. The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.*

In response to Elkins v. Superior Court of Contra Costa County, on May 29, 2008 the Judicial Branch of California announced the Elkins Family Law Task Force - a new Statewide Panel to Improve Family Law Proceedings.

*"In the lives of the parties, the significance and importance of family law cases cannot be overstated. The courts have a vital role to play in these cases, where critical issues are involved. The parties deserve policies and procedures that can be understood and navigated, and the rules must ensure due process and the opportunity to be heard to ensure the trust and confidence of parties involved in family law proceedings."*

**Brown asserts federal standing to extend above protections to ALL family law litigants not just California.**

## Vicarious Liability: California State Supreme Court

*__Vicarious liability__ is the common law doctrine of the responsibility of the superior for the acts of their subordinate, with a duty to control the activities of a violator.*

There is something terribly wrong when the California Supreme Court discovered a system flaw and did not require any form of damage control. In the Court's own opinion, the Supreme Court pointed out the inherent disposition for prejudice, injury and deprivation contained in Contra Costa County's trial court rules and given that these unlawful rules governed trials over the course of several years – trials in which the disposition of a family's entire net worth and custody of children were at issue - they should have reasonably foreseen these unlawful trial court rules effected the lives of thousands of families; their futures and their safety. There is no quicker way to erode public confidence in our government, than failing to hold our courts and judicial officers accountable AT LEAST to the same standards they expect of us. When structural defects are discovered (such as in Elkins v. Contra Costa County Superior Court), a required minimum duty of care should have included sufficient notification to all potentially aggrieved litigants – especially those not represented by counsel. Cases currently being re-tried in Contra Costa County are parties represented by legal counsel – an acute disadvantage to pro se litigants not equally privy to a legal pool of information. (Ms. Brown 'accidentally' stumbled upon the Elkins case on the internet - one month later all links became 'unavailable'). If taxpayers pay for a product that is structurally defective – such as Contra Costa's trial court rules – then 'recall' notices should be sent to ALL potentially affected

litigants therefore affording equal opportunity to remedy court injustice. When court misconduct or disability is discovered, required notification procedures may also serve as a deterrent.

# Ex-Parte Writ of Habeas Corpus

*A writ of habeas corpus may be issued by federal court in every case where a party is restrained of their liberty without due process of law in the territorial jurisdiction of such courts; Ex parte Farley, 40 Fed 66; In re Neagle, 135, U.S. 1; 10 Sup.Ct. 658, 34 L.Ed. 55. Writ of habeas corpus, the great writ of liberty, has for many centuries been employed to remove illegal restraint upon personal liberty, no matter by what power imposed. It serves as an important check on the manner in which state courts pay respect to federal constitutional rights.*

A parent who has been denied custody of their child by a trial court may file a habeas corpus petition. On a petition for a claim of habeas corpus, the standard of review is "the narrow one of due process, and not the broad exercise of supervisory power." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974)).  In Brown v. Vasquez, 952 F.2d 1164, 1166 (9th Cir. 1991), cert. denied, 112 S.Ct. 1778 (1992), the court observed that the Supreme Court has "recognized the fact that`[t]he writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action.' Harris v. Nelson, 394 U.S. 286, 290-91 (1969).  Therefore, the writ must be "administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." Harris, 394 U.S. at 291. Ms. Brown is entitled to habeas relief based on:

1.  The trial court's legal and factual errors resulted in actual prejudice which affected judgment. O'Neal v. McAninch, 115 S. Ct. 992, 994-95 (1995).
2.  Judicial exposure to hearsay used as evidence, facts not in evidence, and the fact that Ms. Brown was deprived of her right to confrontation, cross-examination and assistance of competent counsel embodied in the Sixth Amendment. Dickson v. Sullivan, 849 F.2d 403, 406 (9th Cir. 1988); see also Jeffries v. Blodgett, 5 F.3d 1180, 1191 (9th Cir. 1993) (introduction of extraneous evidence during deliberations constitutes error of constitutional proportions), cert. denied, 114 S.Ct. 1294 (1994).
3.  Ms. Brown is entitled to relief since the trial court's constitutional errors of due process and procedural fairness had "substantial and injurious effect and influenced judgments." Brecht v. Abrahamson, 113 S. Ct. 1710, 1722 & n.9 (1993).
4.  Ms. Brown is challenging judgments since there is newly discovered evidence of fraud or misconduct by government officials. (See People v. Germany (2005) 133 Cal.App.4th 784.)
5.  Appeal is not an adequate remedy because facts necessary to resolve the problems do not appear in the court records. Habeas corpus allows Ms. Brown to bring in facts outside the record (contained in this document) to support a claim cognizable in habeas corpus and because the state court was without authority.
6.  In August 2007, the laws under which Ms. Brown's trials were adjudicated were declared unlawful.
7.  Ineffective assistance of counsel: Before her trials, Ms. Brown unsuccessfully attempted to meet with her attorney to discuss the basic aspects of her cases and to contest several serious issues which would have changed the outcome of the judgments.

8. Ms. Brown claims a number of witnesses could have testified favorably - including herself - if the trial court's rules had allowed her to appear in court, personally: in order to provide evidence (including exculpatory evidence and indisputable proof of falsified records), to cross-examine and impeach witnesses, to provide evidence of mail interference which compromised her ability to comply with the court's "trial by written declaration" policy, to point out facts already contained in the case files that would have changed the outcomes (judges were not required to read the case file or review the merits), and to provide factual evidence to dispute the hearsay declarations that the court relied on exclusively. Ms. Brown's attorney, her adversaries, and the court's unlawful rules fraudulently affected the administration of justice.

**Upon the issuance of a writ of habeas corpus involving the custody of children, the problem of custody need not be reached since both custody agreement and change of custody order are void on their face.**

# Right to effective assistance of counsel

For centuries, due process and the right to an impartial trial have been fundamental to natural justice. The right to life, liberty, and property chartered the standards that define the United States. They must therefore always be allowed the broadest of interpretation – and protection. The appointment of counsel is a constitutional imperative when, in the estimation of 'the court, in which the matter is pending,' fundamental fairness requires such appointment. (In re Meranda P. (1997) 56 Cal.App.4th 1143, 1154, fn. 6). On the other hand, there is a presumption that there is a right to appointed counsel only when personal freedom is at stake. Yet personal freedom, the right to own a home, the right to earn a living, and the right to raise children - all are fundamental liberties. Conversely, is not taking someone's business also taking away personal freedom? The constitution does not prioritize life, liberty or property, and when such liberties are ever at risk - fundamental fairness should require such an appointment.

Obviously, Ms. Brown is tap-dancing around serious and sensitive issues in front of the toughest of audiences. After all, the court system has things very much in hand and any who wish to discredit them had best examine their position with care. At first glance Ms. Brown may appear somewhat vexatious – her assertions overkill. However, the relative paucity of reported cases involving malfeasance in office - let alone a state court and its judiciary - has made this a tremendously daunting and overwhelming task for a pro-se litigant such as Ms. Brown. On the other hand, perhaps Ms. Brown has sufficient grounds to substantiate her claims and it was simply a matter of time before a case brought the inherent problems within family law litigation to the attention of the federal government. Somehow, someway, we must find a better way to balance the needs of families and children against individual liberties. Further, if Ms. Brown had been entitled to competent legal counsel before, during, or after she was deprived of constitutional rights and rendered indigent and powerless by the hands of the same court, this entire situation could have been prevented. In the very least, it would not have required 3 years for Ms. Brown to 'accidentally' discover the root of her problems by reading the Elkins case and another ten months to research, study and write this. It is Ms. Brown's hope that the federal government will share Ms. Brown's interest in ensuring that the legal process is one in which accurate and just results are achieved. Federal interest in constitutional welfare is best served by a hearing in which both Ms. Brown and the State are represented by counsel, without whom the contest of interest may become unwholesomely unequal

1   If this court is confident that pro se litigant Ms. Brown has successfully asserted her rights and provided sufficient
2   grounds to vacate sua sponte void judgments, it is possible that counsel need only be appointed to assist Brown
3   with a jury to determine liability for resulting injuries. If there are problems with this petition, it would be prudent
4   to allow her leave to revise this petition under advice of appointed counsel. Since Brown's evidence and records
    were compromised by the hands of state authority, and judgment (albeit one-sided) was already rendered, in the
5   interest of justice discovery and evidence for the defendants should therefore be limited to the documents
6   already contained in the existing two case files. Lastly, California courts have determined that an indigent party's
    right to the assistance of counsel is more than the right to have an attorney assigned to one's case. When due
7   process requires the appointment of counsel, the person represented is entitled to the effective assistance of
8   counsel; "otherwise ' it will be a hollow right.(In re Kristin H. (1996) 46 Cal.App.4th 1635, 1659.). Ms. Brown never
9   received due process. Ms. Brown has yet to have competent legal counsel. In the interests of justice, Ms. Brown is
    requesting competent legal counsel be appointed to assist her through this legal labyrinth.

10

11                          **42 U.S.C. § 1988 Proceedings in vindication of civil rights**

12      *(a) Applicability of statutory and common law. The jurisdiction in civil and criminal matters conferred on the*
        *district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in*
13      *the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with*
14      *the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where*
15      *they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and*
        *punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State*
16      *wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent*
17      *with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and*
18      *disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.*

19      *(b) Attorney's fees In any action or proceeding to enforce a provision of sections 42 USC 1981, 1981a, 1982, 1983,*
20      *1985, and 1986 of this title . . . the court, in its discretion, may allow the prevailing party, other than the United*
        *States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer*
21      *for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs,*
22      *including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.*
        *Expert fees In awarding an attorney's fee under subsection (b) of this section in any action or proceeding for 1981a*
23      *of this title, the court, in its discretion, may include expert fees as part of the attorney's fee.*
24

25   To determine whether a litigant has a constitutional right to counsel at any particular point during the
26   proceedings, courts evaluate and weigh the private interests at stake, the government's interest, and the risk that
    the procedures used will lead to an erroneous decision. (Lassiter, supra, 452 U.S. at pp. 31-34.) Yet it appears that
27   the government does not provide any viable means to secure legal counsel when protected constitutional
28   interests other than individual freedom is concerned, and especially considering Brown was rendered indigent
29   and without evidence - by the hands of unlawful state authority – Brown will also be asking for reasonable legal
    fees to be reimbursed for her time. In this federal petition Ms. Brown's interests are at their strongest, the federal
30

government's interests are at their strongest, the public's interests are at their strongest, the State's interests are at their weakest, and the risk of errors occurring has already been confirmed.

## Compensatory and Punitive Damages

***Reprehensibility factors*** *are used to determine punitive damages. A jury should closely examine the severity of the harm inflicted by defendants, the conduct of the defendants, and the wealth of the defendants in determining how to set an award that will punish and deter the defendants from inflicting further harm.*

*1)   The scale (pattern and practice) and profitability of the conduct*

*2)   Evidence of similar harm to others caused or threatened by the same conduct.*

*3)   Whether the harm was physical or economic*

*4)   Whether the conduct demonstrated indifference to or reckless disregard of the health or safety of others*

*5)   Whether the target of the conduct had financial vulnerability*

*6)   Whether the conduct involved repeated actions*

*7)   Whether the harm resulted from intentional malice, trickery, or deceit.*

When a court of law and its judiciary is involved, the reprehensibility factors listed above do not adequately embrace the unconscionable actions of a "runaway court". There is a responsibility to send a strong message to the courts to which we depend. From those who expect our courts to deliver an honest and fair accounting and to promote truth and justice. And for other innocent victims who are powerless to speak for themselves, Ms. Brown proposes additional considerations:

*8)   Absence of litigation remedies when a court empowers judicial malfeasance effecting due process.*

> *a.   Appeal is not a sufficient remedy since presentations of a party's facts do not appear on record when they are prevented from appearing.*
>
> *b.   Appeal is not a sufficient remedy since judges' were following trial court rules.*
>
> *c.   Judge recusal wouldn't work since the problem affected all judges.*
>
> *d.   Litigants, bound to their unlawful court through jurisdiction, had nowhere else to go.*

*9)   Criminal opportunities were made available by the court, corrupted by its own laws.*

*10)  Complete reliance on the integrity of judgments by law enforcement, government agencies, and society as a whole. People think what courts tell them to think, that's what power of authority does.*

*11)  The absolute power, control, and monopoly a court has over the lives of its citizens.*

*12)  The extraordinary fiduciary duty bestowed upon our courts and judicial officers by its litigants predisposed to believe they are getting justice.*

**The strength of the fiduciary duty between a government and its people is the single most important factor in determining public confidence in leadership . . . Can you think of anything more reprehensible than a court of law intentionally making its own rules designed to impede the judicial process? A government is only as strong as its weakest link.**

The irony is unmistakable: those who are the guardians of the Constitution should not be privileged to violate it with corrupt impunity. Any damage inflicted on innocent citizens should not be borne by the victim. With power to abridge liberty and seize property, state-courts and judges are the masters of everyday life in America. They are capable of causing enormous and irremediable harm to someone who, like Ms. Brown, simply is not given a chance to protect his or her own interests before the judges irreparably abridges them. Therefore, Ms. Brown will be asking a jury of public opinion to decide if punitive damages should be awarded in order to reform and deter the defendants (and other government agencies, courts, and public officials) from pursuing similar actions.

| Collateral Damage: | $10 million | Home, business, daughter, future / lost wages, ruined credit, ruined life, etc. |
| Punitive Damage: | $40 million | Contra Costa Superior Court (MINIMUM for fraud equals 3 x collateral) |
| | | Court Mediator – Persuading witness not to testify / color of law / misconduct |
| | $10 million | DCFS - Falsifying evidence for profit |
| | $ 5 million | California State Superior Court failure to properly supervise, notify, deter |
| | $ 5 million | Contra Costa County Sherriff - destruction of evidence, records |
| | $ 5 million | Attorney malfeasance / fraud upon the court / conspiracy to defraud |
| | $20 million ?? | Judicial Malfeasance |
| | $20 million??? | Criminal negligence, willful blindness, recklessness |



The Rule of Law asserts that men should not be trusted to govern others unless their rule is just, tempered by fixed laws to prevent tyranny, laws that keep those in high office from exercising power over the populace without restraint, laws that deny the majority power to act without due regard for the rights and well-being of individuals who are a minority, laws that prevent the powerful from plundering the weak. To this end, the state court rules became acts of despotism instead of an extending arm of justice. There's some officials around believe they can do anything they're big enough to do, no matter how it tramples on others' rights. That I don't favor. In some courts you can arbitrate - you can reason a thing out and settle it fair and square. Others figure to profit by what other people do, and I don't aim to stand by in silence. The line between good and evil, hope and despair, does not divide the world between us and them or your and I. It runs down the middle of all of us. I do not want your sympathy, I want your muscle. As the wagon driver said when they came to a long, hard hill, "them that's going on with us get out and push. Them that ain't get out of the way." If we sit secure at this hour, this day, it is because the walls of the law stand between us and evil. Jolt of the earth, terrorism, or even a violent upset in our own government can reduce all to chaos, leaving civilized men exposed as I am now.

Dated this 8th day of August, 2008

Lisa D. Brown
Pro Se Litigant
57 Ramona Road
Danville CA 94526

**The worst enemy is that which no one fears . . .**

In a movie classic, *The Third Man*, Harry Lime (Orson Welles) sold diluted penicillin. In the process, he killed or injured many people. Major Calloway explains this to Harry's friend, Holly Martins, and takes Martins into a hospital ward and shows him children who had died of meningitis after receiving some of Lime's under-strength penicillin. When Harry meets up with Holly in Vienna's celebrated Ferris Wheel they talk and Harry offers to bring Holly in on his racket. *In a famous scene, Lime points to dots (people) moving on the ground far below and asks Holly whether anyone would notice if one of the dots below them stopped moving?*

In California, the Contra Costa County Superior Court enacted and profited by a rule that diluted due process. In the process, they ran rough shod over justice forcing already distraught families to ride bareback through dangerous country. But for some, a serving of diluted due process was poisonous, compromising the integrity of the judicial system. Tampering with long established guidelines for procedural due process and federal rules of evidence was accomplished by a tribunal court no less, a superior court influencing the lives of the majority of population and representing the only measure of justice most will come to know. One who holds accountable the efforts of law enforcement, attorneys, and peripheral agencies. One whose opinion extends to all corners of society. For in the words of a judge lays the highest authority, and they are chiefly responsible for the unfair and far reaching prejudice that resulted   … not for the sake of serving some compelling state interest, but for a purpose that was self-fulfilling in its scope and profitability. It was a pattern and practice which targeted families within its jurisdiction, and the abusive indifference was used to abuse power outside its limited jurisdiction boundaries of family law. The Doctrine of Precedence provides the perfect breeding ground for the procreation of absurd lawmaking therefore we must protect the degree to which the due process clause can be eviscerated to shield the truly incompetent from the consequences of their errors.

It is one thing to feel like a dot in your own country and quite another to treated as a dot … by your local tribunal. Ms. Brown refuses … to become another dot that stopped moving by those whose very duty and obligation should have been to foresee the injuries diluted due process may cause, just as those injected with diluted penicillin trusted they were getting the real thing from a trusted source.

*A word here, a word there, and the choice might have been otherwise.*
*Upon such slender threads are the lives of men suspended.*

*e are a People who thrive on explanations, usually logical, simple explanations. If a dozen people are present, the one presented by the person with the most authority will be accepted. In the world of today, it is the courts and judges who preside within them that hold the most authority. This document is about a court creating hardship and devastating losses as acute and shocking as to be unendurable yet most people are inclined to ignore, as an intrusion, anything that does not fit into their previously conceived ideas of justice.*

## Vacate Void Ab Initio Court Orders and Findings

The facts underlying Ms. Brown's claims are sufficient to establish by both clear and convincing evidence and a preponderance of the evidence that but for fraud upon the court and unlawful Contra Costa County Superior Court rules and order, no reasonable fact finder would have found Ms. Brown guilty of the underlying offenses or the adjudicated judgments' and decisions that followed which are contrary to clearly established federal laws, principle doctrines of state legislature and corresponding statutes, and those which violate the Constitution of the United States.

CCP 473 (b) and FRE 60 does not limit the power of a court to entertain an independent action to relieve a party from judgments, orders, and proceedings; or to grant relief from lack of proper notice; or to set aside judgments for fraud upon the court. Ms. Brown has sufficient evidence to vacate judgments as void ab inito for all of those reasons subject to damages. In addition, this petition contains a showing of cause and actual prejudice, a showing of actual innocence, and the unavailability of efficient counsel. Failure to consider these claims will result in a fundamental miscarriage of justice.

Additionally, for the multiple reasons stated herein, the State of California Superior Court of Contra Costa County, Family Division, acted at all times without subject-matter jurisdiction. All of their orders were, and are, void ab initio. And, as with every jurisdictional failing the matter is void, subject to vacation with damages, and can never be time barred. The illegality of the conduct or the revelation of the real facts makes the entire situation illegal ab initio (from the beginning), not just from the time the wrongful behavior occurs.

As for timeliness, according to Federal Rule of Civil Procedure Rule 60 (b) "on motion and upon such terms as are just, the court may relieve a party from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgments are void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment", However, when a party has been prevented from coming forward as a witness (threats, inexorably intertwined cases, and newly released evidence of fraud upon the court by the court), the tolling of time does not begin until the threat is removed or fraud is discovered.

## Void ab initio: law of voids

**An agreement is said to be "void ab initio" if it has at no time had any legal validity.**

A party may be said to be a trespasser, an estate said to be good, an agreement or deed said to be void, or a marriage or act said to be unlawful, ab initio. In law, void means of no legal effect. The Latin phrase, void ab initio means "to be treated as invalid from the outset". An action, document or transaction which is void is of no legal effect whatsoever: an absolute nullity. This principle of law was stated by the U.S. Supreme Court as "Courts are constituted by authority and they cannot go beyond that power delegated to them. If they act beyond that authority, and certainly in contravention of it, their judgments and orders are regarded as nullities.

**There are very critical differents between void ab initio and voidable**.

Void ab initio can be said void to fail to comply with the fundamentals of contract at the beginning. In practical terms, void is usually used in contradistinction to voidable and unenforceable, the principal difference being that an action which is voidable remains valid until it is avoided. In other words, voidable confers validity until the date it is avoided versus a void order which nullifies the order from the beginning – as if it never happened. Courts have held that, since a void order is not a final order, but is in effect no order at all, it cannot be appealed. A void decision is not in essence a decision at all, and never becomes final

**A void order does not have to be declared void by a judge to be void.**

There is a misconception by some attorneys and judges that only a judge may declare an order void, but this is not the law: (1) there is no statute nor case law that supports this position, and (2) should there be any case law that allegedly supported this argument, that case would be directly contrary to the law established by the U.S. Supreme Court in Vallely v. Northern Fire & Marine Ins. Co., 254 U.S. 348, 41 S.Ct. 116 (1920). A party may have a court vacate a void order, but the void order is still void ab initio, whether vacated or not; a piece of paper does not determine whether an order is void, it just memorializes it. They are not voidable, but simply void, even prior to reversal". See also Old Wayne Mut. I. Assoc. v. McDonough, 204 U.S. 8, 27 S.Ct. 236 (1907); Williamson v. Berry, 8 How. 495, 540, 12 L.Ed. 1170, 1189 (1850); Rose v. Himely, 4 Cranch 241, 269, 2 L.Ed. 608, 617 (1808). Pursuant to the Vallely court decision, a void order does not have to be reversed by any court to be a void order.

**Motions to vacate void judgments may be made at any time after judgment**.

(County of Ventura v. Tillett, supra, 133 Cal. App. 3d 105, 110.). "[A] court may set aside a void order at any time. An appeal will not prevent the court from at any time lopping off what has been termed a dead limb on the judicial tree -- a void order." (MacMillan Petroleum Corp. v. Griffin (1950) 99 Cal. App. 2d 523, 533 [222 P.2d 69]; accord: People v. West Coast Shows, Inc. (1970) 10 Cal. App. 3d 462, 467 [89 Cal. Rptr. 290]; Svistunoff v. Svistunoff (1952) 108 Cal. App. 2d 638, 641-642 [239 P.2d 650]; and see: 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 7, pp. 4024-4025.)

# Chapter 1: Structural defect - void for fraud upon the court by the court

**The classic formulation of the void ab initio doctrine** is found in the early case of Norton v. Shelby County, 118 U.S. 425, 30 L. Ed. 178, 6 S. Ct. 1121 (1886). There, the Court considered whether an unconstitutional state statute that created a county board could give validity to the acts of the board. The Court answered in the negative, stating in relevant part:

> In Elkins v. Contra Costa Superior Court (2007), the California Supreme Court ruled "A trial court is without authority to adopt local rules or procedures that conflict with statutes or with rules of court adopted by the Judicial Council, or that are inconsistent with the Constitution or case law. In sum, local courts may not create their own rules of evidence and procedure in conflict with statewide statutes."

▶ In the cases of Yunker v. Brown (#D04-00009) and Albright v. Brown (#D02-00148), a court such as Contra Costa County Superior court, operating under a rule inconsistent with statute, Constitution and case law cannot confer validity to the acts of its officers of the court. The rule was not a law; it conferred no rights; imposed no duties; afforded no protection; created no office and was, in legal contemplation, inoperative as though it had never been passed. And, under the Norton Rule, it was void ab initio, i.e., void from the beginning.

*"The Court has broadly defined fraud as any conduct calculated to deceive, whether it be by direct falsehood or by innuendo, by speech or silence, by word of mouth, by look, or by gesture. Fraud includes the **suppression of the truth**, as well as the **presentation of false information**. (In re Witt (1991) 145 Ill.2d 380, 583 N.E.2d 526, 531, 164 Ill. Dec. 610)." It is clear and well-established law that any attempt by any officer of the court, whether attorney or judge, to deceive is considered fraud, and when the attempt to deceive occurs in a judicial proceeding, it is "fraud upon the court".*

᠅

# Chapter 2: Structural defect of court - void for lack of due process

A judgment of a court without hearing the party or giving him an opportunity to be heard is not a judicial determination of his rights. *Sabariego v Maverick*, 124 US 261, 31 L Ed 430, 8 S Ct 461, and is not entitled to respect in any other tribunal. "A void judgment does not create any binding obligation. Federal decisions addressing void state court judgments include Kalb v. Feuerstein (1940) 308 US 433, 60 S Ct 343, 84 L ed 370; *Ex parte Rowland* (1882) 104 U.S. 604, 26 L.Ed. 861: "A judgment which is void upon its face, and which requires only an inspection of the judgment roll to demonstrate its wants of vitality is a dead limb upon the judicial tree, which should be lopped off, if the power to do so exists." *People v. Greene*, 71 Cal. 100 [16 Pac. 197, 5 Am. St. Rep. 448]. "If a court grants relief, which under the circumstances it hasn't any authority to grant; its judgment is to that extent void." (1 Freeman on Judgments, 120-c.) An illegal order is forever void.

> In a recent case, Elkins v. Contra Costa County Superior Court (2007), the Supreme court found Contra Costa's rule unlawful: "a local rule of court provided that at trials in dissolution matters, "[d]irect examination on factual matters shall not be permitted except in unusual circumstances or for proper rebuttal. The Court may decide contested issues on the basis of the pleadings submitted by the parties without live testimony." (Super. Ct. Contra Costa County, Local Rules, former rule 12.5(b)(3), eff. July 1, 2005.) In addition, the rule provided that "[s]ubject to legal objection, amendment, and cross-examination, all declarations shall be considered received in evidence at the hearing." (Ibid.) Under the rule, a party's failure to file responsive pleadings, including declarations, in the time prescribed by the rules authorized the court to "permit the matter to proceed as a default," or order a continuance and impose a monetary sanction on the "untimely party." (Id., former rule 12.5(b)(4).) A trial scheduling order (TSO or order) imposed additional restrictions and sanctions. Like the rule, it ordered that all direct testimony at trial be presented prior to trial in the form of declarations "filed in lieu of oral direct testimony, subject to cross-examination." Indeed, even if a party's witness refused to sign a declaration, the party was required to file an unsigned declaration.

> The Supreme Court answered against Contra Costa County Superior Court:: "One of the elements of a fair trial is the right to offer relevant and competent evidence on a material issue. Subject to such obvious qualifications as the court's power to restrict cumulative and rebuttal evidence [citation], and to exclude unduly prejudicial matter [citation], denial of this fundamental right is almost always considered reversible error.

[Citations.]" (3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 3 pp. 28-29, italics added.) Ordinarily, parties have the right to testify in their own behalf (Guardianship of Waite (1939) 14 Cal.2d 727, 730), and a party's opportunity to call witnesses to testify and to proffer admissible evidence is central to having his or her day in court. (Kelly v. New West Federal Savings (1996) 49 Cal.App.4th 659, 677; see Spector v. Superior Court (1961) 55 Cal.2d 839, 843, 844.).

▶ Due process protects the individual so that statutes, regulations, and enforcement actions must ensure that no one is deprived of "life, liberty, or property" without a fair opportunity to affect the judgment or result. This protection extends to all government proceedings that can result in an individual's deprivation, whether civil or criminal in nature.

In 1934, the United States Supreme Court held that due process is violated "if a practice or rule offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental". Snyder v. Massachusetts, 291 U.S. 97, 105 (1934).

▶ There is unmistakably no greater tradition rooted in the conscience of our people than the right to have and raise a child, it is a liberty. The right to own and be secure in their property and not to be deprived of it without due process is also ranked as fundamental. Equally important, is the liberty to earn a living. Lastly, it is the right to be free from cruel and unusual punishment. Ms. Brown lost her home, her business, her infant daughter, and is currently being punished for a crime of which she was never even charged – all without ever having a day in court, an opportunity to heard and present evidence in her behalf, to address her accusers, or to cross-examine witnesses – all the fruits of Brown's life of achievement flushed down the drain in 3 weeks time . . . and this is merely an introduction to the injustices contained n this document.

"In the general course of human nature, a power over a man's subsistence amounts to a power over his will." Hamilton, in The Federalist No. 79, P. 491 (1818)

▶ Procedural due process is two-part: it includes BOTH the opportunity to be heard at proceedings AND to be adequately notified of the charges or proceedings. Contra Costa County Superior Court adopted a pattern and practice of dispensing significantly diluted due process targeted to a specific class of citizens - family law litigants - who continue to be afforded second-class justice and protection.

A practice or rule that deprives a person(s) of those rights ranked as fundamental without due process is an offence to justice. Furthermore, procedural protections provided by the Eighth Amendment to the United States Constitution guarantee reliable procedures that protect innocent people from being punished, which would be tantamount to cruel and unusual punishment (refer to sections 3, 5, 8, 9). Herrera v. Collins, 506 U.S. 390 (1993).

1. First, let's examine OPPORTUNITY to be heard. Opportunity to be heard includes both written testimony AND direct testimony. Historically, it has been well established that live oral testimony is the required opportunity to satisfy procedural due process, yet Contra Costa thought oral testimony took too much court time and therefore prohibited oral testimony in family court trials.

> *The following paragraphs reflect the opinion of the Supreme Court in Elkins v. Contra Costa County Superior Court published in August 2007 regarding Contra Costa's prohibition of direct oral examination:*
>
> "The historical pattern of a trial as an oral examination of witnesses in the presence of the trier of fact rather than an exchange of written declarations is reflected in Evidence Code section 711, which provides that "[a]t the trial of an action, a witness can be heard only in the presence and subject to the examination of all the parties to the action, if they choose to attend and examine." (Italics added.) Also in conformity with the historical form of a trial, Evidence Code section 780 directs the trier of fact to evaluate witness credibility by, among other methods, observing the witness's demeanor "while testifying" as well as his or her "attitude toward the action in which he testifies or toward the giving of testimony."
>
> "Permitting oral testimony rather than relying upon written declarations also is consistent with the historically and statutorily accepted practice of conducting trial by means of the oral testimony of witnesses given in the presence of the trier of fact. (See Evid. Code, §§ 711, 780; Code of Civ. Proc., §§ 2002, 2005.)
>
> Oral testimony of witnesses given in the presence of the trier of fact is valued for its probative worth on the issue of credibility, because such testimony affords the trier of fact an opportunity to observe the demeanor of witnesses. (Ohio v. Roberts (1980) 448 U.S. 56, 64.) A witness's demeanor is "part of the evidence" and is "of considerable legal consequence." (People v. Adams (1993) Cal.App.4th 412, 438; see Meiner v. Ford Motor Co. (1971) 17 Cal.App.3d 127, 140-141 ["[O]ne who sees, hears and observes [a witness] may be convinced of his honesty, his integrity, [and] his reliability . . . because a great deal of that highly delicate process we call evaluating the credibility of a witness is based on . . . 'intuition' "].) "
>
> "The testimony of witnesses given on direct examination is afforded significant weight at trial in ascertaining their credibility; cross-examination does not provide the sole evidence relevant to the weight to be accorded their testimony. "In a contested hearing, the precise words and demeanor of a witness during direct as well as cross-examination bears on the credibility and weight the trier of fact accords the witness's testimony. Moreover, observation of a witness on direct is important to the planning and execution of effective cross-examination." (Denny H. v. Superior Court (2005) 131 Cal.App.4th 1501, 1513- 1514.)"

2. Contra Costa County adjudicated cases based on the exchange of written declarations even though written testimony is substantially less valuable, constitutes hearsay, and deprives litigants of their 'day in court'.

> *(Cont'd from the Supreme Court's opinion in Elkins v. C.C. County Superior Court)*
> "Ordinarily, written testimony is substantially less valuable for the purpose of evaluating credibility. (Goldberg v. Kelly (1970) 397 U.S. 254, 269 ["Particularly where credibility and veracity are at issue . . . written submissions are a wholly unsatisfactory basis for decision"]; Rosenthal v. Great Western Fin. Securities Corp. (1996) 14 Cal.4th 394, 414 [" 'it's pretty difficult to weigh credibility without seeing the witnesses' "].) "A prepared, concise statement read by counsel may speed up the hearing, but it is no substitute for the real thing. Lost is the opportunity for the trier of fact and counsel to assess the witness's strengths and weaknesses, recollection, and attempts at evasion or spinning the facts . . . . [¶] . . . [W]ith a scripted statement, prepared and agreed to by one party in advance, comes the passage of time and with that lapse may come the party's unyielding acceptance of the script. Lost to cross-examination is the opponent's ability to immediately test and dissect adverse testimony." (*Denny H. v. Superior Court*, *supra*, 131 Cal.App.4th at p. 1514, italics omitted.)

> (Contra Costa's) "rule and order are inconsistent with various statutory provisions. We reach this conclusion because, pursuant to state law, marital dissolution trials proceed under the same general rules of procedure that govern other civil trials. Written testimony in the form of a declaration constitutes hearsay and is subject to statutory provisions governing the introduction of such evidence. Our interpretation of the hearsay rule is consistent with various statutes affording litigants a "day in court," including the opportunity to present all relevant, competent evidence on material issues, ordinarily through the oral testimony of witnesses testifying in the presence of the trier of fact."

3. Furthermore, consider the implications of the following portion of Contra Costa's local court rule in terms of fundamental fairness to litigants, the integrity of the judicial process, and the complicity of the court in the subornation of perjury . . . ?

> "Failure to provide a declaration because a witness refused to sign it shall not excuse the filing of [any] unsigned declarations."

4. The Court of Contra Costa didn't allow direct testimony or live cross-examination unless the parties stipulated to the admission of written declarations OR failed to object to hearsay. Not only did Contra Costa's rule violate procedural due process but it created an unusual burden on unassuming litigants expecting a trial to proceed traditionally, the way they were raised to believe – that trials include live testimony and direct examination of witnesses. It was therefore unreasonable to expect 'regular Joe' litigants to consider the need to file hearsay objections or to ask their attorney to file one. As a consequence, trials proceeded by written declarations . . . even though written declarations constitute hearsay and are inadmissible (with very few exceptions).

> *(Cont'd from the Supreme Court's opinion in Elkins v. C.C. County Superior Court)*
> "A local superior court rule and a trial scheduling order in the family law court provided that in dissolution trials, parties must present their case by means of written declarations. The testimony of witnesses under direct examination was not allowed except in "unusual circumstances," although upon request parties were permitted to cross-examine declarants."
>
> "The rule and order that were applied in the present case called for the admission of declarations in lieu of direct testimony at trial. It is well established, however, that declarations constitute hearsay and are inadmissible at trial, subject to specific statutory exceptions, unless the parties stipulate to the admission of the declarations or fail to enter a hearsay objection." (Evid. Code, § 1200; Lacrabere v. Wise (1904) 141 Cal. 554, 556-557 (Lacrabere); see also Estate of Fraysher (1956) 47 Cal.2d 131, 135; Fewel, supra, 23 Cal.2d at pp. 438-439 (conc. opn. Of Traynor, J.); Pajaro Valley Water Management Agency v. McGrath (2005) 128 Cal.App.4th 1093, 1107; Windingo Mills v. Unemployment Ins. Appeals Bd. (1979) 92 Cal.App.3d 586, 597; Reifler v. Superior Court (1974) 39 Cal.App.3d 479, 484-485 (Reifler); In re Estate of Horman (1968) 265 Cal.App.2d 796, 805.)
>
> "Although Code of Civil Procedure section 2002 provides that the testimony of a witness may be taken by affidavit, deposition, or oral examination, deposition testimony is admissible at trial only as prescribed by certain statutes not at issue in the present case. Moreover, affidavits (a term including declarations made under oath), as explained, constitute hearsay and are inadmissible at trial in the absence of stipulation or lack of objection, or as otherwise provided by law. The only remaining means recognized in Code of Civil Procedure section 2002 for taking the testimony of a witness is oral examination. In a provision that again reflects the historical form of the adversary trial in which live witnesses are examined in the presence of the parties and the finder of fact, oral examination is defined as "an examination in presence of the jury or tribunal which is to decide the fact or act upon it, the testimony being heard by the jury or tribunal from the lips of the witness." (Code Civ. Proc., § 2005)

"The Supreme Court concluded that Contra Costa's rule and order were inconsistent with the hearsay rule to the extent they render written declarations admissible as a basis for decision in a contested marital dissolution trial. Their conclusion is consistent with fundamental principles established in other statutes. All relevant evidence is admissible, including evidence bearing on the issue of witness credibility (Evid. Code, §§ 210, 351), and the oral testimony of witnesses supplies valuable evidence relevant to credibility, a critical issue in many marital dissolution trials."

5.  The Supreme Court also confirmed that Contra Costa's rule and order violated the principles of due process and placed unreasonable burdens on litigants due to their system of "trial by declaration".

    *(Cont'd from the Supreme Court's opinion in Elkins v. C. C. County Superior Court)*
    "Contra Costa Family law's local rule and order established a system of "trial by declaration" that violated due process principles and placed an "unreasonable burden" on litigants, the sanctions established by the rule and order were inconsistent with the policy favoring trial on the merits, and that their enforcement by the trial court constituted an abuse of discretion".

▶ We have established that the Court of Contra Costa County first diluted due process by limiting litigants "opportunity" for procedural due process. We will now examine the second element of procedural due process; the right to be adequately notified. There are fundamental flaws in the current method of notification by mail which unequally distributes legal burdens and access to justice between litigants often to the detriment of the party 'defending' an action, a cause, or any matter involved within a proceeding. These problems were intensified by Contra Costa County's rule and order since "trial by declaration" also implies "trial by mail". The overwhelming reliance on mail delivery and the unrealistic timelines affected fundamental rights and invited fraud. Both servings of Contra Costa's diluted due process distributed to family law litigants were enacted to satisfy self-serving and profitable court agendas.

1.  In family law trials, the custody of children and the disposition of a family's entire net worth make the stakes about as high as you can get. The higher the stakes, the higher the risk of foul play. Add to that, a jurisdiction devoid of investigators, limited law enforcement, and very few deterrence factors (punishment for crimes in family law jurisdictions is considerably less, if at all). In Contra Costa County, foul play was made even easier since all a party had to do was to interfere with the mail service of their adversary of which most family law litigants already had access. If a party didn't receive their court notifications, their adversary won . . . period. (Later, this document will explain just how easy this was accomplished).

    *   *It is a well-established fact that family court cases have an inherent predisposition for being emotionally charged.*
    *   *Unique to family court proceedings however, is that the likelihood that disputing parties have at some point had access to each other's mail is exceptionally high compared to any other legal matter. For instance, it may not look suspicious for a neighbor or postal carrier to notice a recently estranged spouse / domestic partner picking up mail from a home they previously occupied.*

- *The chance of being caught interfering with someone's mail is next to zero. In fact, local authorities told Ms. Brown she would have to catch her perpetrator on videotape. It is especially difficult when the perpetrator can claim he still receives mail at the former address.*

- *Equally difficult, is the ease in which such a party can have mail forwarded in behalf of their estranged partner. They also know key information such as passwords, social security numbers, checking account and credit card account numbers, driver's license numbers, mother's maiden name, grammar school name and mascot, favorite color, and name of first car owned.*

- *Ms. Brown will be providing circumstantial evidence of mail interference throughout this document. However, for the preservation of factual evidence such information will only be disclosed to authorities at the proper time. Suffice to say, there is overwhelming circumstantial evidence, factual evidence (banks, public agencies, court records), and witnesses including, but not limited to, Brown's postal carrier.*

2. Contra Costa's trial scheduling order (TSO) required declarations to be filed 10 days before hearings, responsive declarations filed 5 days before hearings. Five days for mail service, preparation, and filing responses is excessive, unfair and creates prejudice, injustice and bias (of course this is assuming the recipient does in fact receive the documents in the first place).

> *(From the Supreme Court's opinion in Elkins v. Contra Costa County Superior Court)*
>
> "The TSO directed the parties to file responsive declarations and exhibits five court
>
> days prior to trial, along with any objections to exhibits, as well as responsive briefs
>
> and any demands for the production of declarants for the purpose of cross-
>
> examination."

3. The trial court failed to consider contributing factors such as mail delivery time. The average delivery time for first class mail in San Ramon in 2004 was 7 days. Should not the court have reasonably foreseen that there exist inherent discrepancies in mail delivery dates hindering litigants' ability to properly prepare and proceed in a fair manner?

> *(cont'd from above)*
>
> "The TSO concluded with the following warning: "Failure to comply with these
>
> requirements will constitute good cause to exclude evidence or testimony at trial
>
> and/or to make adverse inferences or findings of fact against the non-complying
>
> party."

4. It is incredible that such an integral element to fundamental fairness such as notification relies on 'proof of mailing' instead of 'proof of receipt', especially considering 'proof of receipt' is readily available and easily obtainable. Proof of receipt versus proof of service equally distributes the burden of proof, guarantees receipt, and establishes concrete timelines.

- *Proof of service merely requires a party to sign an affidavit stating an item was mailed on a certain date. There is no proof that the recipient did in fact receive the document or what date it was actually received.*

Civil Rights, Constitutional Law, Evidence, Habeas Corpus, Government Contracts, Government Law - 33

- *Here's a question to ponder... how does one know they are missing mail unless they know they know in advance what it is they will be missing? And, even if the party finds out they are missing mail, there is absolutely no way to prove it. It sounds about as believable as "my dog ate my homework".*

- *In fall 2004, the Contra Costa Family Law courthouse changed their computer system. This change canceled court-generated notices of upcoming hearing dates. Instead, it was left to the petitioners in each case to notify all parties. On November 1, 2004, Yunker filed an affidavit confirming proof of service by mail to Brown. On November 20, 2004, Ms. Brown was sorting her mail. (Yunker knew Brown's long-time habit of discarding junk mail without review). While Brown was talking to her parents she randomly opened a few junk mail pieces – a rare event indeed. One of the envelopes was from an accounting services company. To her surprise, enclosed were her court documents. The postmark was dated November 14, 2004 (exhibit available). Ms. Brown's hearing date was less than one week away.*

5. Ms. Brown believes the court should have reasonably foreseen the potential for injustice, prejudice, and harm. At a glance, seemingly meaningless particulars have been interjected into state codes. Why? Because those laws, developed over hundreds of years and time-tested to protect its citizens, have been diluted or forfeited for the sake of expediency and profit.

▶ Parties to a legal proceeding should keep themselves abreast of matters involved in their case. Ms. Brown did just that. She called to find out when hearings were scheduled only to discover live testimony was not allowed. She even asked the clerk several times for certified mail service – all such requests were denied. Even though Brown tried to thwart her adversary's attempts to keep her from testifying, it was the Contra Costa Court who ultimately locked her out.

> *(Cont'd from the Supreme Court's opinion in Elkins v. C. C. County Superior Court)*
>
> "Failure to provide initial declarations may result in there being no direct testimony on that issue and issue sanctions may result. Failure to file a trial brief indicates to the court that no cases are being relied on by that side."
>
> "Contra Costa's local superior court rule and a trial scheduling order in the family law court provided that "parties must present their case by means of written declarations. The testimony of witnesses under direct examination was not allowed except in "unusual circumstances," although upon request parties were permitted to cross-examine declarants."

▶ While Contra Costa's intentions may have been to expedite cases and reduce rancor and adversarial confrontation during trial, they failed to take necessary precautions to protect parties who may be in hostile situations prior to and during trial by not allowing them to testify directly and orally before the trier of fact. In hostile situations, it is definitely not in the best interest of children and families to notify their adversaries in advance of what they intend to testify. As for the trial court's intentions, the following brief was included in the Supreme Court's opinion in Elkins v. Contra Costa County:

In their brief, the Northern and Southern California Chapters of the American Academy of Matrimonial Lawyers (Academy) argue that Contra Costa's local rule and order only increase the burden on the trial courts and further strain limited judicial resources, because it is more time consuming for the court to examine lengthy declarations than it is to listen to testimony, leaving courts "with two options: (1) spend more time than they have available at court to read the lengthy materials, or (2) just give the written materials a cursory review, and rule by 'guesstimate.' This is not a choice favored by litigants, lawyers, or judicial officers."

▶ Yet even in the best case scenarios, ruling on cases by 'guesstimate' is unmistakably not what the Constitution, the Supreme Law of the Land, had in mind. But, a 'guesstimate' would have been favorable to the justice Ms. Brown received as you will soon discover.

"Contra Costa Superior Court claimed in the Elkins case,"[f]irst and foremost" that efficiency and the "expeditious resolution of family law cases" support its rule and order. It also seeks to justify these requirements on the theory that they serve to reduce rancor and "adversarial confrontation between estranged spouses," and to assist the many self-represented litigants in the family law courts by "giving them direction as to how to prepare for trial, how to frame issues properly, and how to provide evidentiary support for their positions and . . . avoid being 'blindsided' by the adverse party."

▶ In Ms. Brown's case, the court's 'expediency' rule did the opposite of what it was designed to do. By shutting a critical door of justice – direct testimony – Contra Costa 'locked out litigants' . . . exposing Brown and her infant daughter to further harm and to continually be 'blindsided by adverse parties".

▶ If the burdens created by the Contra Costa's local rule and order were so "'onerous" they overwhelmed most attorneys, consider that AT THE SAME TIME Ms. Brown was simultaneously fighting 2 separate Contra Costa Family Division lawsuits, while trying to refinance her home, install upgrades (new carpets, new paint, new hardwood floors, crown molding), run her business full time AND care for her dependent infant full time . . . with absolutely no support and no assistance.

*(Cont'd from Elkins v. Contra Costa County)*

"The same brief characterizes as an "absurdity" Contra Costa's claim that the rule and order help self-represented litigants by describing in detail how they must prepare for trial. On the contrary, the brief claims, "[t]he burdens created by the local court rule and [order] are so onerous that they overwhelm most attorneys, let alone self-represented litigants."

● *If one adds the number of documents filed between the concurrent cases then Ms. Brown should have received between 1-2 notifications per week - per the signed affidavits of notice by mail. Suffice to say that out of those court appointments and filings Brown did receive, the times and/or dates don't match what was filed with the court.*

- *At the time Ms. Brown was caring for her infant daughter full-time (for a short time Yunker half-heartedly helped pay for a nanny but then fired the nanny as soon as he filed his custody suit), Ms. Brown was also trying to singlehandedly run her business which normally required a minimum of 2 full time and 1 part-time employees. Business associates, clients, and potential helpers were repeatedly warned away by Yunker who parked up the hill monitoring Brown's every move. Yunker could correctly recite which garbage cans were put out each week – for six weeks straight. Yunker knew which sprinklers were or were not working properly even though they were programmed daily at 6am for watering. Yunker purchased the same brand baby monitor that was used inside the house to listen to Brown's private plans and affairs simply by adjusting it to the same frequency as used inside the house. He used the information gleaned from phone conversations to further his case, Albright's case, and to isolate her from friends and relatives. Brown installed a peephole in her garage so she could see if the 'coast was clear' in order to run errands. Brown ordered groceries online, put up sheets to cover vaulted windows that opened to the street to shield Yunker's view from his truck up the street and covered her backyard windows to not see his silhouette in the night. For Ms. Brown life was a constant survival struggle. And, as you will see, the burdens created by the Contra Costa's local rule and order were not only "'onerous", they were unconscionable.*

## Void ab initio # D04-00009 & #D02-00148 : Procedural Due Process and Personal Jurisdiction

▶ The trial court applied the sanction provision of its unlawful local rules in a mechanical fashion without considering alternative measures for notification. And since direct testimony and live cross-examination were not allowed Ms. Brown was deprived of a fair opportunity to affect the judgment or result. Had the court permitted Ms. Brown to testify directly to the court or approved her certified mail requests, she could have provided evidence and witnesses to rebut claims against her and avoided the loss of constitutionally protected liberties; her home, her business, her evidence, and her daughter. In applying the local rule and order mechanically to exclude all of Ms. Brown's evidence — and proceeding, in the words of the trial court, "by default" — the trial court improperly denied Ms. Brown access to present her case to the court, thereby depriving the court of personal jurisdiction and rendering all orders and suborders void from the beginning.

> Only an inspection of the record of the case showing that the judge was without
> jurisdiction or violated a person's due process rights, or where fraud was involved in
> the attempted procurement of jurisdiction, is sufficient for an order to be void

▶ Since default judgments are offered as a remedy only when proof of personal service has been verified, Ms. Brown is challenging the court to provide evidence of personal jurisdiction each time it allowed itself to proceed 'by default' either by statutory default judgment or under its own self-imposed authority in Brown's cases. Where a jurisdictional challenge is made, it is upon the court to provide evidence it did have jurisdiction. An affidavit of mail service signed and dated by Brown's adversaries is not sufficient. Proof of receipt of mail or proof by personal service confirming Brown was personally notified and also indicating the actual date she was notified must appear on the face of the record in order to show the court secured personal jurisdiction. If there is a jurisdictional failing appearing on the face of the record, the matter is void, subject to vacation with damages, and can never be time barred. Absent such a showing, all judgments are void from the beginning and hold no authority in any jurisdiction.

# Chapter 3: Albright v. Brown - OSC filed with intent to commit fraud

Prior to the commencement of case no. D02-00148 in January 2002, Albright and Brown had privately agreed as to the disposition of their community property and the terms of their separation. In accordance with their agreement, Albright informed Brown he would file for legal separation with the court so that neither party would become liable to each other in the future. Albright cautioned Ms. Brown that she would be served court papers and not to be worried about filing asset declarations since the parties had already agreed as to the disposition of their assets.

▶ **Situation:**
*In January 2002, Albright told Brown he wanted to file for separation officially with the court for the financial protection of both parties. Albright and Brown had been separated for over a year. Since Albright recently changed careers, was not expected to earn much money the first year, and was already obligated to pay rent on a house shared with 3 friends, he could not afford the mortgage payment. Albright did not want a court battle since neither party could afford attorney fees, nor had they ANY equity in their home. Since the marriage lasted only 9 months the parties had little to dispute (they officially separated at 15 months and made their agreement 1 year after that).*

    a) **Concerns:**
*If the home Albright owned with Brown was sold at that time, Albright would lose his original investment of $75,000 ($85,000 less $10,000 owed to Brown for Albright's share of wedding expenses) for reasons explained below. Although neither party wanted to take over the hefty mortgage payments, neither wanted to sustain considerable financial losses due to the following:*

        ✓ *The parties would be subject to capital gains tax since their home had not been a primary residence for the required 2 years (11 months for Albright, 15 months for Brown at the time of agreement).*
        ✓ *Since they purchased the home for $25,000 over the market price, they would lose the $25,000.*
        ✓ *The couple added $30,000 in upgrades which would be an immediate loss instead of a future gain.*
        ✓ *Realtor fees of approximately $45,000 would present an additional loss.*

    b) **Additional concerns:**
        ✓ *Brown had considerable home-related charges on her credit cards of which Albright owed half*
        ✓ *Albright owed Brown half of his $1,000/month support payments for a child secretly withheld from Brown through the marriage.*
        ✓ *Albright was concerned that if EDD found out he was able to afford renting a property in addition to owning a property, his child support payments would increase.*

▶ In the end it was agreed that Albright would keep their retirement and Brown would retain the equity in their home. Brown would pay Albright his original sole property interest of $75,000 in 2-5 years - when their newly purchased property had sufficient equity. In the end, both parties would come out

of the very short marriage in nearly the same financial positions as when they entered into the marriage. The agreement was based on the following;

**c)  Agreement**

- ✓ *Albright would keep retirement accounts and Brown would keep the home and home equity - all Albright wanted was the money he came into the marriage with to be paid back in 2-5 years.*
- ✓ *Since Brown had wanted to annul the marriage based on fraud (not discussed in this document), they agreed Brown would keep everything they acquired throughout their short marriage especially since Brown paid for it – excluding wedding gifts.*
- ✓ *Brown would also keep Sara and Shasta - the family dogs.*

To outsiders Albright's offer appeared generous, by design. Albright frequently boasted, "I let her have everything . . . all I asked for is my original money back". In reality, if one considers that at that time Albright's original money was worth zero, it was actually quite generous of Ms. Brown to extend herself in his behalf especially after the financial overhaul Albright had already put her through.

From the time they were engaged, and Albright moved into Brown's home (Albright rented his condo and kept the proceeds), Brown had been paying ALL the monthly bills – mortgage payment, utility bills, the works. While Brown put her earnings into her home and sole proprietorship, Albright put his half of the couple's expenses into 'their' retirement. Considering Brown made 100% of all monthly bills and mortgage payments throughout their relationship plus upgrades, furniture, etc. Brown was left with 2 choices:

1. ***Sell the home.*** *Sustaining considerable investment losses would render the value of Albright's share at zero – with insufficient funds to repay Brown – in addition to Brown's investment interest which although not a total loss would be considerably reduced. Hence, a double loss for Brown in addition to an expensive a court battle for the remaining retirement and IRA monies held by Albright.*
2. ***Keep the home.*** *Brown would have a chance at re-securing her investment and would keep the things she paid for. Albright would keep their retirement. No court battles. No splitting up Brown's credit card receipts, mortgage payments, insurance, and monthly bills. The only thing unequal about the deal is that Albright's position was much improved since he didn't pay rent or a single bill during the relationship. Brown on the other hand would improve her position only if the real estate market continued its remarkable growth. But this option allowed the parties to go on with their lives (the following 1.5 years passed without a word). And for Ms. Brown, this option was preferable to prolonging the humiliation Albright's fraudulent marriage already caused.*

Albright was concerned that California's over-inflated real estate market was overdue for a 'crash'. By making this agreement with Brown, Albright could re-secure his $75,000 in 2-5 years time instead of losing it entirely. He would avoid paying capital gains tax since the IRS would assume he still lived there, his child support payments would not increase, and most importantly Brown would sustain all financial losses by taking the real estate market risk. Albright knew a family friend/attorney who could file the docs free of charge to make the separation legal. Albright warned Brown that she would be served with papers but it was merely a formality. Financial statements would be included but not to worry since they had worked out the disposition of their assets. (It wasn't until much later that Brown discovered records of several other accounts of considerable value not disclosed to Brown).

**d) Proof by Witness**

*Albright made himself out to be a martyr - only asking for what he came into the marriage with. It would not be difficult to get twenty affidavits stating the terms of their agreement.*

**e) Proof by Performance**

*Even though evidence of the written agreement was compromised by Contra Costa County (sections 5 and 6), the considerable efforts and sacrifices the wife employed by significantly reducing her social life and doubling her work week hours in order to make the mortgage payments, combined with substantial renovations and upgrades performed without consent or financial assistance from Albright shows substantial performance of the parties' agreement and satisfies the evidentiary function of the writing requirement of section 852. Even more compelling is the original tax returns and stipulations made to the parties' accountant which confirms Albright and Brown's agreement; that Brown owned the home exclusively therefore Albright would not be taking property deductions effective August 1, 2001. (Albright later amended his tax returns 4 months before fraudulently seizing Brown's property in June 2004 – reviewed in section 5. However, unless the accountant is on Albright's payroll, he should be a credible witness).*

> 1584. Performance of the conditions of a proposal, or the acceptance of the
>
> consideration offered with a proposal, is an acceptance of the proposal.

▶ ESPECIALLY where evidence of written agreement was destroyed by the Sherriff under unlawful authority of the court (explained in section 5), to refuse to grant Brown relief from section 852 where both parties' substantially performed on the agreement and Brown detrimentally changed her position in reliance thereon would result in a harsh and unconscionable loss.

> Section 852 does not expressly preclude application of the traditional exceptions to the statute of frauds. The legislative comments to section 852 indicate that the ordinary rules and formalities applicable to real property transfers remain applicable to transmutations of real property between spouses. The doctrine of partial performance may be applied in proper cases and exempt oral marital transmutation agreements from the application of section 852. (Section 852 precludes the admission of extrinsic evidence to prove an oral transmutation of property between spouses.)
>
> Although the Legislature intended "to invalidate all solely oral transmutations," the couple's oral agreement here does not solely involve an oral transmutation.
>
> (*MacDonald, supra,* 51 Cal.3d at p. 269.) It involves an express written transmutation with a contemporaneous oral promise to waive husband's interest in community property including their single family residence in exchange for the amount of his original separate property interest.

► It is important to mention that if Albright's real estate predictions came true, he would be able to live 'foot-loose and fancy free' devoid of mortgage and maintenance obligations until Brown hit financial catastrophe. Then, Albright could take back the house, keep the retirement, AND Brown would still owe him $75,000 as per written agreement. The motivation for entering into the marriage in the first place would finally be realized . . . prosperity.

California requires interspousal transmutations to be shown by a higher standard of proof, i.e., clear and convincing proof, which alleviates many problems of perjury. (*In re* Marriage of Weaver (1990) 224 Cal.App.3d 478, 486-487.) Section 851 ensures that any agreement between spouses will be carefully scrutinized to ensure creditors' rights are protected. Section 721 requires spouses to be bound by the highest good faith and fair dealing in their transactions with each other, and classifies the relationship as fiduciary, subject to the same rights and duties of nonmarital business partners. Sections 851, 721, and 852 work together to ensure the integrity of interspousal agreements as they relate to the affected spouses, creditors, and third parties. While these code sections indicate an increasing preference for formalities in interspousal contracts, their presence coupled with the higher standard of proof allows for a pragmatic interpretation of section 852 that comports with other statutes of frauds. Applying the traditional exceptions to the statute of frauds to section 852 allows agreements between married persons to be treated identically to those between unmarried persons. It effectuates the intent of the Legislature and recognizes that husbands and wives are not formal in all of their dealings, just as unmarried persons are not always formal or clear in their dealings.

► Needless to say, Albright's real estate predictions did not come true and although Brown came close to financial catastrophe, she survived. The real estate market continued to flourish as well as Brown's equity. Albright's agreement based on selfish interests turned into a greedy game of revenge; Albright's weapon of choice . . . would be the 'compromised' Contra Costa County Superior Court; and Albright's accomplice would become James Yunker. After all, 'the enemy of my enemy is my friend' is one of the oldest motives known. And this . . . is where Ms. Brown's fateful journey begins.

ॐ

# Chapter 4: Albright v. Brown - Void for personal jurisdiction

While a judge or a court may issue orders to control their court, they have no lawful authority to issue any order which violates the Supreme Law of the Land. The first amendment to the U.S. Constitution states that all entities have the mandatory right of an adequate, complete, effective, fair, full, meaningful and timely access to the court.

> A judgment may not be rendered in violation of constitutional protections. The validity of a judgment may be affected by a failure to give the constitutionally required due process notice and an opportunity to be heard. Earle v. McVeigh, 91 US 503, 23 L Ed 398.h  See also Restatements, Judgments ' 4(b). Prather v Loyd, 86 Idaho 45, 382 P2d 910. The limitations inherent in the requirements of due process and equal protection of the law extend to judicial as well as political branches of government, so that a judgment may not be rendered in violation of those constitutional limitations and guarantees. Hanson v Denckla, 357 US 235, 2 L Ed 2d 1283, 78 S Ct 1228. A void judgment is not entitled to the respect accorded a valid adjudication, but may be entirely disregarded, or declared inoperative by any tribunal in which effect is sought to be given to it. It is attended by none of the consequences of a valid adjudication. It has no legal or binding force or efficacy for any purpose or at any place. ... It is not entitled to enforcement ... All proceedings founded on the void judgment are themselves regarded as invalid. 30A Am Jur Judgments " 44, 45.
>
> It is a fundamental doctrine of law that a party to be affected by a personal judgment must have his day in court, and an opportunity to be heard. *Renaud v. Abbott*, 116 US 277, 29 L Ed 629, 6 S Ct 1194. Every person is entitled to an opportunity to be heard in a court of law upon every question involving his rights or interests, before he is affected by any judicial decision on the question. Earle v McVeigh, 91 US 503, 23 L Ed 398.

## 1. Albright v. Brown: Void for substantive due process

▶ In addition to Ms. Brown's complaints that Contra Costa County's trial court rules violated procedural due process, Ms. Brown is challenging that default judgments violate the 5th and 14th amendments to the constitution when substantive due process is required. Default judgments are also inherently contrary to the rule of law and fail to provide equal protection to distinct classes of litigants. A state law of default cannot violate the Constitutional protections of the United States.

"This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."

▶ Ms. Brown is aware that such a federal challenge would dramatically impact the states in which community property presides and default judgments may subsequently depend. Yet it is unreasonable not to address the issue simply by creating a compelling government interest to justify procedures that were inherently wrong to begin with. The United States Supreme Court asserted that although the legislature can avoid a measure because it approaches the confines of the Constitution, the judiciary cannot. Furthermore, that while a Court will not take jurisdiction if it should not, equally true is that it must take jurisdiction if it should. And although family law litigation may be a subject the Court would gladly avoid, Ms. Brown asks that the Court exercise their best judgment and conscientiously perform their duty.

Cohen v. Virginia: It is most true that this Court will not take jurisdiction if it should not; but it is equally true that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the Constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given than to usurp that which is not given. The one or the other would be treason to the Constitution. Questions may occur which we would gladly avoid, but we cannot avoid them. All we can do is to exercise our best judgment and conscientiously to perform our duty. In doing this on the present occasion, we find this tribunal invested with appellate jurisdiction in all cases arising under the Constitution and laws of the United States. We find no exception to this grant, and we cannot insert one.

U.S. v. Will: Chief Justice Marshall's exposition in Cohens v. Virginia, 6 Wheat. 264 (1821), wrote, "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid; but we cannot avoid them." Id., at 404

▶ Customary to family law litigation, fundamental liberties are often at risk such as property rights, parental rights, and disposition of an individuals entire net worth. Ms. Brown was deprived of her home, her business, her evidence . . . then her daughter, then punished for crimes she was never charged with, placed in harm's way and subjected to irreparable harm. Life, liberty, and property . . . without evidentiary basis . . . without factual findings . . . based entirely on hearsay . . . without review of the merits . . . and

without Ms. Brown ever having her day in court at any time – in any of her cases. Therefore Ms. Brown qualifies for federal standing to assert her claim:

**Constitutional requirements for Federal Standing:**

1) **Causation:** *State laws, unequally applied, prevented Ms. Brown from receiving due process. Without substantive due process protection, Brown could not introduce material evidence which would have deprived the court of jurisdiction*
2) **Injury:** *Ms. Brown suffered actually (and others may suffer imminently) an invasion of legally protected interests which were concrete and particularized, distinct and palpable, not abstract. The injuries were economic as well as non-economic.*
3) **Redressability:** *Even though Ms. Brown is challenging a more generalized level of government action and the invalidation of which would affect all states, a favorable outcome is necessary to achieve harmony with the United States Constitution.*

**Prudential limitations:**

4) **Third party interest:** *The injury alleged is directly traceable to government conduct.*
5) **Specific, not generalized grievance:** *Ms. Brown's injury is widely shared with many people but in a differentiated way.*
6) **Zone of Interest Test:** *Ms. Brown is within the zone of interest protected by constitutional provision.*

▶ For a substantive due process claim to prevail it must satisfy the following analysis:

**Judicial review of substantive due process violations**

When a law or other act of government is challenged as a violation of individual liberty under the Due Process Clause, courts nowadays primarily use two forms of scrutiny, or judicial review. This inquiry balances the importance of the governmental interest being served and the appropriateness of the government's method of implementation against the resulting infringement of individual rights. If the governmental action infringes upon a fundamental right, the highest level of review—strict scrutiny—is used. In order to pass strict scrutiny review, the law or act must be narrowly tailored to further a compelling government interest. Most courts have viewed the due process clause, and sometimes other clauses of the Constitution, as embracing those fundamental rights that are "implicit in the concept of ordered liberty" (*Palko v. Connecticut*). Just what those rights are is not always clear. Some of these rights have long histories or "are deeply rooted" in American society.

In Washington v. Glucksberg, Chief Justice Rehnquist described the framework for substantive due process analysis. "Our established method of substantive-due-process analysis has two primary features:

1. First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, "deeply rooted in this

Nation's history and tradition," and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed."

2.  Second, we have required in substantive-due-process cases a "careful description" of the asserted fundamental liberty interest. Our Nation's history, legal traditions, and practices thus provide the crucial "guideposts for responsible decision making," that direct and restrain our exposition of the Due Process Clause. As we stated recently in Flores, the Fourteenth Amendment "forbids the government to infringe . . . 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest".

1.  Default judgments for the sake of expediency do not meet the strict scrutiny test as serving a compelling government interest.

> In Elkins v. C. C. Superior Court (2007), the Supreme Court stated in their opinion: "The Trial Court Delay Reduction Act did not elevate delay reduction over the right of a litigant to present his or her case to the court, nor was delay reduction favored over deciding cases on the merits. " 'Cases filed in California's trial courts should be resolved as expeditiously as possible, consistent with the obligation of the courts to give full and careful consideration to the issues presented, and consistent with the right of parties to adequately prepare and present their cases to the courts.' Thus, in establishing delay reduction programs, the Legislature recognized *competing* public policy considerations and 'attempted to balance the need for expeditious processing of civil matters with the rights of individual litigants.'" (Garcia, supra, 16 Cal.4th at pp. 479-480)

> "As stated by an appellate court in 1943 with reference to a trial court's refusal to permit a witness to testify in a marital dissolution matter: "We are fully cognizant of the press of business presented to the judge who presides over the Domestic Relations Department of the Superior Court . . . and highly commend his efforts to expedite the handling of matters which come before him. However, such efforts should never be directed in such manner as to prevent a full and fair opportunity to the parties to *present all competent, relevant, and material evidence* bearing upon any issue properly presented for determination. Matters of domestic relations are of the utmost importance to the parties involved and also to the people of the State of California. . . . To this end a trial judge should not determine any issue that is presented for his consideration until he has heard all competent, material, and relevant evidence the parties desire to introduce." (Shippey v. Shippey (1943) 58 Cal.App.2d 174, 177)

2. Procedural default judgments should not 'trump' substantive due process. When fundamental liberties are potentially at risk (primarily in criminal and family law litigation) and unless factual evidence shows beyond a reasonable doubt that unforeseeable circumstances - foul play, unfair prejudice, uncontrollable circumstances or arbitrary forces of nature have not played a role in the party's failure to proceed, inference should not be made to the contrary. We are to be governed by the rule of law . . . not of men, or wherever the wind blows. The constitution does not read, "No State shall deprive any person of life, liberty, or property, without due process of law – unless a default judgment has been ordered."

> **In law, a default** is the failure to do something required by law or to appear at a required time in legal proceedings. For example, when a party has failed to file meaningful response to pleadings within the time allowed, with the result that only one side of a controversy has been presented to the court, the party who has pleaded a claim for relief and received no response may request entry of default. In some jurisdictions the court may proceed to enter judgment immediately: others require that the plaintiff file a notice of intent to take the default judgment and serve it on the unresponsive party. If this notice is not opposed, or no adequate justification for the delay or lack of response is presented, then the plaintiff is entitled to judgment in his favor. Such a judgment is referred to as a "default judgment" and, unless otherwise ordered, has the same effect as a judgment entered in a contested case.

- *The more hostile the relationship, the higher the likelihood an entry of default will be pursued*
- *The higher the stakes, the higher the risk of foul play*
- *Procedural default judgments do not take into account higher stakes, greater risks or fundamental liberties*

3. Defaults fail to equally protect fundamental liberties. For example, in criminal proceedings defaults are not allowed - it would be wrong to take away someone's freedom without the due process of law. Also in criminal trials, subpoenas and warrants are issued to secure witnesses if necessary. Yet in civil trials, default judgments extinguish a party's rights whether or not a liberty interest is at issue. This does not satisfy substantive due process when fundamental liberties are at issue. It should not be the government's choice to prioritize the importance of our liberties by protecting some of our liberties and not protecting others. All fundamental rights should be protected as required by our Constitution. Absent proper government protection, the only logical explanation for default judgments to be used instead of subpoenas when substantive due process is required is that default judgments are used to expedite the handling of cases. However, expediency does not meet the strict scrutiny test as serving a compelling government interest.

**Default Judgments without notice and opportunity are an abuse of process**

4. Default judgments are remedies usually available only to plaintiffs or petitioners. Since defaults are issued upon a party's request, they rely on the relationship of the parties or the stakes involved instead of consistently applied law. (It is important to point out that in ADDITION to statutorily

allowed default judgments Contra Costa County also applied unauthorized defaults - without request, without notice, without even calling it a 'default' – a pattern and practice of rendering 'under the table' defaults).

To add injury to injury, the choice of whether or not a party is notified of the default hearing and opportunity to defend the action is decided by the judge at his or her discretion. Thus, a default judgment entered without notice to one party amounts to no more than a judge's private agreement to decide in favor of one party - and is not a judicial act. It amounts to one party conniving with a judge to predetermine the outcome of a judicial proceeding. The other party's expectation of judicial impartiality is actively frustrated by the scheme, pubic confidence in the judiciary is eroded, and it gives the appearance of impropriety. It amounts to ex-parte communications affecting the merits of a proceeding. In fact, it is much worse. It is an ex-parte JUDGMENT - a decision entirely based without a party's right to be heard, based on the merits of only one party, and impairs the integrity, impartiality, and competence of the judiciary.

> The United States Supreme Court, in Scheuer v. Rhodes, 416 U.S. 232, 94 S. Ct. 1683, 1687 (1974) stated that when a state officer acts under a state law in a manner volative of the Federal constitution, he comes into conflict with the superior authority of the Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. A judge's private, prior agreement to decide in favor of one party is not a judicial act. Although a party conniving with a judge to predetermine the outcome of a judicial proceeding may deal with him in his "judicial capacity," the other party's expectation of judicial impartiality is actively frustrated by the scheme. It is the antithesis of the "principled and fearless decision-making" that judicial immunity exists to protect. Rankin v. Howard, 633 F.2d 844 (9th Cir. 1980) cert. DENIED, 451 U.S. 939, 101 S. Ct. 2020, (1981), Pierson v. Ray, 386 U.S. 547, 554, 87S. Ct. 1213 (1967), and Gregory v. Thompson, 500 F. 2d 59 (9th Cir. 1974).

5. Furthermore, since both the request to enter default AND opportunity to be heard at the default hearing relies entirely on the judge and one party, default judgments are incapable of being applied consistently by defining criteria. Thus, default judgments are governed by the will of men rather than the rule of law. This conflicts with another deep-rooted tradition that we are innocent until proven guilty. It relies on bias, elicits prejudice, violates substantive due process, voids subject matter jurisdiction and serves no compelling government interest.

> The concept of "rule of law" is an ancient ideal first posited by Plato as grounded in divine reason and so inherent in the natural order. To be acceptable, any rule of law must be capable of being applied consistently so a definition of the criteria for this qualitative analysis must be supplied.

> The rule of law, in its most basic form, is the principle that no one is above the law. The rule follows logically from the idea that truth, and therefore law, is based upon fundamental principles which can be discovered, but which cannot be created through

an act of will. Perhaps the most important application of the rule of law is the principle that governmental authority is legitimately exercised only in accordance with written, publicly disclosed <u>laws</u> adopted and enforced in accordance with established procedural steps that are referred to as <u>due process</u>. The principle is intended to be a safeguard against arbitrary governance, whether by a <u>totalitarian</u> leader or by <u>mob rule</u>. Thus, the rule of law is hostile both to <u>dictatorship</u> and to <u>anarchy</u>.

> ". . . the world may know, that so far as we approve of monarchy, that in America THE LAW IS KING. For as in absolute governments the King is law, so in free countries the law OUGHT to be King; and there ought to be no other."
>
> — Common Sense (1776) by Thomas Paine
>
> "In the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers or either of them: the executive shall never exercise the legislative and judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men."
>
> — Massachusetts Constitution, Part The First, art. XXX (1780).

The last phrase, "to the end it may be a government of laws and not of men," has been quoted with approval by the U.S. Supreme Court and every state supreme court in the United States.

▶ The Rule of Law asserts that men should not be trusted to govern others unless their rule is just, tempered by fixed laws to prevent tyranny, laws that stop individuals from accumulating wealth by force, laws that keep those in high office from exercising power over the populace without restraint, laws that deny the majority power to act without due regard for the rights and well-being of individuals who are a minority, laws that prevent the powerful from plundering the weak. Yet, without more widespread understanding of the Rules of Court by which alone we can enforce the Rule of Law, these high-sounding ideals are meaningless. The Rule of Law is threatened today by seemingly innocent schemes of powerful people who seek to undermine the principles of due process for the sake of an all-powerful government that will decree what law is and enforce its edicts with unbridled force.

> This principle that laws should govern instead of men -- laws of our own making and not the cruel edicts of tyrant dictators or divine right decrees of kings -- is the bedrock of human justice, the philosophical cornerstone of these United States, and the foundation for what constitutes 'civilized'.

## 2. Albright v. Brown – Void where service of process was not made pursuant to statutory law

▶ According to the local rules of the trial court, service of summons must be completed within 60 days of original filing of Petition. This did not occur. Service of summons was eventually affected on Ms. Brown but not in compliance with statutory laws.

> [Service of complaint] The complaint must be served on all named defendants and proofs of service on those defendants must be filed with the court within 60 days after the filing of the complaint.

> Service of valid process is necessary to give a court jurisdiction over a defendant. A summons is necessary to satisfy due process requirements. Statutory service requirements, being in derogation of common-law rights, must be strictly construed and compliance with them must be exact. Even actual knowledge of a proceeding does not validate defective process. Ms. Brown's service of process was defective. Even if Ms. Brown was aware of the proceeding, the Supreme Court has "made it clear that actual knowledge of a proceeding does not validate defective service of process." Green v. Yarbrough, 299 Ark. 175, 771 S.W.2d 760 (1989); Wilburn v. Keenan Companies, Inc., 298 Ark. 461, 768 S.W.2d 531 (1989); Tucker v. Johnson, 275 Ark. 61, 628 S.W.2d 281 (1982).

## 3. Albright v. Brown: Void - trial court without jurisdiction to enter default judgment

▶ According to the local rules of the trial court, if at the expiration of 90 days from the date of original filing (60 days to effect service of summons + 30 days for responsive pleading = 90 days maximum), the court has not received either a response or a request to enter default – the entire matter is to be dropped from the court calendar. The case would need to be re-filed and fees re-paid. In addition to defective service of summons and also against trial court rules, Mr. Albright was allowed to file for a default against Ms. Brown 1.5 years later.

> If the trial court concluded that the objection raised by Ms. Brown to the default judgment waived her defense to personal jurisdiction, Ms. Brown's objection was that the trial court had no jurisdiction to enter the default judgment. While it is possible for a party to waive the defense of personal jurisdiction, there is no authority for the proposition that personal jurisdiction is waived by a failure to appear in an action. If anything, Ms. Brown preserved her defense by failing to appear. The trial court may support its reasoning that the facts of this case merely show a failure to prove timely service. Yet the doctrine of precedence requires that the trial court lacked jurisdiction

over Ms. Brown and therefore the default judgment is void. This is explained simply.

*Raymond v. Raymond*, 343 Ark. 480, 36 S.W.3d 733 (2001)

▶ Albright's severely delayed request to enter a default judgment against Brown (corresponding with record-breaking real estate profits), and the fact that no declarations of disclosure were ever filed, supports Ms. Brown's contention that the parties had in fact privately agreed to conditions of their separation (including disposition of their community property) and that the default was entered fraudulently, motivated by greed.

(a) Within 60 days of service of the petition for dissolution or nullity of marriage or legal separation of the parties, each party shall serve on the other party a preliminary declaration of disclosure, executed under penalty of perjury on a form prescribed by the Judicial Council. The commission of perjury on the preliminary declaration of disclosure may be grounds for setting aside the judgment, or any part or parts thereof, pursuant to Chapter 10 (commencing with Section 2120), in addition to any and all other remedies, civil or criminal, that otherwise are available under law for the commission of perjury. The parties may agree to accelerate or delay the time within which to exchange preliminary declarations of disclosure by written stipulation or by oral stipulation made in open court.

(b) The preliminary declaration of disclosure shall not be filed with the court, except on court order.

(c) The preliminary declaration of disclosure shall set forth with sufficient particularity, which a person of reasonable and ordinary intelligence can ascertain, all of the following:

(1) The identity of all assets in which the declarant has or may have an interest and all liabilities for which the declarant is or may be liable, regardless of the characterization of the asset or liability as community, quasi-community, or separate.

(2) The declarant's percentage of ownership in each asset and percentage of obligation for each liability where property is not solely owned by one or both of the parties. The preliminary declaration may also set forth the declarant's characterization of each asset or liability.

(d) A declarant may amend his or her preliminary declaration of disclosure without leave of the court.

(e) Along with the preliminary declaration of disclosure, each party shall provide the other party with a completed income and expense declaration unless an income and expense declaration has already been provided and is current and valid.

2105. (a) Except by court order for good cause or as provided in subdivision (c), before or at the time the parties enter into an agreement for the resolution of property

or support issues other than pendente lite support, or, in the event the case goes to trial, no later than 45 days before the first assigned trial date, each party, or the attorney for the party in this matter, shall serve on the other party a final declaration of disclosure and a current income and expense declaration, executed under penalty of perjury on a form prescribed by the Judicial Council. The commission of perjury on the final declaration of disclosure may be grounds for setting aside the judgment, or any part or parts thereof, pursuant to Chapter 10 (commencing with Section 2120), in addition to any and all other remedies, civil or criminal, that otherwise are available under law for the commission of perjury.

(b) The final declaration of disclosure shall include all of the following information:

(1) All material facts and information regarding the characterization of all assets and liabilities.

(2) All material facts and information regarding the valuation of all assets that are contended to be community property or in which it is contended the community has an interest.

(3) All material facts and information regarding the amounts of all obligations that are contended to be community obligations or for which it is contended the community has liability.

(4) All material facts and information regarding the earnings, accumulations, and expenses of each party that have been set forth in the income and expense declaration.

(c) The parties may stipulate to a mutual waiver of the requirements of subdivision (a) concerning the final declaration of disclosure by execution of a waiver in a marital settlement agreement or by stipulated judgment or a stipulation entered into in open court. The waiver shall include all of the following representations:

(1) Both parties have complied with Section 2104 and the preliminary declarations of disclosure have been completed and exchanged.

(2) Both parties have completed and exchanged a current income and expense declaration.

(3) The waiver is knowingly, intelligently, and voluntarily entered into by each of the parties.

(4) Each party understands that by signing the waiver, he or she may be affecting his or her ability to have the judgment set aside as provided by law.

(d) Whether execution of a mutual waiver of the final declaration of disclosure requirements pursuant to subdivision (c) will affect the rights of either party to have the judgment set aside or will affect the fiduciary obligations of each to the other shall be decided by a court based on the law and the facts of each particular case. The

authority to execute a mutual waiver provided by this section is not intended, in and of

itself, to affect the law regarding the fiduciary obligations owed by the parties, the

parties' rights with respect to setting aside a judgment, or any other rights or

responsibilities of the parties as provided by law.

▶ It is IMPORTANT to note that NONE of the above is necessary when a default judgment is ordered. The party requesting the default automatically gets whatever they want. The other party cannot introduce any new evidence. In Ms. Brown's case, the default prevented Brown from introducing the parties' agreement showing she in fact owned the home. The law of default trumped Brown's constitutional right to property.(As you will see in the next few sections, Brown's default 'trumped' a heck of a lot more than just her right to property).

## 4. Albright v. Brown: Default judgment was judicial abuse of discretion

▷ The default hearing was held without notice to Ms. Brown. The judge first showed bias by allowing only Mr. Albright to appear at the default hearing. Had both parties been notified, Ms. Brown could have shown the judge documentation of the parties' agreement confirming that in fact, Mr. Albright had transmuted 100% of his interest to Ms. Brown 1.5 years earlier.

- *Due process of law requires that a party be accorded procedural fairness, i.e., given notice and an opportunity to be heard. It is 'unjust, unfair, and inequitable' to allow the default judgment to stand where it is clear Ms. Brown had no notice that such an order was contemplated 1.5 years after the original complaint was filed.*

▷ Secondly, since both parties failed to comply with the trial court's rules, bias continued to permeate the courtroom when the judge applied harsh sanctions against Ms. Brown for failing to file a timely response, yet did not hold Mr. Albright equally accountable for failing to file a timely default.

- *Throughout the remainder of the trial, a consequence of this default judgment was that Ms. Brown was prevented from producing material evidence – that she was the sole owner of the residence.*
- *Absent judicial bias, the default judgment would not have been entered and the final outcome much different.*

▷ The court became abettors to Albright's fraudulent schemes, resulting in prejudice, fraud, constitutional deprivations, and obstructed the administration of justice.

"The trial judge [has] the duty of seeing that the trial is conducted with solicitude for

the essential rights of the accused." "'(People v. Shelley (1984) 156 Cal.App.3d 521,

530.)'" In order to implement this duty, the trial judge is vested with both the statutory

and the inherent power to exercise reasonable control over all proceedings connected

with the litigation before him.' " (Ibid.) This means that "' the court has the authority "' to

take whatever steps [are] necessary to see that no conduct on the part of any person

obstructs the administration of justice.'

## 5. Albright v. Brown: Void - Request to set aside default defective service of process

▶ *At what point did the court acquire jurisdiction?*
*A judgment is void on its face if the trial court exceeded its jurisdiction by granting relief that it had no power to grant.*

> The trial court erred in refusing to vacate the default judgment which had been entered
> based upon defective service. Because no notice sufficient to satisfy due process was
> obtained, the default judgment was void ab initio. Void judgments have no legal effect.
> *Davis v. Office of Child Support Enforcement*, 322 Ark. 352, 357, 908 S.W.2d 649, 652
> (1995) (citing Rankin v. Schofield, 81 Ark. 440, 98 S.W. 674 (1905)).
> They are worthless; no rights can be obtained from them and all proceedings founded
> upon them are equally worthless. Therefore, all subsequent orders, enforcement
> actions, attempts at revival, any and all actions flowing from the judgment are also
> void.

## 6. Albright v. Brown: Void - jurisdiction is lost when hearsay is used as evidence and material evidence is in error.

▶ No items of proof of fact were submitted by Albright to support a default judgment as required per Family Code 2336. Therefore, Albright's affidavit was based entirely on hearsay also in violation of Evidence Code 1220.

> The law provides specific exceptions to the general rule excluding hearsay evidence
> (see, e.g., Evid. Code, § 1220 et seq.), including those governing the admission of
> affidavits or declarations. For example, in the marital dissolution context, Family Code
> section 2336 requires various items of proof of fact to be submitted to the court in
> support of a default judgment and requires such proof to be in the form of an affidavit.
> (Fam. Code, § 2336, subd. (a).)

▶ During the hearing to set aside the default, Albright admitted to the judge that the sole property interests listed in his pleading were made in error therefore the trial court judge abused its discretion by not vacating the matter as being prospectively inequitable and because material evidence was entered in error.

- *The trial judge should have automatically dismissed the case due to material evidence entered in error in direct violation of Federal Rules of Evidence.*

- *The trial court judge also should have weighed the duration of time between the date the original cause was filed (January 2002) and the date the default was entered (July 2003) and been concerned with who had been responsible for the property and its financial obligations during that duration of time.*

▶ In the end, bias and prejudice continued to haunt Ms. Brown yet she was advised that she would have to wait until final judgment before filing a new cause of action for fraud and undue influence. Unfortunately for Ms. Brown, final judgment would be too late.

> The trial court's "Intermittent reliance on the default judgment" has no effect on the trial court's lack of jurisdiction to enter a default judgment in the first place. And against any argument that laches prevents Brown from setting aside the subsequent writ of possession, writ of attachment, and enforcement action in 2004 or the divorce decree in 2005 (all actions of which Brown was excluded) since laches "has been applied in numerous cases where one party has obtained an invalid divorce and remarried, but the first spouse then waits too long under the facts of the particular case to assert her right to have the *void judgment* vacated, laches may be easily extinguished because the trial court had no jurisdiction or authority to hear the cases in the first place. Statutory service requirements, being in derogation of common-law rights, must be strictly construed and compliance with them must be exact. A judgment rendered when service failed to meet statutory service requirements renders the court without personal jurisdiction over the litigants and any judgment is therefore void *ab initio*. Once a judgment is found to have been rendered without jurisdiction, such judgment is void; it is as though suit had never been brought and since there is no impediment to bringing the suit where personal jurisdiction over Ms. Brown could be had; a void judgment amounts to nothing and has no force as res judicata.

▶ The laws should be applied equally to protect ALL fundamental rights - it is not OK for government to decide which liberty is more fundamental than another. If Ms. Brown's case had been held in a criminal jurisdiction, she would have gladly had law enforcement bring her before the court. She would have been provided an attorney, she could arrive safely, and most importantly she would have been allowed direct access to the court. When fundamental liberties are at stake - as a MINIMUM precaution - notification by personal service and opportunity to be heard both by written declaration AND direct access, should be mandatory PRIOR to an entry of default so that a party can show good cause, question personal jurisdiction, and be afforded protection against fraud, foul play, and devastating losses.

❧

# Chapter 5: Albright v. Brown - Void subject matter jurisdiction.

▶ In the first section, we established that the Supreme invalidated Contra Costa County Superior Court as operating under a rule inconsistent with statute, Constitution and case law, and therefore cannot confer validity to the acts of its officers of the court. Their rules and orders in Ms. Brown's concurrent trials conferred no rights; imposed no duties; afforded no protection; created no office and was, in legal contemplation, inoperative as though it had never been passed. And, under the Norton Rule, Ms. Brown's judgments were therefore void ab initio, i.e., void from the beginning

▶ As stated in the second section, Contra Costa Court Superior Court's pattern and practice restricted Brown's adequate, complete, effective, fair, full, meaningful and timely access to the court. The court's 'trial by mail' denied Ms. Brown direct access to the court, failed to provide sufficient proof of mail service to satisfy the additional burden based entirely on the integrity of mail performance, failed to equally protect both parties, created unjustifiable burdens on family law litigants, and failed to provide sufficient remedies and protections for litigants in hostile situations because they should have reasonably foreseen that such litigants would be 'trapped' in dangerous situations when the court removed their only emergency exit . . . direct access to the court. Ms. Brown furthermore asserts that the court acted at all times without jurisdiction resulting in constitutional deprivations and as a consequence Ms. Brown claims federal standing for procedural due process violations.

▶ We have also established the rights Ms. Brown complains of embrace those fundamental rights that are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty" therefore qualifying for substantive due process protection, and that the Supreme Court denied Contra Costa County's purported government interest of expediency as failing to meet the criteria established under the Fourteenth Amendment which "forbids the government to infringe . . . 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest".

▶ We also discussed how default judgments should not supersede substantive due process, that the government lacks authority to prioritize our fundamental liberties by protecting only certain classes of liberties against default judgments, and that default judgments should not be controlled by the rule of men but rather a prescribed rule of law. Ms. Brown also asserts a federal claim against the use of defaults when fundamental liberty interests are at issue as not meeting the strict scrutiny test in that they serve no compelling government interest. California's law of default violated Brown's constitutionally protected right to not be deprived of property without the due process of law.

> The New York Court of Appeals held in Wynehamer v. New York that "without 'due
> process of law,' no act of legislation can deprive a man of his property, and that in civil
> cases an act of the legislature alone is wholly inoperative to take from a man his
> property." *Wynehamer v. New York*, 13 N.Y. 378, 418 (N.Y. 1856).

▶ A rendering of default, whether or not is was achieved through a default judgment or by a trial court scheduling order, deprives a court of it's ability to adjudicate based on the merits of a case. Defaults have been widely criticized as coming dangerously close to crossing the fine line of due process, especially in family law litigation. In Ms. Brown's cases, we will be reviewing how the court crossed that line on four separate occasions, in four different contexts, by four different legal processes. What they do have in common is they were all ordered by the Contra Costa County Family Superior Court and all were fundamentally protected by the due process of law.

▶ The common law authority that these actions were brought under as well as causation of injuries will be challenged at length in the following sections. In this section, Ms. Brown is challenging jurisdiction, testimony of competent fact witnesses, hearsay as evidence, subject matter jurisdiction, opportunity to be heard, and fraud upon the court. Above all, it is important to keep the following in mind:

> In Elkins v. Contra Costa County, the Supreme Court stated, "A fair and full
> adjudication on the merits is at least as important in family law trials as in other civil
> matters, in light of the importance of the issues presented such as the custody and
> well-being of children and the disposition of a family's entire net worth. "

1. **Albright v. Brown: Void where a court is exercising special statutory jurisdiction the record must show upon its face that the case is one where the courts have authority to act. Before a decree can have vitality the court must have jurisdiction not only of the person but of the subject matter**.

   ▶ The original complaint resulted in a default judgment against Brown. However, one year after Brown's fraudulent default, an unlawful detainer action was added to the same case. Since the original complaint did not include an unlawful detainer action, the court lacked subject matter jurisdiction, did not have authority to act and is void on its face.

   > There is a presumption, under law, that a court governed by the rules of limited
   > jurisdiction is without subject-matter jurisdiction. When jurisdiction is challenged, the
   > party claiming that the court has jurisdiction has the legal burden to prove that
   > jurisdiction was conferred upon the court through the proper procedure. Otherwise, the
   > court is without jurisdiction.

   ▶ A default judgment does not forever deny a party's rights in whatever additional claims the winning party may wish to bootstrap to the case after the fact – yet this is exactly what the court did. Ms. Brown should have been given an opportunity to be heard on the new claim, but she was not. In fact, at the eviction hearing Ms. Brown was told to wait outside court room doors. She was allowed into the courtroom only to hear judgment. Parties who have properly appeared in an action are entitled to notice of any impending motions or hearings. The court's order to evict Ms. Brown was therefore "null and void" as a denial of Brown's constitutional rights to procedural due process.

   > The only issue that could have been resolved under the default judgment is the issues
   > embraced in Albright's original complaint. But relief in a complaint with no answer
   > (default) is limited to the issues embraced in the original complaint wherein a default
   > judgment was taken against Brown. The issue of Brown destroying the value of the
   > home arose a year later and therefore should not have been adjudicated under the
   > default judgment which tied Brown's hands ability to defend the additional actions.

▶ The court exceeded jurisdiction, violated clearly established law, and acted without authority at all times, by adjudicating an unlawful detainer action in family court.

> A government agent's liability in a federal civil rights lawsuit now no longer turns upon whether the defendant acted with "malice," but on whether a hypothetical reasonable person in the defendant's position would have known that their actions violated clearly established law.

▶ Brown's fraudulent default judgment operated as a bill of attainder.  The court not only allowed the fraudulent default judgment to deprive Brown of Albright's (legally transmuted) property interest, the court then proceeded to unlawfully seize her property entirely; then took her business and sole source of income. They allowed her personal property to be stolen and her evidence destroyed. They rendered her and her infant daughter indigent and forced them to the streets. Furthermore, while Brown was in a protective shelter the court sold her home and denied access to her records. THEN, the same court took her infant daughter because the sale of her home was and indication of abduction. The daughter was placed in the care of the very person she was protecting her daughter from. And finally, the same court rendered Brown incompetent and defenseless - once again exceeding jurisdiction by finding Brown guilty of substance abuse (a criminal offense) based on falsified evidence. As a result they reduced her parental rights to supervised visitation and changed her child's name. Not at any point did Ms. Brown have a 'day in court' in ANY of these court processes. Forced into a world filled with threats of harm, extreme prejudice, forced indigence, rendered incompetent, deprived of court access, evidence destroyed, reputation ruined, credit ruined, property stolen, her business taken, her home taken, her daughter taken, her parental rights removed. A life ruined . . . because this was more efficient.

> A bill of attainder (also known as an act or writ of attainder) is an act of legislature declaring a person or group of persons guilty of some crime and punishing them without benefit of a trial. The United States Constitution forbids both the federal and state governments to enact bills of attainder, in Article 1, Sections 9 and 10, respectively. It was considered an excess or abuse of the British monarchy and Parliament. The precedent that best reflects most of the original intention of the mandates is from Cummings v. Missouri. It states,
>
> "A bill of attainder, is a legislative act which inflicts punishment without judicial trial and includes any legislative act which takes away the life, liberty or property of a particular named or easily ascertainable person or group of persons because the legislature thinks them guilty of conduct which deserves punishment."

## 2.  Albright v. Brown: Void eviction for right to be heard and a meaningful trial

▶ As mentioned previously, during the writ of attachment hearing on June 16, 2004, Ms. Brown was instructed to wait in the hallway outside courtroom doors. She was invited inside the courtroom only to hear final judgment. Ms. Brown was represented by legal counsel, Mary Courtenay, however attorneys cannot testify in court.

Before a court (judge) can proceed judicially, jurisdiction must be complete consisting of two opposing parties (not their attorneys - although attorneys can enter an appearance on behalf of a party, only the parties can testify and until the plaintiff testifies the court has no basis upon which to rule judicially), and the two halves of subject matter jurisdiction = the statutory or common law authority the action is brought under (the theory of indemnity) and the testimony of a competent fact witness regarding the injury (the cause of action). If there is a jurisdictional failing appearing on the face of the record, the matter is void, subject to vacation with damages, and can never be time barred.

- *Even if Ms. Courtenay could have testified, Ms. Brown's 'so-called attorney' had not met with Ms. Brown to discuss details of her two cases and therefore had no basis from which to testify.*

- *Ms. Courtenay seized the opportunity made available by Contra Costa's unlawful rule. By denying Ms. Brown opportunity to meet with her, Ms. Courtenay could show cause as to why she did not file responsive pleadings. If responsive pleadings were not received, Ms. Brown would not be allowed to directly testify to the court. If Brown did not testify directly to the court, the Judge would never know the attorney had not met with her client.*

From Elkins v. Contra Costa County: "To demonstrate the harshness of respondent's application of its rule and order, we recall that under the fast track statutes, the burden of sanctions may not be imposed upon the client if it was the attorney who was responsible for violating the fast track rules. (Gov. Code, § 68608, subd. (b); *Garcia, supra,* 16 Cal.4th at pp. 481-482.) Under the fast track scheme, had Jeffrey been represented and had his counsel been responsible for making the mistakes attributed to Jeffrey, the trial court would not have been authorized to impose what amounted to issue sanctions affecting the merits of Jeffrey's case.

▶ The above statement by the Supreme Court illustrates the impossible conundrum that Ms. Brown (and possibly many others) faced. Brown hired an attorney because she did not know the law. So if Brown's attorney made the mistakes attributed to Brown and therefore the court was unauthorized to impose issue sanctions affecting the merits of Brown's case, just how did the court plan on the problem being discovered if another court rule denied Ms. Brown opportunity to be heard directly? And unless a party such as Ms. Brown takes the time to understand the laws (which defeats the purpose of hiring an attorney in the first place), those mistakes would never be discovered. Those mistakes cost Brown her life.

- *Before the hearing Ms. Courtenay told Ms. Brown she left several messages for Ms. Brown to schedule a meeting to discuss her two cases. On the other hand, Ms. Brown claimed she left several messages for Courtenay without response.*

- *Until the Supreme Court published their opinion in the Elkins v. Contra Costa County Superior Court case in 2007, Ms. Brown did not realize the importance of the issue of phone calls/messages (their importance will become clear in the following section). Ms. Courtenay did not realize the contact numbers Ms. Brown provided were in fact cell phone numbers. Unfortunately for Ms. Courtenay, cell phone records indicate ALL incoming and outgoing calls. Brown's records indicate several outgoing calls to Ms. Courtenay from Ms. Brown, but NO incoming calls from Ms. Courtenay between May 31, 2004 and the hearing June 16, 2004 - roughly 2 weeks later. In fact, phone records prove that not one single call was made from Courtenay to Brown until 5 hours AFTER Brown's scheduled eviction on June 30, 2004.*

▶ Why is this important? Contra Costa County Superior Court's rule and order allowed cases to proceed 'by default' if timely responses were not received. Additionally, the same local court rule governing family law proceedings required the parties to file a timely request that the court review the case file prior to a hearing on a contested matter. In other words, the local rule relieved the court of its obligation to read the case file at all when the request to do so was untimely. And according to the trial court's unlawful rule and order, all an attorney had to do was fail to file a responsive declaration or a request for the judge to read the file. The litigant would be unable to testify directly in court, the judge wouldn't read the case file at all; the judgment would be rendered by default instead of on the merits or facts; and the attorney would be paid full price for doing essentially nothing. Over time, this lack of judicial accountability penetrated the integrity of the judicial system as a whole by creating a "butterfly effect" (described in the second chapter "Fraud upon the court").

- *It is a fact that the national average income for attorneys has dropped below that of teachers. Ms. Courtenay however, found a way to use Contra Costa County's rule and order to her advantage and be compensated at full price for doing zero work. Of course, at the expense of litigants, families and children.*
- *Furthermore, Ms. Brown discovered a clause in Courtenay's contract that would compensate Courtenay for legal services from the proceeds of the sale of Brown's home. This appears to be an inherent conflict of interest if the purpose for Brown hiring Courtenay was to defend her against eviction and sale of her home yet Courtenay could be additionally compensated by affecting the sale of Brown's home.*
- *It is also important to mention that before the hearing, Brown asked Courtenay about all the improvements she recently made to the property. Courtenay informed Brown that the money she put forth would be reimbursed. This is important because it shows pre-meditation on Courtenay's part. Brown had no idea what was going on since all the legal correspondence had been sent to Courtenay. Courtenay most certainly should have used Brown's factual evidence of substantial upgrades to directly contradict Albright's claim that Brown was devaluing the property. Instead, she had already planned on Brown losing in court so she could get paid even more than the $5,000 Brown already paid Courtenay - from the sale of Brown's home – without doing a thing. That is why Courtenay did not want Brown inside the courtroom and that is why she told Brown that the upgrades would be reimbursed (of course, they were never reimbursed since Brown was never notified of the disposition hearing).*

▶ Although the following statement seems too ludicrous to bear any merit, it is important to consider the following: Contra Costa's illegal rule was in place for several years. Hundreds, if not thousands of attorneys participated in trials during that period of time. It is quite extraordinary that an untrained, pro-se litigant such as Mr. Jeffrey Elkins brought such a basic and fundamentally illegal trial rule and order to the attention of the Supreme Court.

1

"Attorney(s) may not have informed you that an Order was not legal, since attorney(s) by law

2

must protect the courts or be disbarred."

3

## 3. Albright v. Brown: Void eviction when hearsay used as evidence.

4

5

▶ Since Ms. Brown was told to wait outside courtroom doors, Brown cannot claim to know what was

6

said during the hearing. However, in Albright's written declarations Albright claimed Brown was
devaluing the property. Albright's sole witness was his realtor/friend of which neither Albright nor

7

Sonkoly had been to Brown's home for many months. Therefore both witnesses lacked personal
knowledge to testify as to the injury claimed by Mr. Albright – the condition of Brown's home.

8

9

Lack of personal knowledge Federal Evidence Code Rule 602: A witness may not

10

testify to a matter unless evidence is introduced sufficient to support a finding that the

11

witness has personal knowledge of the matter. Evidence to prove personal knowledge

12

may, but need not, consist of the witness's own testimony. This rule is subject to Rule

703, relating to opinion testimony by expert witnesses.

13

14

▶ Ms. Brown is not only challenging the competency and credibility of both witnesses as lacking

15

personal knowledge necessary to base their claim, but the presence of bias and interest also existed.
Both Albright AND Sonkoly were inherently biased since they were THE primary beneficiaries who

16

stood to profit considerably from the sale of Brown's home. Furthermore, the judge signed a listing
agreement several months earlier (without Brown's consent) naming Sandor Sonkoly as the listing

17

agent. Therefore, the judge was equally aware and complicit in the bias offered by both Sonkoly and

18

Albright.

19

Bias of Witness Federal Rule Evidence 616: For the purpose of attacking the credibility

20

of a witness, evidence of bias, prejudice, or interest of the witness for or against a

21

party to the case is admissible

22

▶ Neither Albright or Sonkoly are experts in determining what is considered 'devaluation' of property

23

value (the condition Albright stipulated to justify immediate relief of judgment), and since there was
no appraisal ordered and no other factual evidence to support Albright's claims, the judgment was

24

ordered ENTIRELY based on hearsay - by witnesses who were known to be biased and lacked

25

personal knowledge to support their claims.

26

Perhaps the most important of the Rules of Evidence is that hearsay testimony is

27

inadmissible. This makes it impossible for the accuser to induce friends or family to

28

give false evidence in support of their accusations because, normally, this evidence

29

would be rejected by the presiding authority or judge.

30

▶ Brown tried to show the judge receipts for new carpets, crown molding, tile floors, hardwood flooring material, new paint – dated within weeks of the hearing – in direct contradiction to Albright and Sonkoly's hearsay, but the Judge ignored Brown. This was clearly exculpatory, factual evidence, far outweighing Albright and Sonkoly's hearsay statements which were riddled with bias, self-interest, and lacked personal knowledge.

> A determination of what constitutes "fairness" includes consideration of completeness and relevancy as well as possible unfair prejudice.

> "Local courts may not create their own rules of evidence and procedure in conflict with statewide statutes. Reviewing courts have not hesitated to strike down local court rules or policies on the ground they are inconsistent with statute, with California Rules of Court promulgated by the Judicial Council, or with case law or constitutional law. Appellate decisions have invalidated local rules or restricted their application in many areas of affected litigation, including dissolution actions, litigation under the Trial Court Delay Reduction Act (Gov. Code § 68600 et seq.) (fast track litigation), complex litigation (Cal. Rules of Court, rule 3.400 et seq.), and general civil litigation. *(Excerpt from Elkins case)*

▶ Because the judge relied entirely on hearsay as evidence even though factual evidence was offered in direct contradiction to the biased testimony by parties who lacked personal knowledge, the judge was disqualified by operation of law. The judge acted contrary to law throughout the entire proceeding therefore all orders were issued without lawful authority and were void ab initio. The disqualification is self-executing.

> Some of the law relative to judicial disqualification can be found in Liteky v. U.S., 114 S.Ct. 1147 (1994) (""Disqualification is required if an objective observer would entertain reasonable questions about the judges impartiality. If a judge's attitude or state of mind leads a detached observer to conclude that a fair and impartial hearing is unlikely, the judge must be disqualified." [Emphasis added]. Id. at 1162.); Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 108 S.Ct. 2194 (1988) (what matters is not the reality of bias or prejudice but its appearance); United States v. Sciuto, 521 F.2d 842 (7th Cir. 1996) ("The right to a tribunal free from bias or prejudice is based, not on section 144, but on the Due Process Clause." Id. at 845.); United States v. Balistrieri, 779 F.2d 1191 (7th Cir. 1985) (455(a) "is directed against the appearance of partiality, whether or not the judge is actually biased.") (it is self-executing). The failure of the Family Law Judge to follow the mandatory requirements of the law is a further evidence of his appearance of partiality.



# Chapter 6: Void when court exceeds jurisdiction

A judgment is void on its face if the trial court exceeded its jurisdiction by granting relief that it had no power to grant..

> "' It seems well settled . . . that when a statute authorizes prescribed procedure, and
> the court acts contrary to the authority thus conferred, it has exceeded its jurisdiction . '
>
> Hamilton, in The Federalist No. 79, P. 491 (1818)

### Orders Exceeding Jurisdiction

"If a court grants relief, which under the circumstances it hasn't any authority to grant, its judgment is to that extent void." (1 Freeman on Judgments, 120-c.) "A void judgment is no judgment at all and is without legal effect." (*Jordon v. Gilligan*, 500 F.2d 701, 710 (6th Cir. 1974)) "a court must vacate any judgment entered in excess of its jurisdiction." (*Lubben v. Selective Service System Local Bd. No. 27*, 453 F.2d 645 (1st Cir. 1972).). A void judgment does not create any binding obligation. Federal decisions addressing void state court judgments include *Kalb v. Feuerstein* (1940) 308 US 433, 60 S Ct 343, 84 L ed 370.

### Void Orders Can Be Attacked At Any Time

An order that exceeds the jurisdiction of the court, is void, or voidable, and can be attacked in any proceeding in any court where the validity of the judgment comes into issue. (See *Rose v. Himely* (1808) 4 Cranch 241, 2 L ed 608; *Pennoyer v. Neff* (1877) 95 US 714, 24 L ed 565; *Thompson v. Whitman* (1873) 18 Wall 457, 21 l ED 897; *Windsor v. McVeigh* (1876) 93 US 274, 23 L ed 914; *McDonald v. Mabee* (1917) 243 US 90, 37 Sct 343, 61 L ed 608.

*Due to a lack of legal training, Ms. Brown is forced to explain the following 'conundrum' - a legal impossibility - from a rather pedestrian point of view. However, by the end of this section it should become quite clear that the entire matter was clearly outside of family law jurisdiction. The reason Brown included this first "conundrum", is this is perhaps where family law jurisdiction jumped the fence into civil jurisdiction's backyard. The "conundrum" represents the fence that divides the two jurisdictions — a fence that is not meant to be jumped. Even the legal documents seem to 'jump the fence" starting off first as petitioner v. respondent (family law), then to plaintiff v. defendant (civil law), then to judgment creditor v. judgment debtor (as listed on the civil writ of possession).*

▶ Since Albright and Brown were separated yet still legally married when the following writs were executed, how was it possible for Albright attach his money judgment award against community property for which he is also liable? In other words, how could Albright be both a judgment creditor and a judgment debtor? Any reasonable person can understand that makes absolutely no sense. For example, the following statute applies to authorized writs of attachment:

487.010 (d). The following property of Ms. Brown is subject to attachment:

(1): Any provision of this title that applies to the property of Ms. Brown or to obligations owed to Ms. Brown also applies to the community property interest of Mr. Albright and to obligations owed to either spouse that is community property.

(2): Any provision of this title that applies to property in the possession or under the control of Ms. Brown also applies to community property in the possession or under the control of the spouse of Mr. Albright.

▶ Procedurally in marital dissolution cases, one of the parties may be awarded property rights subject to repayment of outstanding liabilities to the other spouse. At that point, the spouse with rights to the property could obtain a new loan and grant deed - devoid of any community property interest. At that time, the new rightful owner of the property could cash out sufficient equity in the property to pay-off the other party. Everyone would live happily ever after. But in order to do that, the spouse would need to establish a refinance outside of community property. In order to do that, there would need to be a final judgment or decree stating the conditions of the divorce.

- *Ms. Brown was counseled that in order for her to present evidence as to Albright's original fraudulent claim, only upon final judgment could she file a separate cause of action against Mr. Albright to void/vacate Albright's money judgment award, awarded by way of an unlawful default judgment. Only then would Brown finally be allowed to introduce as 'new evidence' the parties' private marital agreement wherein Albright transmuted 100% of his interest in the property in January 2002.*

- *This would not be a suitable choice for Mr. Albright since fraud could land him in jail. Instead, he had to find a way to 1) evict Brown from her home and quickly sell the house BEFORE final judgment; 2) put the "Albright/Yunker Plan" into effect to prevent Brown from testifying/producing evidence (chapter 7); and 3) get out of dodge with his winnings (Albright currently resides in Arizona).*
  **Contra Costa County Superior Court provided the perfect criminal playground to do just that.**

▶ The court and Mr. Albright adjudicated a forcible detainer action against Ms. Brown as though she was the sole owner of the property, based upon a money judgment awarded out of community property. It does not make sense that the property was "community' for the original cause of action and default judgment, then "not community" for the money judgment forcible detainer action; all within the same case.

As further proof, consider the following:
- *Ms. Brown was approved for a refinance that would pay off Albright's claim and would remove Albright from any financial obligation - since it would be entirely in Brown's name. Albright signed the papers to start the process on February 4, 2004, but refused to sign the final papers.*
  **The judge was made aware of Brown's refinance during judgment at the attachment hearing.**

- *CCP 487.030. (d): Ms. Brown was deprived of an additional remedy - claiming a homestead exemption. Albright's approval would have been required since the home was still considered community property*

▶ Ms. Brown was deprived of all remedies and opportunities to rectify Albright's fraudulent claim. The judge showed bias by restricting Brown to the confines of community property while allowing Albright to act as both a private individual and a party to community property according to however his interests were best suited.

▮ Proof by performance carries more weight than any written or recorded document can provide. Since the Superior Court of Contra Costa and Mr. Dan Albright performed a forcible detainer action against Ms. Brown, the following is a partial listing of the violations of statutory law regarding forcible detainer actions against real property. This is important, because it will quickly become clear as to why the family law division of limited jurisdiction clearly exceeded its authority. Forcible detainer trials involve a separate division of law entirely which might explain the gross miscarriage of justice.

● *Procedurally, it is one thing to be awarded a money judgment and quite another to find a legal mechanism to get the money. If a money judgment is less than the value of the property, then a lien can be obtained such as a contractor's lien.*

● *If the money judgment exceeds the value of the property a writ of attachment may be ordered. When the real property to be attached is a home however, a writ of possession must also be obtained before the amount of the attachment can be levied upon. Upon a writ of possession, the attachment may be executed (writ of execution). This is how a forcible detainer action works when real property interests are involved.*

● *When fundamental liberties such as the right to own property are concerned, there are very strict statutes which MUST be followed. The laws regarding these writs take up entire divisions of the civil code of procedure and require strict compliance -judicial discretion is not allowed.*

## Exemptions

1) 487.020 (b). Exempt from attachment is any property which is necessary for the support of a defendant who is a natural person or the family of such defendant supported in whole or in part by the defendant.

▶ #1: Upon the judge granting the writ, even Albright's attorney was stunned and said, "Your honor, are you aware that Ms. Brown has a business located at her residence?" The judge was also made aware that Brown was providing for her infant daughter. Of course this point was cleverly manipulated by Albright who asserted that Brown was staying in the house to care for an infant "who wasn't even his" (as if this was a recent separation rather than something that happened 4 years beforehand). But Brown was not allowed to say one word in her behalf during the brief few minutes she was allowed into the courtroom. The judge paid absolutely no attention and granted the writ knowing it violated a fundamental statutory law. Ms. Brown was deprived of her home which was used to provide for her dependent daughter and for personal, family and household purposes even though it was exempt.

2) CCP 484.070: The failure to claim that the property is exempt will not preclude the defendant from making a claim of exemption at a later time.

▶ **#2: Brown's rights reserved.**

3)  487.010. (c):  The following property of the defendant is subject to attachment:

(2): Accounts receivable, chattel paper, and general intangibles arising out of the conduct by the defendant of a trade, business, or profession

(3): Equipment.

(5): Inventory.

(6): The entire net worth of Ms. Brown's trade, business, or profession.

(7): Money on the premises where a trade, business, or profession is conducted.

(9): Instruments.

(10): Securities.

▶ #3: The list above includes items which were also seized during the forcible detainer action. These items ARE legally available for attachment (unlike Brown's personal residence) however they WERE NOT listed anywhere in the pleadings, the writs, or the judgments. This constitutes the second violation of due process since Ms. Brown's business; inventory, accounts receivable, equipment, entire operation and sole source of income were illegally seized subject to an unlawful detainer against Brown's exempt property which was originally perpetrated by fraud. Wow . . . what a mouthful!

"In the general course of human nature, a power over a man's subsistence amounts to a power over his will."

Hamilton, in The Federalist No. 79, P. 491 (1818)

The right to earn a livelihood and to continue employment unmolested by efforts to enforce void enactments is entitled to

protection in equity in the absence of an adequate remedy at law.

## Actions in which an attachment is authorized

4)  483.010 (c). If the action is against a defendant who is a natural person, an attachment may be issued only on a claim which arises out of the conduct by the defendant of a trade, business, or profession. An attachment may NOT be issued on a claim against a defendant who is a natural person if the claim is based on the sale or lease of property, a license to use property, the furnishing of services, or the loan of money where the property sold or leased, or licensed for use, the services furnished, or the money loaned was used by the defendant primarily for personal, family, or household purposes.

▶ #4: The importance of protecting property used for personal, family, or household purposes is underscored in many ways throughout several divisions of law. Not only is such property exempt from attachment, it also constitutes an unauthorized attachment. What this means is that if a party fails to file timely exemptions, the court and judge are unauthorized to grant attachments against property used for personal purposes.

Civil Rights, Constitutional Law, Evidence, Habeas Corpus, Government Contracts, Government Law - 64

5) CCP 483.010 (b): An attachment may not be issued on a claim which is secured by any interest in real property arising from agreement, statute, or other rule of law (including any mortgage or deed of trust of realty and any statutory, common law, or equitable lien on real property.

6) However, an attachment may be issued if the security has become valueless or has decreased in value to less than the value owing on the claim, in which event the amount to be secured by the attachment shall not exceed the lesser of the amount of the decrease or the difference between the value of the security and the amount then owing on the claim.

► #5: An attachment is not authorized on a claim which is secured by any interest in real property.

► #6: Albright based his claim for a writ of attachment by asserting Brown was decreasing the value of the home. But to assert that claim his security interest would have had to become valueless or decreased in value to less than the value owing on his claim. It is IMPOSSIBLE for the value of Ms. Brown's home which sold for nearly $900,000 three weeks after the writ was ordered, to have been decreased to the value Albright was claiming of $95,000. More important than the judge failing to consider the costs Brown incurred for new carpet, new paint, crown molding, new fireplace, newly repaired tile and was in the process of installing new hardwood flooring, but the judge most certainly should have considered these facts as being in direct contradiction to Albright's claim that Brown was decreasing the value of the property.

7) CCP 580 (a): The relief granted to the plaintiff, if there is no answer, cannot exceed that demanded in the complaint, in the statement required by Section 425.11, or in the statement provided for by Section 425.115; but in any other case, the court may grant the plaintiff any relief consistent with the case made by the complaint and embraced within the issue. The court may impose liability, regardless of whether the theory upon which liability is sought to be imposed involves legal or equitable principles.

(b) Notwithstanding subdivision (a), the following types of relief may not be granted in a limited civil case:

8) (2) A permanent injunction.

9) (3) A determination of title to real property

10) (4) Declaratory relief, except as authorized by Section 86

► #7: The relief granted to Albright (since Brown's attorney failed to answer) clearly exceeded what was demanded in the complaint by $800,000. Maybe the judge needs to include first grade math as part of continuing education – but alas, judges are exempt from participating in such nonsense.

► #8: Selling Ms. Brown's home without her consent or signature in 7 days was an illegal permanent injunction.

► #9: The claim unlawfully resulted in a determination of real property. Albright and the court had Brown's home sold before she could file responsive remedies. Brown was forcefully evicted on June 30. The judge signed the sales agreement and signed the grant deed in Brown's behalf on July 8, 2004. Consequently, Brown is still prohibited from finding out who got paid out of the proceeds of the sale of her home – because Brown did not sign the grant deed . . . the court did.

► #10: If declaratory relief constitutes a judge's determination of parties' rights, then this action clearly constituted declaratory relief. Declaratory relief however, is a 'no – no'.

11) CCP 484.020. The application shall be executed under oath and shall include all of the

following:

(a) A statement showing that the attachment is sought to secure the recovery on a claim

upon which an attachment may be issued.

12) (b) A statement of the amount to be secured by the attachment.

(c) A statement that the attachment is not sought for a purpose other than the recovery on

the claim upon which the attachment is based.

(e) A description of the property to be attached under the writ of attachment and a

statement that the plaintiff is informed and believes that such property is subject to

attachment. Where the defendant is a natural person, the description of the property shall

be reasonably adequate to permit the defendant to identify the specific property sought to

be attached.

▶ #11: From the beginning, the intentions of Ms. Brown's attorney were corrupt therefore Ms. Brown cannot ascertain whether these and other laws were followed. Suffice to say, Brown did not received one single document.

▶ #12: Ms. Brown does know however, that the statement of the amount to be secured by the attachment was left blank on the actual writ taped to the door of Brown's home on June 23, 2004 - one week after the writ hearing and one week before her eviction June 30, 2004. (Bear in mind that Brown's second case also had a hearing scheduled for June 23, 2004 and trial scheduled for the day after the eviction, July 1, 2004).

13) CCP 484.040. No order or writ shall be issued under this article except after a hearing. At

the times prescribed by subdivision (b) of Section 1005, the defendant shall be served with

all of the following:

(a) A copy of the summons and complaint.

(b) A notice of application and hearing.

(c) A copy of the application and of any affidavit in support of the application.

▶ #13: Same answer as #11- Attorney malfeasance. No such service was presented to Brown.

CCP 484.050 The notice of application and hearing shall inform defendant of the following:

14) (c) The amount to be secured by the attachment.

15) (d) If the right to attach order is issued, a writ of attachment will be issued to attach the

property described in the plaintiff's application unless the court determines that such

property is exempt from attachment or that its value clearly exceeds the amount necessary

to satisfy the amount to be secured by the attachment. However, additional writs of

attachment may be issued to attach other nonexempt property of the defendant on the

basis of the right to attach order.

16) (e) If the defendant desires to oppose the issuance of the order, the defendant shall file with the court and serve on the plaintiff a notice of opposition and supporting affidavit as required by Section 484.060 not later than five court days prior to the date set for hearing.

17) (f) If the defendant claims that the personal property described in the application, or a portion thereof, is exempt from attachment, the defendant shall include that claim in the notice of opposition filed and served pursuant to Section 484.060 or file and serve a separate claim of exemption with respect to the property as provided in Section 484.070. If the defendant does not do so, the claim of exemption will be barred in the absence of a showing of a change in circumstances occurring after the expiration of the time for claiming exemptions.

18) (g) The defendant may obtain a determination at the hearing whether real or personal property not described in the application or real property described in the application is exempt from attachment by including the claim in the notice of opposition filed and served pursuant to Section 484.060 or by filing and serving a separate claim of exemption with respect to the property as provided in Section 484.070, but the failure to so claim that the property is exempt from attachment will not preclude the defendant from making a claim of exemption with respect to the property at a later time.

▶ #14-#18: Attorney malfeasance made available by an illegal trial court rule and order intended to expedite cases, by requiring family law cases be tried entirely by written declaration.

❧

To illustrate: The attorney, not Ms. Brown, receives Albright's writ application documents. Since meetings to discuss Brown's case occurred before trial, Ms. Courtenay could not have filed written responses or filed Brown's exemptions. Because the trial court rule and order only allowed oral testimony on issues already presented to the court via written declarations, it would not appear odd that Ms. Brown was told to wait outside the courtroom for the duration of the hearing. For Courtenay's plan to work, she needed to keep Brown out of the courtroom in case Brown blurted something out that might give her plan away - and under the circumstances, the likelihood of that happening was exceptionally high. (FYI – Albright, Yunker and Sonkoly had already done their best to prevent Brown from appearing in court in the first place, but Brown prevailed. Phone records indicate there was a lot of communication between all of these parties who should have had no reason to be communicating. Brown of course had no idea they even knew of each other. She would soon find out 2 weeks later during what Brown calls "ground zero").

According to trial court rules, if responsive declarations were not received the matter proceeded 'by default'. In Contra Costa, this meant judgment was rendered entirely in favor of the party who complied with their rules regardless of the fact the rules clearly went against the tradition of a person's 'day in court', and regardless of the facts. Of course, if the judge provided even a cursory review of the facts Courtenay's plan might have been exposed. But Courtenay knew her plan would work, confident that the crippled system would abet her crimes. Courtenay knew from the contracts Brown signed that it was Ms. Brown's personal residence and that the residence was used to support her dependent daughter. Therefore she should have filed exemptions and objections REGARDLESS. However, a provision of the contract allows for payment from the sale of Brown's home.

1   For a very long time Ms. Brown was puzzled as to why Courtenay threw a 3 inch wide case binder at Brown and
    had security officers escort Brown out of her office on the day of Brown's eviction and 18 hours before Brown's
2   custody trial. Courtenay became furious when Brown questioned Courtenay about her failure to return Brown's
    calls to schedule a time to discuss her two cases. Courtenay emphatically denied Brown's remarks and stated she
3   had logged numerous calls and left several messages for Brown. It wasn't until the Elkins v. Contra Costa County
4   case recently published that Brown was finally able to piece together many such troubling scenarios that
    previously made little sense. As it was, those phone calls were indeed important, and Courtenay's extreme
5   reaction now made sense.  What Courtenay DOES NOT know is that the phone number Courtenay claimed to
    have left messages on was a cellular phone. Cellular bills record all incoming and outgoing calls. There was not
6   one single call to Brown from Courtenay's office or cell phone.

7   It is important to mention that this type of default is much different than the default judgment filed against
8   Brown discussed in section 3. 'Default' is a term used to describe the manner in which the judge weighed – or
9   didn't weigh – the merits of the case. The records do not indicate Ms. Brown lost her home due to a default
    judgment. Instead, the records indicate Brown appeared and judgment was rendered against her. Of course this
10  worked to the advantage of the judge for it would have appeared peculiar to have 2 separate default judgments
    in the same trial resulting in the loss of a person's fundamental liberty. This court rule also sufficiently
11  circumvented the judicial process since an actual default judgment offers remedies and protections such as the
12  opportunity for the party to 'set aside' the default. The trial court's rule was much more efficient. By depriving
    parties of those protections and remedies; expediency triumphed over a trial on the merits.

13

14              19) CCP 484.060 (a) If the defendant desires to oppose the issuance of the right to attach

15                  order sought by plaintiff or objects to the amount sought to be secured by the attachment,

16                  the defendant shall file and serve upon the plaintiff no later than five court days prior to the

17                  date set for the hearing a notice of opposition. The notice shall state the grounds on which

                    the defendant opposes the issuance of the order or objects to the amount sought to be
18
                    secured by the attachment and shall be accompanied by an affidavit supporting any
19
                    factual issues raised and points and authorities supporting any legal issues raised. If the
20                  defendant fails to file a notice of opposition within the time prescribed, the defendant shall

21                  not be permitted to oppose the issuance of the order.

22              20) (b) If a defendant filing a notice of opposition desires to make any claim of exemption as

23                  provided in Section 484.070, the defendant may include that claim in the notice of

                    opposition filed pursuant to this section.

24  ▶ **#19 and #20: Ms. Brown's attorney knew Brown qualified for exemptions from the beginning.**
    **Courtenay was hired for both Brown's cases; one entitled "eviction" and the other entitled**
25  **"custody". Contained in the contract was Ms. Brown's place of employment - Brown's sole**
    **proprietorship located at Brown's personal residence. Regardless of the claims by Courtenay that**
26  **Ms. Brown refused to return her calls (phone records indicate otherwise), at a minimum Ms.**
    **Courtenay should have filed an objection to attach Brown's property claiming known exemptions**
27  **and objected to Brown's personal residence being attached since the value GROSSLY exceeded**
28  **Albright's claim.**

29

30

21) CCP 484.070. (b): If the defendant desires to claim at the hearing that real or personal property not described in the plaintiff's application or real property described in the plaintiff's application is exempt from attachment, in whole or in part, the defendant shall claim the exemption as provided in this section. Failure to make the claim does not preclude the defendant from later claiming the exemption. If the claim is made as provided in this section but the defendant fails to prove that the property is exempt from attachment, the defendant may not later claim that the property, or a portion thereof, is exempt except as provided in Section 482.100.

▶ **#21: Contra Costa County's trial court rule and order prevented Ms. Brown from claiming anything during the hearing since direct oral examination was not allowed. However, Ms. Brown reserves the right, subject to damages, to claim an exemption for Brown's personal property not described in Albright's application yet unlawfully seized.**
**And . . . ALL of Ms. Brown's evidence, case information, witness names and files, for BOTH of her cases was unlawfully seized by the Sherriff and turned over to her adversaries!**
**(This occurred less than 24 hours before Brown's custody trial - scheduled the following day . . . Brown and her infant were forced to the streets with the clothes on their backs and $.42 cents)**

The illegality of the conduct or the revelation of the real facts makes the entire situation illegal ab initio (from the beginning), not just from the time the wrongful behavior occurs. When the sheriff entered Brown's property under the 'assumed' authority of a court order requiring him to seize only the real property, but instead he takes Brown's personal property as well, he was a trespasser from the beginning. Since the officer abused his authority, the court should presume that he intended from the outset to use that authority as a cloak from under which to enter the property for a wrongful purpose.

22) CCP 484.080. (b): The court may, in its discretion and for good cause shown, grant the defendant a continuance for a reasonable period to enable him to oppose the issuance of the right to attach order. If such a continuance is granted, the court shall extend the effective period of any protective order issued pursuant to Chapter 6 (commencing with Section 486.010) for a period ending not more than 10 days after the new hearing date unless the defendant shows pursuant to Section 486.100 that the protective order should be modified or vacated.

▶ **#22: AT A MINIMUM, the judge should have granted a continuance based on the following facts; the bias and lack of personal knowledge of the witnesses, no factual evidence to support a finding that Ms. Brown was devaluing the property, Ms. Brown appeared but was told to wait outside courtroom doors, Brown's attorney did nothing on Brown's behalf, and the judge KNEW the property was used by Brown for personal, family and household purposes; that the property was used to provide for Brown's dependent daughter; that Brown had recently spent considerable money upgrading the home rather than degrading it; that Ms. Brown obtained approval to refinance the property to pay off Albright's claim but Albright refused to sign final documents; that Albright was in fact acting as both judgment creditor and judgment debtor in the same transaction; that Albright's only witness, Sandor Sonkoly was inherently biased since the court named him as listing agent for the sale of the property months beforehand; that Mr. Sonkoly and Mr. Albright lacked personal knowledge to assert Brown was decreasing the value of the property; that neither Albright or Sonkoly were considered experts in real estate appraisal; and failed to**

require an appraisal by a neutral expert in order to follow federal rules of evidence prohibiting hearsay used as evidence. And don't forget about due process issues, the unlawful default judgment and the fraudulent cause of action.

▶ Let's not forget another important fact. A big part of a judicial officer's duty is to also weigh the prejudice caused by such an order and potential detriment and harm that would result from a wrongful attachment. The judge was abusively indifferent to such thoughts such as: customer inventory, accounts receivables of $245,000, equipment liens, credit rating obliterated, bank account closures, seizures, collections, financial devastation and irreparably ruined business reputation. Oh, one more thing . . . forcing a mother and her infant to the streets.

23) CCP 484.090. (a): At the hearing, the court shall consider the showing made by the parties appearing and shall issue a right to attach order, which shall state the amount to be secured by the attachment determined by the court in accordance with Section 483.015 or 483.020, if it finds all of the following:

24) (1): **Not met** - The claim upon which the attachment is based is one upon which an attachment may be issued

25) (2): **Not met** - The plaintiff has established the probable validity of the claim upon which the attachment is based.

26) (3): **Not met** - The attachment is not sought for a purpose other than the recovery on the claim upon which the attachment is based.

(4): Met - The amount to be secured by the attachment is greater than zero.

27) (b): **Not met and no undertaking requested** - If, in addition to the findings required by subdivision (a), the court finds that the defendant has failed to prove that all the property sought to be attached is exempt from attachment, it shall order a writ of attachment to be issued upon the filing of an undertaking as provided by Sections 489.210 and 489.220.

28) (c): **Not met and judge knew defendant was exempt** - If the court determines that property of the defendant is exempt from attachment, in whole or in part, the right to attach order shall describe the exempt property and prohibit attachment of the property.

29) (d): **Not met** - The court's determinations shall be made upon the basis of the pleadings and other papers in the record; but, upon good cause shown, the court may receive and consider at the hearing additional evidence, oral or documentary, and additional points and authorities, or it may continue the hearing for the production of the additional evidence or points and authorities.

▶ #23-#26: The judge ordered a writ of attachment requiring ALL four conditions to be met, yet only ONE condition was met (that the value to attach was greater than zero).

▶ #27-28: Not only were the conditions not met, the judge KNEW the property was exempt from attachment, yet the judge still ordered the writ of attachment and FAILED to order the filing of an undertaking REQUIRED by law to protect Ms. Brown against a wrongful attachment (refer to 'Undertakings' in this section).

▶ **#29: The judge intentionally acted against the law by not allowing Brown into the courtroom during the hearing: The judge intentionally prevented Ms. Brown from providing evidence, oral or documentary. When Brown told the judge she had secured a refinance but Albright refused to sign it, or that Brown had evidence of upgrading the property, or that Albright's attorney tried warning the judge that Brown had a business at the residence – should have been reasonable doubt. But, the judge disregarded evidence already on record, favored hearsay, biased declarations over facts, failed to consider good cause Brown showed the court, or continue the hearing to give Brown opportunity for the production of additional evidence. And let us not forget the most important fact, that the judge knew the case clearly exceeded family court jurisdiction.**

### CCP 484.100. Brown's rights retained:

The court's determinations under this chapter shall have no effect on the determination of any issues in the action other than issues relevant to proceedings under this chapter nor shall they affect the rights of the plaintiff or defendant in any other action arising out of the same claim of the plaintiff or defendant. The court's determinations under this chapter shall not be given in evidence nor referred to at the trial of any such action.

### CCP 484.110.(a) Brown's rights retained

Neither the failure of the defendant to oppose the issuance of a right to attach order under this chapter nor the defendant's failure to rebut any evidence produced by the plaintiff in connection with proceedings under this chapter shall constitute a waiver of any defense to the plaintiff's claim in the action or any other action or have any effect on the right of the defendant to produce or exclude evidence at the trial of any such action.

### CCP 484.110. (b) Brown's rights retained

Neither the failure of the plaintiff to oppose the issuance of an order reducing the amount to be secured by the attachment under this chapter nor the plaintiff's failure to rebut any evidence produced by the defendant in connection with proceedings under this chapter shall constitute a waiver of any defense to the defendant's claim in the action or any other action or have any effect on the right of the plaintiff to produce or exclude evidence at the trial of any such action.

## Writ of Attachment Procedures

For the purposes of this section, references to the "judgment debtor" shall be deemed references to the defendant (Ms. Brown), and references to the "judgment creditor" shall be deemed references to the plaintiff (Mr. Albright). This was also how the names were listed on the writ notice taped to Brown's door one week before the eviction.

30) CCP 489.210. Before issuance of a writ of attachment, a temporary protective order, or an order under subdivision (b) of Section 491.415, the plaintiff shall file an undertaking to pay the defendant any amount the defendant may recover for any wrongful attachment by the plaintiff in the action.

▶ **#30: Civil Code of Procedure chapter 9 is devoted exclusively to undertakings. The requirement of undertakings pursuant to writ of attachment is not a matter of judicial discretion. After**

**repeatedly failing to follow the laws, then proceeding to order an unlawful and unauthorized fraudulent attachment against Ms. Brown's real property, the officer of the court continued to abuse power by not requiring an undertaking prior to ordering the writ of attachment. In so doing, the judge intentionally prevented Ms. Brown's from recovering damages due to a wrongful attachment against constitutionally protected fundamental liberties.**

31) CCP 489.220. (a) Except as provided in subdivision (b), the amount of an undertaking filed

pursuant to this article shall be ten thousand dollars ($10,000).

32) (b) If, upon objection to the undertaking, the court determines that the probable recovery

for wrongful attachment exceeds the amount of the undertaking, it shall order the amount of

the undertaking increased to the amount it determines to be the probable recovery for

wrongful attachment if it is ultimately determined that the attachment was wrongful.

▶ **#31: The judge awarded attorney fees and damages to Albright, yet the judge failed to require even the MINIMUM undertaking of $10,000 to protect Brown's assets.**

▶ **#32: Obviously CCP 489.220 (b) was violated since Brown could not object to the amount of Albright's undertaking if the judge didn't require one in the first place.**

33) CCP 489.230. (a) The notice of attachment shall include a statement, in a form adopted by

the Judicial Council, advising the defendant that the undertaking has been filed and

informing the defendant of the right to object to the undertaking.

▶ **#33: In failing to require an undertaking prior to ordering a writ of attachment, the judge also denied Brown opportunity to object to the amount of the undertaking.**

▶ **It is also important to note that the writ notice taped to Brown's door required the amount of the attachment to be listed on the face of the form. There was no such amount listed on the notice or anywhere in the documents. The amount is important because just as a landlord eviction notice requires an amount to be listed on the notice so that the tenant can pay that amount up until the final hour and stop the eviction, the same is required for real property evictions. Because the amount was not listed anywhere in any of the documents, the intention of Brown's adversaries – including the judge – was to intentionally deny Brown any opportunities to keep her property. It was much more lucrative for her adversaries to split Brown's $400,000-$700,000.**

## Writ of Possession: General Concepts

*First a judge must require an undertaking or surety as a security against a wrongful attachment. Therefore, the laws surrounding writs of possession require substantive elements of proof and due process. That is also why surety bonds or undertakings of no less than twice the value or market value of the attached property is required prior to the ordering of any writ of possession. It is a protection for the party whose wages may have wrongfully been attached to quickly recover damages. (It would not make sense for that person who was wrongfully deprived of their wages to further endure the burdens of hiring an attorney and battling a new case, and suffering more damage as a consequence.)*

▶ **In Ms. Brown's case, the judge failed to require an undertaking before ordering a writ of attachment. The judge's failure was intentional because it was a requirement – NO JUDICIAL DISCRETION ALLOWED. But the judge broke the law a second time by also ordering a writ of possession without an undertaking. Undertaking procedures MUST be strictly followed and**

**verified BEFORE a judge can order a writ of possession. The judge violated entire sections of law not mentioned because they deal with undertakings – and because the judge didn't require an undertaking, all of those laws were violated.**

## 1. Albright v. Brown: Void for unlawful activity of a judge, Code of Judicial Conduct.

▶ **The judge violated over 73 laws. The judge acted at all times in the absence of jurisdiction and against the law.**

The law is clear and well-settled that a judge in a statutory proceeding, such as divorce, bankruptcy, forcible detainer, etc., is governed by the rules of limited jurisdiction and not by the rules of general jurisdiction. "Normally, anyone dealing with a government agency assumes the risk of having ascertained whether the official or agent is acting within the bounds of his authority." Drury Displays, Inc. v. Brown, 715 N.E.2d 1230 (1999). The court is a government agency, and the judge, as an officer of the court, may or may not have lawful authority to issue a specific order. Without lawful authority, his orders are void ab intitio, of no legal force or effect.

The Court in Yates v. Village of Hoffman Estates, Illinois, 209 F. Supp. 757 (N.D. Ill. 1962) held that "not every action by a judge is in the exercise of his judicial function. … it is not a judicial function for a judge to commit an intentional tort even though the tort occurs in the courthouse. When a judge acts as a trespasser of the law, when a judge does not follow the law, the judge loses subject-matter jurisdiction and the judges' orders are void, of no legal force or effect."

▶ **This is where Ms. Brown must waive a white flag. Ms. Brown can attribute Albright's overall actions to greed. She can understand how the trial court's rule and order jeopardized the integrity of judicial process and contributed to her attorney's unethical fraud. None of these factors however, explain why the judge acted in direct contravention of the law and the judicial ethical canons. Under no circumstances does a judge have the authority to usurp jurisdiction.**

Chief Justice Marshall's exposition in Cohens v. Virginia, 6 Wheat. 264 (1821), wrote, "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid; but we cannot avoid them."

This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding.

▶ **Under Federal law, when any officer of the court has committed "fraud upon the court", the orders and judgment of that court are void, of no legal force or effect.**

- A judge is an officer of the court, as well as are attorneys. A state judge is a state judicial officer, paid by the State to act impartially and lawfully. A federal judge is a federal judicial officer, paid by the federal government to act impartially and lawfully. State and federal attorneys fall into the same general category and must meet the same requirements. A judge is not the court. People v. Zajic, 88 Ill.App.3d 477, 410 N.E.2d 626 (1980).

- Whenever any officer of the court commits fraud during a proceeding in the court, he/she is engaged in "fraud upon the court". In Bulloch v. United States, 763 F.2d 1115, 1121 (10th Cir. 1985), the court stated "Fraud upon the court is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury. ... It is where the court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function --- thus where the impartial functions of the court have been directly corrupted."

- "Fraud upon the court" has been defined by the 7th Circuit Court of Appeals to "embrace that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." Kenner v. C.I.R., 387 F.3d 689 (1968); 7 Moore's Federal Practice, 2d ed., p. 512, ¶ 60.23. The 7th Circuit further stated "a decision produced by fraud upon the court is not in essence a decision at all, and never becomes final."

▶ **Judicial Disqualification: "Recusal under Section 455 is self-executing; a party need not file affidavits in support of recusal and the judge is obligated to recuse themself sua sponte under the stated circumstances." Taylor v. O'Grady, 888 F.2d 1189 (7th Cir. 1989). Further, the judge has a legal duty to disqualify himself even if there is no motion asking for his disqualification. The Seventh Circuit Court of Appeals further stated that "We think that this language [455(a)] imposes a duty on the judge to act sua sponte, even if no motion or affidavit is filed." Balistrieri, at 1202.**

- In 1994, the U.S. Supreme Court held that "Disqualification is required if an objective observer would entertain reasonable questions about the judge's impartiality. If a judge's attitude or state of mind leads a detached observer to conclude that a fair and impartial hearing is unlikely, the judge must be disqualified." [Emphasis added]. Liteky v. U.S., 114 S.Ct. 1147, 1162 (1994).

- Courts have repeatedly held that positive proof of the partiality of a judge is not a requirement, only the appearance of partiality. Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 108 S.Ct. 2194 (1988) (what matters is not the reality of bias or prejudice but its appearance); United States v. Balistrieri, 779 F.2d 1191 (7th Cir. 1985) (Section 455(a) "is directed against the appearance of

partiality, whether or not the judge is actually biased.") ("Section 455(a) of the Judicial Code, 28 U.S.C. §455(a), is not intended to protect litigants from actual bias in their judge but rather to promote public confidence in the impartiality of the judicial process.").

● That Court also stated that Section 455(a) "requires a judge to recuse himself in any proceeding in which her impartiality might reasonably be questioned." Taylor v. O'Grady, 888 F.2d 1189 (7th Cir. 1989). In Pfizer Inc. v. Lord, 456 F.2d 532 (8th Cir. 1972), the Court stated that "It is important that the litigant not only actually receive justice, but that he believes that he has received justice."

● The Supreme Court has ruled and has reaffirmed the principle that "justice must satisfy the appearance of justice", Levine v. United States, 362 U.S. 610, 80 S.Ct. 1038 (1960), citing Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13 (1954). A judge receiving a bribe from an interested party over which he is presiding, does not give the appearance of justice.

● Judges do not have discretion not to disqualify themselves. By law, they are bound to follow the law. Should a judge not disqualify himself as required by law, then the judge has given another example of his "appearance of partiality" which, possibly, further disqualifies the judge. Should another judge not accept the disqualification of the judge, then the second judge has evidenced an "appearance of partiality" and has possibly disqualified himself/herself. None of the orders issued by any judge who has been disqualified by law would appear to be valid. It would appear that they are void as a matter of law, and are of no legal force or effect.

● Should a judge not disqualify himself, then the judge is violation of the Due Process Clause of the U.S. Constitution. United States v. Sciuto, 521 F.2d 842, 845 (7th Cir. 1996) ("The right to a tribunal free from bias or prejudice is based, not on section 144, but on the Due Process Clause.").

● Should a judge issue any order after he has been disqualified by law, and if the party has been denied of any of his / her property, then the judge may have been engaged in the Federal Crime of "interference with interstate commerce". The judge has acted in the judge's personal capacity and not in the judge's judicial capacity. It has been said that this judge, acting in this manner, has no more lawful authority than someone's next-door neighbor (provided that they are not a judge).

● The Supreme Court has also held that if a judge wars against the Constitution, or if he acts without jurisdiction, he has engaged in treason to the Constitution. If a judge acts after he has been automatically disqualified by law, then he is acting without jurisdiction, and that suggest that he is then engaging in criminal acts of treason, and may be engaged in extortion and the interference with interstate commerce.

● Courts have repeatedly ruled that judges have no immunity for their criminal acts. Since both treason and the interference with interstate commerce are criminal acts, no judge has immunity to engage in such acts.

▶ **Judicial Immunity: The state high court very recently ruled that "sophisticated users" can't sue manufacturers for failing to warn them about risks they should have known about given their**

**skill level. In Ms. Brown's opinion, judicial officers, attorneys and other public officials and agencies must at least be held accountable to the same standards they expect from the general public. Therefore, given their skill levels (ESPECIALLY officers of the court), they cannot defer their complicity or use in any defense whatsoever, that the trial court's illegal rules and orders 'made them do it'. Judges, of all entities in the United States 'should know better' due to their required skill level and oath to the citizens of the United States.**

- *The United States Supreme Court, in Scheuer v. Rhodes,* 416 U.S. 232, 94 S. Ct. 1683, 1687 (1974) stated that when a state officer acts under a state law in a manner volative of the Federal constitution, he comes into conflict with the superior authority of the Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. A judge's private, prior agreement to decide in favor of one party is not a judicial act. Although a party conniving with a judge to predetermine the outcome of a judicial proceeding may deal with him in his "judicial capacity," the other party's expectation of judicial impartiality is actively frustrated by the scheme. It is the antithesis of the "principled and fearless decision-making" that judicial immunity exists to protect. *Rankin v. Howard,* 633 F.2d 844 (9th Cir. 1980) cert. DENIED, 451 U.S. 939, 101 S. Ct. 2020, (1981), *Pierson v. Ray,* 386 U.S. 547, 554, 87S. Ct. 1213 (1967), and *Gregory v. Thompson,* 500 F. 2d 59 (9th Cir. 1974).

- The judicially fashioned doctrine of official immunity does not reach so far as to immunize criminal conduct proscribed by an Act of Congress. "Absolute immunity from criminal liability involves immunity even in cases of alleged malice and negligence. *Fraud, corruption, and other inherently criminal acts.... are not covered.* SUING JUDGES, *id supra* at page 78. See also, *United States v. Hastings,* 681 F. 2d 706 at 711, n.17 (11th Cir. 1982), *Oshea v. Littleton,* 38 L.ed 2d. 674 at 688 (1974), and *Cooke v. Bangs,* 31 F. 640 (US Cir. Ct. Minnesota, (1887) at page 642.

- "No man in this country is so high that he is above the law." No officer of the law may set that law at defiance with impunity. All the officers of the Government, from the highest to the lowest, are creatures of the law, and are bound to obey it. It is only supreme power in our system of government, and every man, who, by accepting office, participates in its functions, is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives. See *INTERNATONAL POSTAL SUPPLY COMPANY v. BRUCE* (05/31/04) 194 U.S. 601, 48 L.Ed. 1134, 24 S. Ct. at page 609. But immunity from suit is a high attribute of sovereignty – a prerogative of the State itself – which cannot be availed of by public agents when sued for their own torts. The Eleventh Amendment was not intended to afford them freedom from liability in any case where, under color of their office; they have injured one of the State's citizens. To grant them such immunity would be to create a privileged class free from liability from wrongs inflicted or injuries threatened. Public agents must be liable to the law, unless they are to be put above the law. See *OLD COLONY TRUST COMPANY v. CITY SEATTLE ET AL.* (06/01/26) 271

U.S. 426, 46 S.Ct. 552, 70 L. Ed at page 431. No officer of the law may set that law at defiance with impunity. See *United States v. Lee*, 106 U.S. 196, 220 and *Burton v. United States*, 202U.S. 344.

- The liability of state judicial officials and all official participants in state judicial proceedings under § 2 was explicitly and repeatedly affirmed. The notion of immunity for such officials was thoroughly discredited. The Senate sponsor of the Act deemed the idea "akin to the maxim of the English law that the King can do no wrong. It places officials above the law. It is the very doctrine out of which the rebellion [the Civil War] was hatched." Cong. Globe, 39th Cong., 1st Sess., 1758 (18660 (Sen. Trumble). Thus, § 2 was "aimed directly at the State judiciary." Id., at 1155 (Rep. Eldridge). See also id. At 1778 (Sen. Johnson, member of the Senate Judiciary Committee).There was "no difference in the principle involved" between a civil remedy and a criminal sanction. Ibid. See *BRISCOE ET AL. V. LAHUE ET AL.* (03/07/83) 460 U.S. 3325, 103 S. Ct. 1108, 75 L.Ed. 2d 96, 51 U.S.L.W. at page 359.

"People are the Masters of both Congress and Courts, not to overthrow the Constitution, but to overthrow the men who pervert it!" Abraham Lincoln

## Ex-Parte Writ of Possession

A writ of possession will issue ex parte (without a noticed hearing on very short notice) only if (CCP 512.020):

34) The property was stolen, or

35) The property is a credit card, or

36) The property was acquired by defendant for commercial purposes, is not necessary for family support, will not be available for levy by reason of removal, or destruction, and immediate seizure is necessary to protect it.

37) An ex parte writ of possession cannot issue in any other circumstances. [CCP 512.020(a)]

38) The TRO can remain in effect for a maximum 15 days, unless the court authorizes a 22-day duration for good cause shown.

39) Any defendant whose property has been taken pursuant to a writ of possession issued under this subdivision may apply for an order that the writ be quashed and any property levied on pursuant to the writ be released.  Such application shall be made by noticed motion, and the provisions of Section 512.050 shall apply.  Pending the hearing on the defendant's application, the court may order that delivery pursuant to Section 514.030 of any property previously levied upon be stayed.  If the court determines that the plaintiff is not entitled to a writ of possession, the court shall quash the writ of possession and order the release and redelivery of any property previously levied upon, and shall award the

defendant any damages sustained by him which were proximately caused by the levy of

the writ of possession and the loss of possession of the property pursuant to such levy.

**The judge illegally ordered an ex-parte writ of possession because the judge knew, without a doubt, that not one of the conditions required by law was met. The ex-parte writ of possession was unauthorized for failing to meet probable cause requirements. Absent probable cause requirements, Brown was deprived her right to a noticed hearing, the third due process violation in a single trial.**

▶ **#34: Ms. Brown did not feloniously take the property from Mr. Albright.  In reality, the court allowed Albright to feloniously take the property from Ms. Brown since she was the legal owner, not Mr. Albright.**

▶ **#35-37: The property was not a credit card. Ms. Brown did not acquire possession of the property in the ordinary course of her trade or business. The property WAS necessary for the support of Ms. Brown and her family. There was no immediate danger the property would become unavailable to levy by reason of being transferred, concealed, or removed from the state or become substantially impaired in value by acts of destruction. The ex-parte writ of possession WAS NOT necessary to protect property.**

▶ **#38-39: Please read these 2 statutes for they will become very important in the following sections.**

      40) The usual method of obtaining a writ of possession is by order following noticed hearing
          [Ca Civ Pro § 512.020(a)]. The substantive prerequisites for issuance of the writ must be
          shown at the hearing, and defendant must be given an opportunity to oppose its issuance.

▶ **#40: Ms. Brown was denied noticed hearing by the unlawful issuance of the ex-parte writ of possession.**

      41) CCP 512.100. Neither the failure of the defendant to oppose the issuance of a writ of
          possession under this chapter nor his failure to rebut any evidence produced by the
          plaintiff in connection with proceedings under this chapter shall constitute a waiver of any
          defense to plaintiff's claim in the action or any other action or have any effect on the right of
          the defendant to produce or exclude evidence at the trial of any such action.

      42) CCP 512.110. The determinations of the court under this chapter shall have no effect on the
          determination of any issues in the action other than the issues relevant to proceedings
          under this chapter, nor shall they affect the rights of any party in any other action arising out
          of the same claim.  The determinations of the court under this chapter shall not be given in
          evidence nor referred to in the trial of any such action.

▶ **#41: Brown's right's retained.**

▶ **#42: This is where the events and legal proceedings begin to get dicey. Suffice to say, the determinations of the court under this chapter most definitely affected Ms. Brown's rights in another action arising out of this claim. First Ms. Brown had all of her evidence and case information seized during the writ of possession less than 24 hours before her scheduled custody trial in the same court. Second, the seizure of her home was used as an indication of abduction of her infant resulting in the infant being taken away from her. Ms. Brown is still only allowed to see her daughter under supervised visitation.**

43) At the hearing the plaintiff must show the probable validity of his or her claim to possession of the property (under applicable substantive law); and a probability of "immediate danger" that the property will be transferred, concealed or removed, or may become substantially impaired in value and that an undertaking has been filed pursuant to Ca Civ Pro § 515.050 [Ca Civ Pro § 513.010 (b)]

44) "Probable validity" means it is "more likely than not" that plaintiff will obtain judgment against defendant on the claim to possession of the property. [Ca Civ Pro § 511.090]

▶ **#43 - #44: No validity to Albright's claim, no showing of immediate danger, and no undertaking filed . . .NO!! NO!! and NO!!**

45) To obtain either a temporary restraining order or writ of possession, plaintiff must post a bond of twice the value of defendant's interest in the property--i.e., market value, less amounts of liens or balances due under conditional sales contracts or security agreements. [Ca Civ Pro § 515.010] The levying officer will deliver the undertaking to defendant (together with a copy of the writ and of the order for issuance of the writ) upon seizure of the property. [Ca Civ Pro § 514.020(a)]

46) Note: If the court finds that defendant has no interest in the property, no undertaking is required. [Ca Civ Pro § 515.010(b)]

47) Defendant may prevent plaintiff from taking possession of the property under a writ of possession or may regain possession of the property seized, by posting a bond in the same amount as plaintiff's bond. [Ca Civ Pro § 515.020(a)]

▶ **#45 - #46: Albright did not post a bond of twice the value of Brown's interest in the property as required by law. Maybe . . . the judge had a bad hair day and decided that today she would divest Brown of her life's sole financial achievements and at the same time take away opportunities to renew her financial vitality by also taking her business and while she's at it – remove any traces of this unconscionable act by seizing all of Brown's evidence, files, and records. Then, and only then, could the judge have reasonably not required Albright to post a bond because Brown now had no interest in the property.**

▶ **#47: By failing to require Albright to post a bond, Ms. Brown was also deprived of all possible remedies including Brown posting a bond equal to that of Albright's to prevent Albright from taking possession of the property.**

48) As with any proceeding, the court cannot go ahead unless the complaint, the moving papers, and all the supporting documents are timely served. (Ca Civ Pro § 1005) Any TRO already issued will be dissolved if the hearing is thwarted due to lack of service. [Ca Civ Pro § 527(d)(3)]

▶ **#48: No Service, No Proof of Service, No Documents, No Hearing, No Facts, No Surety Bond, and NO REMEDIES!!**

49) Except in rare cases where special permission is granted, the hearing will normally be conducted only on affidavits and declarations. After resolving objections, the court will admit into evidence, by reference to the file, the affidavits, declarations, and (if applicable) the verified complaint.

▶ **#49: Since there was no hearing, Ms. Brown was not allowed to produce affidavits or declarations or ANYTHING in her behalf.**

50) CCP 515.010. (a) Except as provided in subdivision (b), the court shall not issue a temporary restraining order or a writ of possession until the plaintiff has filed an undertaking with the court. The undertaking shall provide that the sureties are bound to the defendant for the return of the property to the defendant, if return of the property is ordered, and for the payment to the defendant of any sum recovered against the plaintiff. The undertaking shall be in an amount not less than twice the value of the defendant's interest in the property or in a greater amount. The value of the defendant's interest in the property is determined by the market value of the property less the amount due and owing on any conditional sales contract or security agreement and all liens and encumbrances on the property, and any other factors necessary to determine the defendant's interest in the property.

51) (b) If the court finds that the defendant has no interest in the property, the court shall waive the requirement of the plaintiff's undertaking and shall include in the order for issuance of the writ the amount of the defendant's undertaking sufficient to satisfy the requirements of subdivision (b) of Section 515.020.

▶ **#50: The judge was not authorized to order a writ of possession until Mr. Albright filed an undertaking of no less than twice the market value of Brown's home. By law $1,800,000.00 (2 x $900,000.00) was required by Mr. Albright to satisfy any authorized writ of possession. By failing to require the undertaking, the judge deprived Brown of all recovery monies if Brown recovered property.**

▶ **#51: In order for the court to waive Albright's requirement for filing an undertaking, the court must have found that Brown had no interest in the property. (Perhaps this explains how the court authorized itself to order the sale of Brown's home and sign her grant deed without Brown's knowledge or consent).**

52) CCP 515.020. (a) The defendant may prevent the plaintiff from taking possession of property pursuant to a writ of possession or regain possession of property so taken by filing with the court in which the action was brought an undertaking in an amount equal to the amount of the plaintiff's undertaking pursuant to subdivision (a) of Section 515.010 or in the amount determined by the court pursuant to subdivision (b) of Section 515.010.

53) (b) The undertaking shall state that, if the plaintiff recovers judgment on the action, the defendant shall pay all costs awarded to the plaintiff and all damages that the plaintiff may

sustain by reason of the loss of possession of the property. The damages recoverable by the plaintiff pursuant to this section shall include all damages proximately caused by the plaintiff's failure to gain or retain possession.

54) (c) The defendant's undertaking may be filed at any time before or after levy of the writ of possession. A copy of the undertaking shall be mailed to the levying officer.

55) (d) If an undertaking for redelivery is filed and the defendant's undertaking is not objected to, the levying officer shall deliver the property to the defendant, or, if the plaintiff has previously been given possession of the property, the plaintiff shall deliver the property to the defendant. If an undertaking for redelivery is filed and the defendant's undertaking is objected to, the provisions of Section 515.030 apply.

▶ **#52-#55: An 8th Amendment violation for cruel and unusual punishment arises when a court's failure to protect a party is achieved through abusive indifference. Ms. Brown was denied opportunities to prevent Albright from fraudulently taking possession of property per CCP 515.020 by filing an undertaking for redelivery equal to the amount of Albrights undertaking because the amount of Albright's undertaking was never established thus denying Ms. Brown remedies per CCP 515.020.**

56) CCP 515.030. (a) The defendant may object to the plaintiff's undertaking not later than 10 days after levy of the writ of possession. The defendant shall mail notice of objection to the levying officer.

57) (b) The plaintiff may object to the defendant's undertaking not later than 10 days after the defendant's undertaking is filed. The plaintiff shall mail notice of objection to the levying officer. (c) If the court determines that the plaintiff's undertaking is insufficient and a sufficient undertaking is not filed within the time required by statute, the court shall vacate the temporary restraining order or preliminary injunction, if any, and the writ of possession and, if levy has occurred, order the levying officer or the plaintiff to return the property to the defendant. If the court determines that the plaintiff's undertaking is sufficient, the court shall order the levying officer to deliver the property to the plaintiff.

58) (c) If the court determines that the defendant's undertaking is insufficient and a sufficient undertaking is not filed within the time required by statute, the court shall order the levying officer to deliver the property to the plaintiff, or, if the plaintiff has previously been given possession of the property, the plaintiff shall retain possession. If the court determines that the defendant's undertaking is sufficient, the court shall order the levying officer or the plaintiff to deliver the property to the defendant.

▶ **#56-#58: If there still exists any question as to the intent of the judicial officer relative to abusive indifference, one need only to reasonably view judicial conduct during the 10 day period for Brown to file for applicable remedies per CCP 515.030 and other available writs. The fact that the judge ordered the home sold and signed Brown's grant deed (without notifying Brown and without Brown's consent) and completed the sale PRIOR to the expiration of the 10 day period, clearly implies the judge had no intention to protect the fundamental property rights of Brown.**

**Wrongful Attachment**

59) CCP 490.010. A wrongful attachment consists of any of the following:

(a) The levy under a writ of attachment or the service of a temporary protective order in an action in which attachment is not authorized, except that it is not a wrongful attachment if both of the following are established:

(1) The levy was not authorized solely because of the prohibition of subdivision (c) of Section 483.010.

(2) The person who sold or leased, or licensed for use, the property, furnished the services, or loaned the money reasonably believed that it would not be used primarily for personal, family, or household purposes.

(b) The levy under a writ of attachment or the service of a temporary protective order in an action in which the plaintiff does not recover judgment.

(c) The levy under writ of attachment obtained pursuant to Article 3 (commencing with Section 484.510) of Chapter 4 or Chapter 5 (commencing with Section 485.010) on property exempt from attachment except where the plaintiff shows that the plaintiff reasonably believed that the property attached was not exempt from attachment.

▶ **#59: To cut through the mumbo jumbo of this statute, it is merely stating that (a) Albright engaged in a wrongful attachment since he knew the home was being used for personal, family, or household purposes, (b) he recovered 3 times the amount owed and (c ) Albright knew the property was exempt.**

60) CCP 490.020. (a) The liability of a plaintiff for causing a wrongful attachment under Section 490.010 includes both of the following:

(1) All damages proximately caused to the defendant by the wrongful attachment.

(2) All costs and expenses, including attorney's fees, reasonably expended in defeating the attachment.

(b) The liability of a plaintiff for wrongful attachment pursuant to Section 490.010 is limited by the amount of the undertaking.

61) CCP 490.060. Nothing in this chapter limits the right to recover for damages caused by an attachment or protective order on any common law theory of recovery.

▶ **#60: While Albright's liability for causing a wrongful attachment includes all damages proximately caused to Ms. Brown by the wrongful attachment including all costs and expenses, including attorney's fees, reasonably expended in defeating the attachment, the judge fraudulently denied Brown her right of recovery since Mr. Albright's liability for a wrongful attachment is limited by the amount of the undertaking – which of course, the judge failed to require.**

▶ **#61: Brown's rights retained.**

# Recovery of Real Property

62) CCP 318. No action for the recovery of real property, or for the recovery of the possession thereof, can be maintained, unless it appear that the plaintiff, his ancestor, predecessor, or grantor, was seized or possessed of the property in question, within five years before the commencement of the action.

63) CCP 319. No cause of action, or defense to an action, arising out of the title to real property, or to rents or profits out of the same, can be effectual, unless it appear that the person prosecuting the action, or making the defense, or under whose title the action is prosecuted, or the defense is made, or the ancestor, predecessor, or grantor of such person was seized or possessed of the premises in question within five years before the commencement of the Act in respect to which such action is prosecuted or defense made.

64) CCP 321. In every action for the recovery of real property, or the possession thereof, the person establishing a legal title to the property is presumed to have been possessed thereof within the time required by law, and the occupation of the property by any other person is deemed to have been under and in subordination to the legal title, unless it appear that the property has been held and possessed adversely to such legal title, for five years before the commencement of the action.

65) CCP 322. When it appears that the occupant, or those under whom he claims, entered into the possession of the property under claim of title, exclusive of other right, founding such claim upon a written instrument, as being a conveyance of the property in question, or upon the decree or judgment of a competent Court, and that there has been a continued occupation and possession of the property included in such instrument, decree, or judgment, or of some part of the property, under such claim, for five years, the property so included is deemed to have been held adversely, except that when it consists of a tract divided into lots, the possession of one lot is not deemed a possession of any other lot of the same tract.

▶ **#62-#65: Ms. Brown has no idea what the difference is between these, but suffice to say, if Ms. Brown lost her home June 30, 2004, she is clearly within the 5 year timeline to make a claim for wrongful attachment and unlawful seizure and possession.**

## 2. Albright v. Brown: Writ of possession, writ of attachment, writ of execution based on void order of default based on void cause of action for fraud upon the court

Even a writ cannot breathe life into a *void judgment*: The legal effect of a judgment on a *writ of attachment, writ of possession, or writ of execution*, where the prior default judgment remains void without timely process or satisfaction, is to remove the presumption of payment arising from lapse of time. It adds nothing to the validity of the

former judgment, but simply leaves it as it was when rendered. The *writs were* dependent for its legal existence upon a valid default judgment; without it, the whole proceeding was a nullity. It is, therefore, perfectly immaterial to the merits of the case whether Ms. Brown appeared at the eviction or not. Pile et al. 9 Ark. 336, 4 Eng. 336 (1849). Because the original default judgment is void due to lack of service, the court must vacate the writ of possession judgment and all orders and suborders entered pursuant to it, and return the property to Ms. Brown immediately. *Adams v. Nationsbank*, 74 Ark.App. 384, 49 S.W.3d 164 (Ark.App. 07/05/2001). A void judgment or decree is a mere nullity, and has no force, either as evidence or by way of estoppel. The holding that a void judgment may be attacked collaterally was reaffirmed in *Chester v. Arkansas State Board of Chiropractic Examiners*, 245 Ark. 846, 435 S.W.2d 100 (1968). A judgment rendered without jurisdiction is void. *Cloman v. Cloman*, 229 Ark. 447, 316 S.W.2d 817 (1958). ARCP Rule 58 states: "[a] judgment or decree is effective only when so set forth and entered as provided in Rule 79(a)." The comment to this rule points out that the date of entry, as opposed to the date of rendition, is the effective date for appeal purposes. However, the date of entry is not controlling in the present case because death extinguished the jurisdiction of the court. It is not necessary to appeal from a void order because it never became effective. A void order is subject to collateral attack at any time. *Pendergist v. Pendergist*, 267 Ark. 1114, 593 S.W.2d 502 (1980).

▶ **The judge did not require an undertaking to be filed by Albright; the writ of attachment was unauthorized, exempt, and exceeded the amount necessary to satisfy Albright's money judgment by $800,000; the ex-parte writ of possession was entirely against statutory laws; therefore the entire matter was void ab initio for over 60 reasons (only one is required). Let us not forget that the entire matter was illegal to begin with; exceeded authority, fraudulent claim, due process, unlawful default judgment, etc., etc. Ms. Brown is requesting the entire matter be vacated and the property be returned to Ms. Brown subject to damages. Since the court unlawfully denied the required filings of undertakings or sureties, Ms. Brown is also requesting a prejudgment writ of attachment be ordered against all property assets for the following individuals directly complicit in the felonious act of conspiracy to defraud - Mr. Albright, Mr. Sonkoly, Ms. Courtenay, and for fraud upon the court - Ms. Courtenay and Judge Craddock.**

▶ **This malicious use of process left Brown with no where to go, no source of income, no evidence that could be used against them, and no available remedies. No options . . . equals no chance for recourse.**

*The legal engine may have been running . . . but there was no one behind the wheel.*

❧

*For the past 8 years, time has been measured by bitter chapters. At first, chapters were measured by years. Then it was months, then weeks, then days until June 15, 2004 to July 30, 2004 when chapters were measured by hours. For a 3 day period time was measured in minutes, June 30 to July 2. That is what I call "Ground Zero". Then the cycle started its painful process of reversing itself – from minutes, to hours, to days, to months and now years to understand the madness of what prevailed throughout that time.*

## Two weeks to Ground Zero

On Tuesday June 15, 2004, the night before Brown's extremely important eviction hearing, Yunker phoned Brown around 10pm. He confessed to Brown many things that were extraordinary to say the least and they spoke until nearly 4am - the morning of her trial. Brown found the timing a bit peculiar, but at the time she had no reason to suspect Albright and Yunker knew each other (phone records and testimony would later indicate they had been communicating regularly). Yunker confided to Brown numerous surprises including Yunker's purchase of a baby monitor – the same brand Brown used inside the home - so he could listen in to Brown's conversations while parked up the street. Even more surprising was the 180 degree shift in his demeanor toward Brown. No longer was Brown his object of discourse, viewed as one might a strange repulsive animal; a centipede for instance, which curiosity leads one to examine in spite of the aversion it raises. Instead, Yunker suddenly wanted to spend the upcoming weekend - the last weekend before their custody trial - together as a family one last time. He wanted to "look into her eyes and tell her how much she meant to him", and he wanted to stay at a local hotel for the weekend.

Following the diabolical eviction trial discussed in the previous 2 sections, Brown came home in tears to find Yunker waiting on her doorsteps. Brown hadn't allowed Yunker inside her home for the past 6 months and although Yunker tried for nearly 2 hours, Brown still wouldn't allow the 12 hour new, 're-born' Yunker into her home. Of course this had to be handled with extreme care, because telling Yunker "no" requires delicate ingenuity. Upon the slightest of provocation, Yunker's wrath is merciless. As an important example, when you finish reading this document please keep in mind the following statement Yunker offered to Brown one year later, as an explanation for all the things you will be reading about in the following sections; "*that'll teach you not to say 'no' when I ask to see Kaylie last December!*" Yunker was referring to a singular incident in which Brown denied a request by Yunker. Even though Brown explained to Yunker that since it was not Yunker's day for visitation, Brown had already made plans for the day; in reality Brown's decision was based solely on safety concerns for her daughter's welfare under the conditions of his visitation (this peculiar circumstance will not be discussed in this document). For this singular instance when Brown said 'no', the following sections will describe what constitutes Yunker's 'wrath'.

1    During those 2 hours, Yunker tried to cheer Brown up – invited Brown to get a massage, go to dinner. Yunker was insistent

2    . . . but Brown remained wary. Even Brown's greatest fear –fear that her daughter would grow up without ever knowing

3    what a 'family' was – was not enough to ease Brown's concern at the sudden and dramatic change in discourse. As the

4    week drew to a close and Yunker was still adamant about the upcoming "family weekend" at a hotel, Brown called the

5    Family Court Facilitator's office. She asked the on-call mediator if this sudden change in demeanor was 'normal' prior to a

6    custody trial. The on-call mediator was deeply concerned and replied, *"No! It is absolutely not normal. I strongly*

7    *recommend against going anywhere alone with him under the current circumstances"*.

8    Fortunately, the mediator's report came out that Friday. After reading the mediation report, Yunker's accidental merriment

9    expired quickly into his habitual moroseness for the rest of the weekend, but he turned it back on the following

10   Wednesday (after their custody hearing) wherein Brown asked for a long cause hearing so she could cross-examine the

11   mediator and testify in court. When she returned to her home, Brown found Albright's Writ of Possession notice taped to

12   her door and Yunker waiting on the steps – once again.

13

## One week to Ground Zero

14

15   Persistent does not quite describe this new Yunker attitude. For example, it took Brown another hour to get it through to

16   him that she had only 1 week to stop the eviction on June 30th and the same 1 week to prepare for her custody trial on

17   July 1st., the following day Yunker offered to come inside and take care of the infant so Brown could do her work, however

18   Brown had just learned of Yunker's drug set-up in the mediator's report she just received. So with as much tact as

19   possible, Brown was able to wiggle out of the awkward situation without offending Yunker's ego or invoking Yunker's

20   wrath. Later in the evening, however, Brown and her daughter loaded into their SUV and headed down the hill to meet Dr.

21   Marsden at Applebee's. After learning of Yunker's listening device, she felt it prudent to discuss her situation in person

22   with Dr. Marsden. On the way down the hill, Brown suddenly saw Yunker's face in her rear-view mirror. He was in her back

23   seat, wanting to know where she was going. (This is a 'safe' example Brown has used to illustrate the flavor of her situation

24   - none of the more traumatic events have been included in this document). Fast-forward to the weekend.

25   Brown had plans to drive to Paso Robles to celebrate her niece's birthday. Brown and her daughter planned to leave early

26   Saturday morning and return Sunday. Yunker showed up at Brown's home around 1:30am, planning to go with them.

27   Yunker didn't ask to go, and Brown was not given a choice. Yunker presented a perfect fatherly and family role to

28   everyone. On the drive home, Yunker kept pressing Brown about moving her things out of the house before her eviction in

29   3 days. Not having a clue that Albright and Yunker knew each other, let alone had a plan together, Brown confided her

30   plan to file a writ of stay the eviction on Friday after their custody trial Thursday. Yunker told Brown he was planning to take

1  | her dinner Friday night to celebrate Brown's birthday and that he had purchased tickets to his family's community Fourth
2  | of July celebration. Brown agreed to attend.

3  | Yunker left that evening to resume his camping trip with friends (he had interrupted his trip to go with Brown and her
4  | daughter to Paso Robles). Tuesday evening before Brown's 6am eviction, Brown went to Walgreen's to pick up a
5  | prescription Dr. Marsden had called in since Brown and her daughter had both taken ill. While parking her vehicle, she
6  | received a phone call from Yunker. Yunker was back in town and was ADAMANT that he pick up Brown's prescriptions for
7  | her even though Brown was already there. (THE PICKING UP OF PRESCRIPTIONS BECOMES IMPORTANT IN SECTION
8  | 7). He also purchased chain locks to put on her doors. Brown went to bed while Yunker installed the locks. In the morning
9  | at 5am, Brown was busy gathering things to pack for her and her daughter before the scheduled 6am eviction. The only
10 | thing Yunker was interested in was loading the hardwood flooring material into Brown's SUV. (YUNKER LOADING
11 | HARDWOOD FLOORING INSTEAD OF CHILD'S CLOTHING IS ALSO VERY IMPORTANT). Yunker left at 5:50am.

## Ground Zero

With one week notice to prepare for both her eviction and her custody trial, Ms. Brown desperately emailed, faxed and left voicemails totaling 19 messages for her attorney in both cases, Mary Courtenay. Ms. Courtenay didn't return one call or message until 4.5 hours AFTER Brown's eviction was to take place. (It is peculiar how Courtenay knew Brown's eviction had not yet taken place). When Brown asked her attorney if she had put a 'stay' to stop the eviction, her attorney simply answered, *"Some day you're gonna thank me. The economy is going to 'hell in a hand basket' and you'll be happy you sold your home when you did."* When Ms. Brown asked Courtenay what a Writ of Possession was (not an unrealistic question to ask an attorney hired for an eviction case of which the right of possession is the key determining factor), her attorney aggressively replied, *"I Don't Know!"*

Obviously, Ms. Brown was quite alarmed at such a statement by her legal counsel, and when Ms. Brown exclaimed *"What??? – you don't know what a writ of possession is?"* Ms. Courtenay angrily demanded that Brown be in her office by 1:30pm to sign a substitution of attorney and hung up . . . one hour before Brown would be evicted and twenty-four hours before Brown's custody trial. Remember, Ms. Courtenay still had not scheduled one single meeting with Ms. Brown to hear her side on either case.

(About 30 minutes later the flooring company truck came by to load Brown's hardwood flooring and witnessed the condition of Brown's home – he thought the home looked nicer than most he visited)

During and following the eviction, instead of protecting the mother's personal property as the law requires, the CCC Sheriff threatened to arrest Brown if she took any of her evidence and case information even though Brown made sure he was aware that she had her custody trial the following day. The Sheriff proceeded to turn all that she owned -- her home, her

1  business, her personal belongings, her dog, and all of personal records and memoirs to her adversary, Mr. Albright who
2  videotaped the whole ordeal.

3  As mentioned in the previous section, the Sherriff chased Brown to her truck but Brown refused to leave without her purse
4  and ID. The deputy finally agreed to get it for her and Brown also asked him to grab her and her daughter's antibiotics.
5  The deputy returned with only the infant's medication. (ANOTHER KEY POINT TO REMEMBER – BROWN'S ANTIBIOTICS
6  WERE NOT FOUND)

7  With only $.42 cents to her name and her baby in diapers, she went to a local restaurant where a friend was known to
8  have lunch daily. As it was, Brown's friend was having lunch with two other persons. Upon learning of Brown's unfortunate
9  events, they quickly went to the store and purchased a bottle and diapers, and let Brown borrow a sweat shirt to put
10 around the child. Another got on the phone with Brown's attorney and arranged a meeting to work out their problems
11 before trial the next day (the person was areal estate attorney and even though his area of expertise was not family law, he
12 knew something was clearly not right). Brown left 1.5 hours later and headed for her parents home. Brown was not
13 allowed to take her cell phone so she had not been in contact with either her parents or Yunker to let them know she had
14 been evicted.

15 You can imagine Brown's surprise when she saw Yunker walking out of her parent's house. Evidently, Yunker had
16 arranged for Brown's father to employ movers who were already busy moving Brown's personal property and business out
17 of her home. But as Yunker was leaving, he walked up to Brown's car window, and handed Brown her antibiotics (the
18 same antibiotics the deputy was unable to find 1.5 hours earlier). As Yunker handed her the medication, he kissed her,
19 said he loved her and that he couldn't wait to celebrate her birthday Friday night and to celebrate the Fourth as a family.
20 The following day she would discover that not more than 15 minutes before Yunker handed Brown her antibiotics, kissed
21 her said he loved her and the rest, Yunker had been stealing memoirs, furniture, all of her child's clothing and photos,
22 trashed Brown's home, then took pictures of it to blackmail Brown from testifying the following day. (This single act
23 showing Yunker's lack of conscience or remorse has unanimously concerned professionals as being "not normal").
24 After dropping her daughter off at her parents, Brown raced to Walnut Creek for a last ditch attempt to reconcile with her
25 attorney before trial – only hours away. The attorney mentioned that she had left several voicemails for Brown and
26 therefore was unable to do anything for Brown since Brown's cases had never been discussed. Brown verified the phone
27 numbers the attorney was using then told her attorney that cell phone records do not show any such calls. Brown's
28 attorney proceeded to throw the 3 inch thick case file at her said, *"Are you calling me a liar, you . . . the _ _ _ _  _ _ _ _*
29 *_?"* Then she called security to have Brown removed from the premises.

30

1  Later that evening Brown called Yunker to ask him how he obtained Brown's antibiotics. Yunker claimed Albright had

2  called him after Brown was evicted. When Brown asked how Albright got Yunker's phone number, Yunker said Albright

3  got it from Sandor Sonkoly (the realtor/witness in Brown's eviction case). When Brown asked how Yunker knew Sandor

4  Sonkoly in the first place, Yunker said he had been doing work for Mr. Sonkoly for nearly a year. When Brown asked

5  Yunker WHY Albright called Yunker to go to Brown's home after she was evicted, Yunker said it was to pick up clothes for

6  the infant. Brown asked Yunker if he had dropped off the infant's belongings when he brought Brown her antibiotics,

7  Yunker said he had not. (Note: The infant's items were never returned to Brown). Lastly, Brown asked Yunker if Albright

8  and Yunker had gone through ALL her personal belongings. Yunker confirmed that they had gone through EVERYTHING

9  (emphasis). Yunker went on to describe additional items he took such as all of Brown's personal memoirs, her piano,

10  some furniture, cameras, video camera, air compressor, tools, computer monitor, and ALL of Brown's photos and

11  memories of her child, and of course the child's clothing and toys. Also disclosed to Brown, was how other personal

12  property was divided between Yunker, Albright and Sonkoly such as Brown's hot-tub, built-in BBQ, washer / dryer, etc.

13

14              *The enemy, of my enemy . . . is my friend.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

# Chapter 7: Yunker v. Brown - Void for fraud upon the court.

*It is IMPORTANT to bear in mind the dates of the following events and that they occurred against the same person, using the same attorney, in the same court, in the same county, under the influence of the same unlawful rules.*

- *June 16: Writ of Attachment hearing case #*
- *June 23: Ex-Parte Writ of Possession notice taped to Brown's front door.*
- *June 24: Custody hearing: judge grants Brown's request for a long cause trial but only allow Brown 1 week to prepare.*
- *Brown's attorney had private meeting with judge – Brown was not notified or present, and was never informed of it.*
- *June 30: Eviction*
- *July 1: Long Cause Custody trial*

*Prior to the Yunker v. Brown custody trial on July 1, 2004, the ONLY issue ever discussed between attorney (Courtenay) and client (Brown) in regard to the case happened immediately after Courtenay degraded Brown during a hearing held the previous week on June 24th. At that hearing Ms. Brown had some serious issues to call into question (detailed below) before agreeing with the mediator's recommendation for custody. The judge refused to allow Brown to say anything until the mediator could be present. Usually a long cause trial is scheduled 2-3 months in advance to allow litigants sufficient time to prepare. Not this court, not this judge, and certainly not with Ms. Courtenay as Ms. Brown's legal counsel. Ms. Courtenay made a mockery of Ms. Brown's request - in front of the judge – resulting in the judge ordering the trial to be scheduled one week later, July 1st (the day after Brown's eviction). Ms. Courtenay's comments ridiculed Ms. Brown in front of the judge.*

*Of course Brown's attorney should have alerted the judge to Brown's extraordinary burdens - such as being scheduled for eviction the day before trial in a separate yet concurrent case - but then again, the judge should have already been aware of those facts. After all, Brown's eviction case was being handled in that very same court. However, when one considers the totality of both cases – events prior to, during, and following Brown's eviction and custody trial – in light of the most incredible timing and circumstances - it would be most extraordinary for the court scheduling to have been mere coincidence.*

*Immediately following the disastrous June 26th hearing, was the one and only time Brown spoke to her attorney about any part of her custody case, albeit brief as it was. Courtenay was exceptionally terse with Ms. Brown. Ms. Brown told Courtenay there were serious problems with the mediator's report including a false criminal history of Brown - which did make Courtenay pause - but then she quickly brushed Brown aside and said Brown would have to fight her battles on her own because one week was not enough for Courtenay to prepare.*

*During that one week Brown tried desperately to "crash study" the laws of eviction (Civil Code of Procedure), domestic abuse (Penal code), custody (family code), DCFS guidelines (welfare and institutions code), the constitution, federal rules of evidence, and writ procedures. During that week she left 19 messages, emails and faxes to Ms. Courtenay to ask questions without one single response.*

*Ms. Brown had to prioritize. Her daughter's safety was much more important than anything else so she focused on her custody trial. She learned enough about writ procedures and protections to feel satisfied with the following plan: Even if her attorney failed to stop the eviction (her attorney never tried), Ms. Brown knew she would still have 15 days to remove her personal property. Since the eviction was Wednesday June 30, the custody trial was the following day Thursday July 1st, Brown could 'quash Albright's writs' on Friday July 2nd- for reasons discussed in the previous section. That would allow her every possible minute to devote to the most important matter at hand - the safety of her daughter.*

*Of course Ms. Brown had no idea that the eviction and the seizure of her case files and evidence was part of much larger plan and all the studying in the world could not have prevented what was already in motion . . . and she was just about to find that out – that she had no more control than a bug getting caught in an invisible web.*

1. **Void ab initio Yunker v. Brown: Where any litigant was represented before a court by a person/law firm that is prohibited by law to practice law in that jurisdiction.**

▶ **Outside courtroom doors on July 1, 2004 (the day after Brown's fraudulent eviction), Ms. Brown's attorney - Ms. Courtenay, stopped Ms. Brown before entering. She served Ms. Brown with copies of two additional causes of actions filed moments before (now Brown's open cases in the same court total's four). According to Courtenay, the judge denied her immediate request to be dismissed as Brown's attorney thereby forcing Courtenay to attend Brown's trial scheduled to start in the next few minutes. Courtenay's removal hearings were set for August 5 to remove Ms. Courtenay from Ms. Brown's custody case and on September 22 for Courtenay to be removed from Brown's eviction matter.**

*At all times, Ms. Courtenay was prohibited from practicing law due to committing fraud upon the court - among all kinds of other things and referenced throughout this document. Courtenay failed to turn over her case information to Brown. Courtenay violated nearly every ethical requirement as well as breaking the law.*
*(It is also important to take notice <u>WITH ABSOLUTE CERTAINTY</u> – that the trial judge was aware of BOTH Brown's case since he signed off on both of Courtenay's causes of action. Therefore, the July 23 judgment -discussed in section 8- was ordered with the judge fully cognizant of the concurrent family law cases against Ms. Brown; one for custody and one for eviction. The importance of this singular fact must not go unnoticed.)*

2. **Yunker v. Brown: Subject matter jurisdiction is lost when evidence is destroyed.**

- **Without her case files, witness names, documents and evidence . . . without a reliable attorney . . . without legal knowledge . . . without her home . . . with only a few pennies left to her name . . . Ms. Brown knew the truth existed in the documents already on record - all she had to do was get into that court room and tell the judge where to find it. This court appearance most certainly would have shifted the tides of justice.**

*However . . . Brown's adversaries also were aware of all that. Since they had seized her evidence the previous day during the eviction, they had full knowledge of what Brown planned to testify in court that day. And for reasons explained below, this could not happen.*

> ☑ 135. Every person who, knowing that any book, paper, record, instrument in writing, or other matter or thing, is about to be produced in evidence upon any trial, inquiry, or investigation whatever, authorized by law, willfully destroys or conceals the same, with intent thereby to prevent it from being produced, is guilty of a misdemeanor.

- **When people's houses are on fire what's the first thing they save after their loved ones and pets are safe? It's the family photos. After that, what do you think Brown's next priority would be? Her case files and evidence, followed by important documents. Worse than a family fire, Brown lost ALL the above thanks to the 'brotherhood' of her local legal enterprise.**

## 3. Yunker v. Brown: Void custody agreement signed duress, coercion

- **Mary Courtenay proceeded to drop an even bigger bomb than the one Brown suffered through in the previous 24 hours (the biggest bomb will be discussed in section 7). Courtenay informed Ms. Brown that Yunker had showed her "very incriminating" photos of Ms. Brown's home taken shortly after Brown was evicted the previous day. Ms. Courtenay added that Mr. Albright was waiting outside to testify against Brown and that Yunker and Albright were working together against Brown. Courtenay told Brown that if she entered the courtroom and made Yunker look bad, Yunker and Albright (waiting outside) would testify and show the judge "incriminating photos" of Brown's home to make Ms. Brown appear an unfit parent. Upon which - Ms. Courtenay promised - the judge would order her infant be immediately placed in foster care. The only way to avoid this disaster was to sign Yunker's custody agreement and not appear in court.**

> **1567. An apparent consent** is not real or free when obtained through: Duress, menace, fraud, or undue influence.

> **1568. Consent** is deemed to have been obtained through one of the causes mentioned in the last section only when it would not have been given had such cause not existed.

> Where a person signs a contract under duress, that contract is treated as being void ab initio.

☑ **Falsifying Evidence, Intimidating or Threatening**: "Malice" means intent to vex, annoy, harm, or injure in any way another person, or to thwart or interfere in any manner with the orderly administration of justice. "A credible threat" is a threat made with the intent and the apparent ability to carry out the threat so as to cause the target of the threat to reasonably fear for his or her safety or the safety of his or her immediate family.

**Attempting to persuade witness not to testify, Penal code 136.1 (b)**
Except as provided in subdivision (c), every person who attempts to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from doing any of the following is guilty of a public offense and shall be punished by imprisonment in a county jail for not more than one year or in the state prison:

☑ (1) Making any report of that victimization to any peace officer or state or local law enforcement officer or probation or parole or correctional officer or prosecuting agency or to any judge.

☑ (2) Causing a complaint, indictment, information, probation or parole violation to be sought and prosecuted, and assisting in the prosecution thereof.

4. **Void Yunker v. Brown: Subject matter jurisdiction can never be presumed, never be waived, and cannot be constructed even by mutual consent of the parties. Fraud committed in the procurement of jurisdiction,** Fredman Brothers Furniture v. Dept. of Revenue, 109 Ill. 2d 202, 486 N.E. 2d 893(1985)

▶ **The Yunker-Albright betrayal was a shock – of the deepest kind, make no mistake – but Brown was still struggling to comprehend why Yunker was willing to risk his daughter. In the few moments Brown had to make her decision, she was too stunned to embrace this latest turn of events and relate them to the events of the previous 24 hours. To an outsider, motive might appear obvious. But for Brown the impact and importance of why Yunker and Albright had carefully planned their insidious endeavors would not become clear until Brown read her case files (and reviewed the docs she never received), researched laws, and reviewed court opinions. But that would not begin until Brown struggled through devastating psychological and personal torment –alone – her entire support system skillfully obliterated during the months leading to Brown's 'ground zero" culminating in Brown's complete isolation from outsiders.**

Certain the real estate market was going to plunder in 2002 and a career change made his income unfit to handle a $3600/month mortgage payment, Mr. Albright approached Ms. Brown with a separation agreement in January 2002. Realizing he would lose his interest if the couple's newly purchased residence was sold, he abandoned all marital profit-making aspirations and focused on a plan to get back his original $89K investment (discussed in section 2) therefore passing all financial loses onto Ms. Brown. Ms. Brown took that risk and barely escaped the 3 yeas of heavy financial encumbrances. However, Ms. Brown's risk paid off. The real estate market continued to

climb at record-breaking pace. When Ms. Brown was finally successful in obtaining a refinance to pay off Albright, Albright's greedy intentions got the best of him and he focused on a plan with Mr. Yunker to make certain he would profit from Brown's efforts. After all – that was why he married her in the first place.

So ... let's try this theory out. Mr. Albright has to keep Brown from filing a stay against his eviction or quash writ for a variety of reasons stated in section 5. Mr. Yunker needs to get Brown out of her fortress of safety – her home – then to keep her from testifying. Thus, the Yunker – Albright plan was in motion. The enemy of my enemy . . . is my friend

Mr. Albright knew if given the chance Brown could prove that she owned the house, even though her evidence was illegally seized during her eviction - which included their agreement. Not only could Brown provide proof by performance, at the time the agreement was first made Albright boasted to all their friends claiming "I gave her everything, all I asked is I get my original money out of it!" (He wanted to look good since they knew he had been cheating on Brown throughout their marriage - conveniently forgetting to mention that since his value was worth nothing Brown was actually doing him a favor).

Suffice to say, would not the quickest way for Albright and Yunker to be successful in their respective cases is if Brown did not receive notifications for hearings, or receive them in time to respond?
Without oral testimony and the court rendering its 'under-the-table-defaults' if no written declarations were received, then VOILA! They could win! How they kept Brown from stopping her eviction/sale of house will be explained in the following section, but it was dependent on Brown signing Yunker's custody agreement.

▶ **When Brown began to study the law, motive started to appear. Dozens of illogical incidents (not mentioned in this document but recorded in Brown's journal) suddenly made sense. When Brown read the Elkins v. Contra Costa County Superior Court in October 2007, opportunity became clear. Prior to the Elkins case, however, the only plausible explanation for what happened to Brown was institutional corruption – absolutely a most daunting, insurmountable, impossible, and complicated burden imaginable.**

- **WHERE** *does one go when it doesn't matter what evidence you present to police, to D.A.'s, or any organization – since they ALL HAVE TO FOLLOW COURT ORDERS!!*
- **WHAT** *does one do if their primary grievance is with the court and judges and their secondary grievance is with their adversaries - just where does one go for impartial, full, and fair adjudication?*
- **WHO** *does one go to for help when one's sole source of income is taken away, their credit ruined, bank accounts closed, money levied, creditors calling hourly and they were left without a roof over their head?*
- **HOW** *does one reconstruct evidence; witness name and phone numbers, affidavits, journals, notes and case information, financial records, signed agreements, receipts, credit information, bank records, personal data, tax information, business and personal records – are illegally seized and turned over to your adversaries AND the only remaining evidence is contained in court files in the possession of your primary adversary, the court?*
- **WHY** *– for court expediency?*

▶ **During Brown's 'crash study' sessions Brown reviewed state and federal laws never once considering a local trial court rule could wreak so much havoc on the reliability of the judicial system and its processes. And, given enough time (years in Contra Costa County's case), this lack of integrity created a 'butterfly effect throughout the system as will soon be explained.**

The "Butterfly Effect" is the cumulatively large effect that a small force produces over a period of time. The theory arises from the notion that the fluttering of a butterfly's wings sets off currents that grow much larger,

**'Butterfly Effect'** as it relates to causation:

The phrase refers to the idea that a butterfly's wings might create tiny changes in the atmosphere that ultimately cause a tornado to appear (or prevent a tornado from appearing). The flapping wing represents a small change in the initial condition of the system, which causes a chain of events leading to large-scale phenomena. Had the butterfly not flapped its wings, the trajectory of the system might have been vastly different.

► **Consider the following Contra Costa County rule: "[D]irect examination on factual matters shall not be permitted except in unusual circumstances." That is a college equivalent of a professor telling students that no mid term or final exams will be required. Is it reasonable to expect those students will study just as hard? Was it reasonable to expect court-related agencies to perform their duties given fractured expectations with no one to grade their performance?!!**

**Rule 1.2: Title.** The rules in this title of the California Rules of Court may be referred to as the Rules Applicable to All Courts.

► **When system-wide errors from both cases are tallied together, the probability that the scope, magnitude, and quantity of such indiscretions make improbable these acts occurred randomly in nature. When something does not occur at random it is considered systemic or systematic . . . and the judicial system, at least at the county level, an abettor of mendacity. Due to the aggregate value of errors, crimes and injustices, the victim and her daughter sustained catastrophic injuries, and 'evil done in the name of good' prevented avenues of support and/or recourse.**

**Persuading witness not to testify, Penal code 136.1 (a)**

Except as provided in subdivision (c), any person who does any of the following is guilty of a public offense and shall be punished by imprisonment in a county jail for not more than one year or in the state prison:

☑ (1) Knowingly and maliciously prevents or dissuades any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law.

☑ (2) Knowingly and maliciously attempts to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law.

**5. Yunker v. Brown: The illegality of the conduct or the revelation of the real facts makes the entire situation illegal ab initio (from the beginning), not just from the time the wrongful behavior occurs.**

▶ **First, let's examine the condition of Ms. Brown's home. There exists evidence and witnesses to support Brown's contention that Albright and Yunker 'trashed' Brown's home immediately following her eviction and took pictures to use against Brown AND substantiate both of their cases. Of course, piecing the evidence together did not happen during the split second Brown had to decide whether or not to enter the courtroom or sign Yunker's custody agreement. In fact, at the time Ms. Brown did not have a clue what was going on and would not understand it for some time. If you are confused, then perhaps you can relate to Ms. Brown's position at the time. However, the answers will be forthcoming.**

- *Ms. Brown was not shown the 'incriminating photos' so she cannot determine if it was her home depicted in the photos.*
- *Six months later, the 'incriminating photos' were shown to the mediator as indicated in the second mediation report - so they did in fact exist and were used to show the mediator the condition of Brown's home by Yunker. That places Yunker in Brown's home (with Albright) immediately following Brown's eviction, and corresponds with Brown's testimony. As a third measure of proof, there are also witnesses who can place both Yunker and Albright at Brown's home immediately following Brown's eviction on June 30th.*
- *Even though receipts for upgrades such as carpeting, crown molding, hardwood flooring, tiles, paint, etc. were seized during her eviction, credit card receipts and purchase orders are still available as proof Brown was upgrading not destroying the property.*
- *Furthermore, there are 2 witnesses who can establish the true condition of Brown's home prior to her eviction. For Ms. Brown's protection, witness names and contact information have been disclosed to unnamed sources.*

  1. *For some reason, the eviction that was scheduled for 6am did not happen until 12:30pm. Between 11-11:30 am, a representative from the flooring company from which Brown purchased hardwood flooring material came by to pick up unopened boxes per Brown's earlier request. It was discovered that THE ONLY thing loaded into Brown's GMC Yukon early that morning was the hardwood flooring. (Yunker did not load clothing or toys for his child – just the unopened boxes of hardwood flooring. Materials which would have clearly contradicted Albright's claim that Brown was devaluing the property). Since Ms. Brown had closed off the downstairs bath to use for supplies and equipment, the representative had to use the upstairs guest bath. As a consequence, he was able to see the condition of Brown's home, upstairs and downstairs. The witness will testify that outside of the living room area – cordoned off for remodeling - the house was kept clean, tidy and nicely decorated. "It looked nicer than most of the homes I enter."*

  2. *There are 2 other witnesses who came to Brown's home within days of her eviction. They will also testify that Brown's home was in order with the exception of the living room in which all furniture and carpeting had been removed pending installation of the hardwood floors and that the downstairs bathroom was closed off for paint and supplies. They will also confirm the many upgrades Brown had added in the previous months.*

- *As disgusting as this may seem, it is a fact that Mr. Albright videotaped Ms. Brown's eviction and followed the Sherriff around delighting to memorialize the diabolical scene. Included in the video, is the Sherriff attempting to handcuff Ms. Brown (while holding her infant), threatening to arrest her for trying to take her case files and evidence. It also captures Ms. Brown being chased out of her home by the Sherriff who would not even allow her to put clothes on her infant or grab a bottle. Mr. Albright and his video camera followed Brown out to her car where she refused to leave until the Deputy agreed to let her have her purse which contained her driver's license. He also agreed to get prescription antibiotics for both Brown and her infant who had taken ill. The Deputy returned with Brown's purse and the antibiotics for the infant. The Deputy could not find the antibiotics for Brown. ***** IMPORTANT DETAIL FOR LATER REFERENCE ******

  *Bottom line here . . . is if this videotape could be obtained it would exonerate Brown, implicate Brown's adversaries, and corroborate Brown's claims.*

- *Since Courtenay had been receiving all the legal correspondence regarding Brown's eviction, Ms. Brown was purposely kept in the dark. It would be several months before Brown learned that Albright had used the condition of Brown's home as the basis for his claim and another year before Brown understood the laws well enough to comprehend its importance. Clearly, both Albright and Yunker had a unified motive – to use the condition of Brown's home to their advantage.*

- *The fact that Brown's home was sold July 8th supports a unified motive for Albright, Yunker and Courtenay.*

  ☑ 141. (a) any person who knowingly, willfully, and intentionally alters, modifies, plants, places, manufactures, conceals, or moves any physical matter, with specific intent that the action will result in a person being charged with a crime or with the specific intent that the physical matter will be wrongfully produced as genuine or true upon any trial, proceeding, or inquiry whatever, is guilty of a misdemeanor.

▶ **Second, let's consider the reasons WHY it was important to keep Brown from testifying in court July 1.**

- *Brown would surely mention the reason she did not have her evidence and case files due to her eviction the previous day - quite possibly exposing a line of inquiry that could draw Albright's fraudulent case into question especially since it was handled by the same court.*
- *Courtenay shouldn't have allowed Brown's custody trial to be scheduled the day after her eviction with one week to prepare for both.*
- *Keeping Brown from testifying was a component of a bigger plan. By scheduling Brown's custody trial the day after Brown's eviction and telling Brown she would not help Brown prepare for her custody trial, Courtenay knew Brown would be too busy during that one week to do anything to stop the eviction. Courtenay refused to return any of Brown's 19 messages.*
- *Brown planned to quash Albright's unlawful eviction and recover her property the day after the custody trial on Friday July 2, 2004. She had confided her plan to both Yunker and Courtenay.*

*And, since Courtenay made it clear that Albright and Yunker were working together - that meant that Albright also knew of Brown's plan.*

- *Remember . . . this was not an eruption of spontaneous circumstances. They ALL knew Brown had several reasons to stop her eviction: exemptions, unauthorized attachment, unlawful ex-parte writ of possession, failure to file required undertakings, and most important of all was a signed agreement whereby Albright transmuted his entire property interest to Brown in exchange for retirement funds (discussed section 2).*

- *They also now had possession of Brown's entire case files, information, evidence, records, AND Brown's only copy of her private separation agreement with Albright; when the Sherriff turned it all over to them during Brown's eviction the previous day. And, they also had possession of Brown's court pleading dated Friday, July 2, 2004.*

- *In order for Albright to be successful, he had to make sure Brown didn't try to recover her property on July 2nd. The only thing more important to Brown than saving her home was the safety of her daughter. The only person who could keep Brown preoccupied with her daughter was Yunker, and for the plan to work he needed to get custody rights. The only way Yunker could get custody rights is if Brown signed his custody agreement and did not appear at trial. The only way that would happen, is by coercion.*

- *In order for Yunker to be successful, Brown had to be out of the safe sanctuary of her home and all incriminating evidence seized. Once out of her home, Yunker could scare Brown into seeking protective shelter. If Brown escaped to a shelter Brown would be prevented from recovering her home and Albright could quickly sell her property. For Yunker to be successful, Albright had to be successful. For Albright to be successful, Yunker had to be successful. If both Yunker and Albright were successful, so were Courtenay and Sonkoly. (the plan will become more clear in the following section)*

- *In November 2004 - four months later - Brown ran into 2 witnesses who knew Brown's former nanny, Lanita Donhowe. (Lanita helped Brown on a trial basis for one month until she was caught stealing). The witnesses informed Brown that Yunker and the nanny sorted through Brown's personal mail on a daily basis at the nanny's residence trying to find ways to incriminate Brown. The nanny spoke to Yunker several times a day, moved Brown's baby monitor around inside the house - so Yunker could remotely listen more clearly to Brown's conversations, and secretly met Yunker in the park to bring him the child's clothes and toys taken from Brown's home while supposedly taking the infant for a walk. This was all done in April, in preparation for the big event that would come in July 2004.*

- *Brown's court appearance July 1, 2004 was for a long cause trial as opposed to a hearing to discuss matters submitted by written declaration. It was Brown's one and only opportunity to directly testify before the court. If Brown brought up facts outlined later in this section (which clearly should have been addressed by legal counsel) it most certainly would have exposed Ms. Courtenay's malfeasance in one case, very possibly both cases. Ms. Brown's testimony would also have been devastating for Yunker's case to which the final phase of Albright's case hinged upon. The stakes had become very high for Albright, Yunker, Courtenay and Sonkoly . . . therefore Brown MUST be stopped.*

### Federal Rule Evidence Rule 501: Privileges recognized only as provided

Except as otherwise provided by constitution or statute or by these or other rules promulgated by [the Supreme Court of this State], no person has a privilege to:

 (4) prevent another from being a witness or disclosing any matter or producing any object or record.

▶ **A year later, Brown carefully read the court's minute order entry for the July 1, 2004 trial. It indicates that Mr. Yunker, Yunker's attorney, and Courtenay did appear at the trial, but Ms. Brown was not present. Furthermore, it states that Brown's attorney had no idea where Ms. Brown was and asked for a continuance. Since the one witness who could corroborate Ms. Brown's story – Yunker's attorney – disappeared very suddenly 3 months later (details not included in this document) – Brown has listed below several reasons which make it more 'reasonable' that Brown did show up for trial July 1, and more 'reasonable' to assume foul play affected Brown's ability to testify as a witness.**

- **Reasonableness Test 1:** *Ms. Brown was adamant about scheduling the July 1 trial even to the judge's obvious dismay. Brown was under extreme personal duress from a life under siege; Brown was scheduled for eviction the day before trial; the judge only allowed one week to prepare for trial; and her attorney refused to help her. Considering the totality of Brown's life in crisis – Brown must've had extraordinary reasons to push hard for that trial. It is therefore 'reasonable' that Brown would show up and 'unreasonable' that Ms. Brown would suddenly agree to Yunker's terms, sign his agreement, and not appear in court.*

- **Reasonableness Test 2:** *When one weighs the significance of what Brown planned to testify in court that day (detailed below) there is unmistakable evidence to support why Ms. Brown had compelling reasons to testify. It is therefore much more 'reasonable' that Ms. Brown would make every effort to attend the trial and testify.*

- **Reasonableness Test 3:** *Due to the nature of the testimony and evidence Brown was planning to proffer at the trial it is 'reasonable' that Mr. Yunker, Ms. Courtenay (and Albright, Sonkoly) had compelling reasons to keep Brown from testifying.*

- **Reasonableness Test 4:** *At some point on July 1, 2004, all 4 parties were able to sign the agreement (each signature has a corresponding dated entry in the signee's handwriting). Witnesses corroborate that Brown left for court in time for trial on July 1, 2004. Phone records and a witness also corroborate a phone call from Yunker prior to Brown's departure for court warning Brown of traffic (Yunker told witness he arrived at court 90 minutes early so either he's extra, extra punctual - or perhaps he was meeting with Courtenay who also arrived early asking the judge to be dismissed from Brown's cases). There are witnesses who can verify Brown's whereabouts for the remainder of the day. Consequently, there exists no opportunity for the agreement to have been signed on July 1st other than before trial. It is therefore 'reasonable' under the circumstances, for the custody agreement to have been signed BEFORE trial time.*

- **Reasonableness Test 5:** *The only sliver of possible explanation Brown's adversaries could provide is that Brown missed the trial and signed the agreement immediately after it concluded. Since the judge granted Courtenay's request for a continuance, there is absolutely no reason for Brown to sign Yunker's agreement thereby forfeiting her right to the continuance for a trial she fought so hard to get in the first place. It is therefore 'unreasonable' for Brown to have signed the custody agreement AFTER the trial.*

- **Reasonableness Test 6:** *If all parties were acting in good faith then it would be 'reasonable' to expect Courtenay or Yunker to show the judge the signed custody agreement and filed it when they appeared in court July 1st. However, the judge might have been curious as to why Ms. Brown was not appearing in person if Ms. Brown had signed the agreement voluntarily. The fact that Courtenay claimed she had no idea where Brown was, asked for a continuance, failed to inform the judge that an agreement had been reached, and failed to file the agreement until July 9th is not 'reasonable'. It is far more 'reasonable' to conclude that Brown's signing of the custody agreement was coerced rather than voluntary.*

**Rule 1.20 Filing.** Unless otherwise provided, a document is deemed filed on the date it is received by the court clerk.

- **Reasonableness Test 7:** *By the time the custody agreement was filed with the court on July 9th, Mr. Yunker had already called the police to file custody violation charges against Brown on July 5th. It is not 'reasonable' for Mr. Yunker to have filed a police report for custody violation on July 5th when Yunker legally didn't have any custody rights until July 9th.*

    - ✗ *June 26th – Long cause trial scheduled with only 1 week to prepare*
    - ✗ *June 26th – Courtenay refuses to help Brown prepare or trial*
    - ✗ *June 26th – Trial scheduled for day AFTER Brown's eviction*
    - ✗ *June 30th – Brown's evidence and case files seized 24 hours before trial*
    - ✗ *June 30th – Courtenay tells Brown to come to her office and substitute Courtenay off the case*
    - ✗ *July 1st – Courtenay petitions court to be dismissed from case immediately prior to trial time*
    - ✗ *July 1st – Brown remains steadfast and undeterred*
    - ✗ *July 1st – Courtenay, Yunker and Albright's remaining alternative is coercion otherwise face fraud charges*
    - ✗ *July 1st – After agreement is signed, all parties leave building*
    - ✗ *July 1st – Courtenay, Yunker, and Yunker's attorney return to courtroom claiming Brown was a no-show*
    - ✗ *July 2nd – The following day Brown is forced to seek protective shelter instead of filing to recover her property*
    - ✗ *July 5th – Yunker files a police report claiming Brown was violating custody using July 1st agreement.*
    - ✗ *July 8th – Brown's home is sold by the court*
    - ✗ *July 9th – Custody agreement signed on July 1st is filed with the court*

▶ **Records, facts, phone records and witnesses all confirm that something was clearly amiss on July 1, 2004. Reasonableness and evidence supports Brown's contention that she was coerced into signing Yunker's agreement. When the totality of the circumstances taking place prior to July 1, 2004 and commencing the following day (next section) are weighed, the signing of the custody agreement and Brown not testifying become an integral element in the execution of a predetermined plan. Yunker's legally established custody rights could now be exploited to keep Ms. Brown from recovering her property. Furthermore, if Brown was rendered temporarily 'unavailable' Brown's home could be sold and profits from the sale distributed without her knowledge. Brown would not be allowed to find out who profited from the sale of her home since she did not sign off on her grant deed - the court did.**

▶ **Lastly, it is important to review what Brown planned to show the court and question the mediator. Seizing Brown's evidence and case information alerted Brown's adversaries as to the damaging testimony Brown planned to produce. Brown had to be STOPPED from testifying in court because the following information was already on record therefore the absence of Brown's evidence was not enough to prohibit Brown from appearing. The main issues are briefly outlined below followed by a detailed history to follow.**

- *DCFS substantiated Brown for substance abuse / neglect based solely upon a falsified criminal history report which could only have been provided by Yunker as indicated in the mediator's report. It is clear that DCFS relied on Yunker's false criminal history report and failed to pull a legitimate CLETS report of their own. Furthermore, the mediator DID include a legitimate CLETS criminal history for Brown but obviously did not read it since it was not even CLOSE to what DCFS indicated in their report. THIS WOULD HAVE BEEN A VERY BIG RED FLAG FOR YUNKER SINCE IT CERTAINLY WOULD HAVE SUPPORTED FALSIFIED EVIDENCE, FRAUD AND ALLEGATIONS OF ABUSE.*

- *Brown planned to question the mediator as to why he failed to fulfill his promise to request a psychological evaluation for Yunker regarding domestic abuse / sexual abuse concerns.*

- *Mediator showed bias when he allowed only Yunker to provide witnesses.*

- *Brown was not informed of the statements made by Yunker's witnesses, was not allowed to cross examine Yunker's witnesses, testimony was hearsay – not taken under oath, and the criminal history for a key witness for both Yunker and DCFS includes 30 felonies/misdemeanors INCLUDING a felony charge for 'persuading a witness not to testify'. A FELONY FOR 'PERSUADING A WITNESS NOT TO TESTIFY' AUTOMATICALLY IMPEACHES A WITNESS PER U.S. RULES EVIDENCE.*

- *The only other witness was a nanny who Yunker hired for Brown who was an illegal alien and the sister of Yunker's right-hand worker. Yunker held their futures in his hand, and was therefore biased. Furthermore, the nanny worked during the day and could not have known what Brown's night-life constituted (or lack thereof). If one considers the totality of the circumstances specifically the incredibly onerous burdens placed upon Brown, it is improbable that Brown was living the high life . . . 'foot-loose and fancy free'.*

▶ **Brown's adversaries had a unified motive. In order for Yunker and Albright to be successful they must get Brown out of her home, keep her from quashing Albright's writ, cash out Brown's assets, and above all, KEEP BROWN FROM TESTIFYING IN COURT!**

**Persuading witness not to testify**, Penal code 136.1 (c)

☑ Every person doing any of the acts described in subdivision (a) or (b) knowingly and maliciously under any one or more of the following circumstances, is guilty of a felony punishable by imprisonment in the state prison for two, three, or four years under any of the following circumstances:

☑ (1) Where the act is accompanied by force or by an express or implied threat of force or violence, upon a witness or victim or any third person or the property of any victim, witness, or any third person. **(section 6, 7)**

☑ (2) Where the act is in furtherance of a conspiracy. **(sections 3, 4, 5, 6, 7, 8, 9)**

☑ (3) Where the act is committed by any person who has been convicted of any violation of this section, any predecessor law hereto or any federal statute or statute of any other state which, if the act prosecuted was committed in this state, would be a violation of this section. **(all sections)**

☑ (4) Where the act is committed by any person for pecuniary gain or for any other consideration acting upon the request of any other person. All parties to such a transaction are guilty of a felony. **(sections 3, 4, 5, 6, 7, 8, 9, 11)**

☑ (d) Every person attempting the commission of any act described in subdivisions (a), (b), and (c) is guilty of the offense attempted without regard to success or failure of the attempt. The fact that no person was injured physically, or in fact intimidated, shall be no defense against any prosecution under this section.

☑ (e) Nothing in this section precludes the imposition of an enhancement for **great bodily injury** where the injury inflicted is significant or substantial. Physical injury is not a requirement for an enhancement for great bodily injury. It is enough that the resulting injury is sgnifical or substantial. **(sections 5, 6, 7, 8, 9, 11)**

☑ (f) The use of force during the commission of any offense described in subdivision (c) shall be considered a circumstance in aggravation of the crime in imposing a term of imprisonment under subdivision (b) of Section 1170. **(sections 5, 6, 7, 8 )**

# POLICE

*Yunker started requesting San Ramon police to conduct welfare checks on Ms. Brown 2 weeks after he filed his suit in Contra Costa Family Court. The welfare checks were either weekly or bi-weekly, at all hours of day and night, and continued for 10 weeks. Yunker told Brown he would call the police if she didn't answer the phone by the third ring. The police would not tell Ms. Brown the reason(s) for the welfare checks (which somehow bypasses the need for warrants established by probable cause). Nonetheless, Ms. Brown did not have a choice. The first welfare check was carefully camouflaged as an exigent circumstance. At approximately 1pm in the afternoon Ms. Brown was horrified when the police barged into her upstairs private master bath where Brown was taking a bath with her 12 month old infant. The police said the front door was wide open and that it must have been caused by the wind. They told her Yunker had driven by and called the police to check on Brown and her daughter out of concern. However, the entry way was mostly enclosed and protected from the wind. The door was locked. (Subsequently, Brown had her locks changed.)*

*Welfare checks continued each week, at all hours of the day and night, for 10 weeks. At no time did the police find any evidence of substance abuse or neglect on any occasion. In fact, during the last police call by Yunker, police discovered Yunker parked up the hill while calling Ms. Brown 7 times during the ordeal staged by Yunker. The police recommended Ms. Brown obtain a restraining order against Yunker and future welfare checks were terminated.*

*Brown did not get a restraining order for several reasons; 1) Brown aready had t make her home a fortress – rarely leaving it as a result. Yunker however had already initiated plan F which involved allegations to DCFS. Plan F started after 5 weeks of unsuccessful welfare checks.*

▶ **Without factual evidence to support probable cause, police must pursue hearsay allegations. A fundamental, moral, ethical, legal and REASONABLE obligation any person has to another in such situations is to establish whether or not a person possesses personal knowledge to warrant concern. Police should AT LEAST be held to that most fundamental, basic and reasonable standard. However, that did not occur:**

- *What the police overlooked was incredibly basic: Yunker was asking the police to conduct welfare checks on behalf of his daughter – because Yunker wasn't allowed in Ms. Brown's home. If Yunker was not allowed in Ms. Brown's home, then HOW COULD YUNKER HAVE PERSONAL KNOWLEDGE THAT BROWN WAS NEGLECTING HER CHILD or ABUSING DRUGS?*

- *A more reasonable explanation for Yunker's allegation can be found in his actions just before he filed for custody.*

1. Yunker  fired Brown's nanny
2. Yunker got rid of Brown's renter
3. Yunker refused to support hs child
4. Yunker refused to pay his agreed-upon share of hospital bills for infant's birth
5. Yunker took Brown's car keys
6. Phone calls from Yunker at all hours of the day up to 30 times a day
7. Yunker purchased a listening device to hear Brown's conversations

*Yunker tried every way possible to make it difficult for Brown to care for child, pay her bills, and run her business without ANY help. And perhaps he figured these additional burdens would create enough hardship resulting in child neglect. Child neglect however has to be caused by something. Substance abuse presented the perfect vehicle for one with a history of projection.*

- *Mr. Yunker used the system to illicit attacks against Ms. Brown. In doing so, it accomplished several things at the same time;*

1. *Yunker had been arrested for domestic violence against Brown 1 month earlier and had a felony drug conviction with intent to sell, so he needed to shift police focus from Yunker to Brown.*

2. *Substance abuse allegations are nearly impossible to defend since it challenges credibility and mental capacity, alternatively and simultaneously.*

3. *By diverting police attention toward Brown and away from Yunker, this diabolical scheme could fly under a heroic banner of 'being concerned for his daughter's welfare' while at the same time Yunker's stalking, harassment, and intimidation would be understood and continue largely unnoticed.*

*(A claim of substance abuse denotes the same witch-hunts today as claiming someone was "crazy" did 30 years ago. Because our policies have not changed much over the last 250 years, the same processes that created the "Salem witch hunts" in the 17th century are alive and well in the 21st century. The operative word is not "witch" it is "hunt". "Witch" is merely an adjective reflecting primary social concern of that period. Our laws are sensible, time-tested, and afford proper protections against "hunting' expeditions. It is therefore not our laws that have failed us it is society that remains unwilling to change. Our social climate allows us to turn the other cheek when legal and enforcement agencies abridge those legal protections for the sake of such hunts. Take a moment however and consider the differences the following public policies might have on society as a whole. What if law enforcement was awarded funding on the number of rehabilitations rather than the number of arrests? What if federal, state and private funding opportunities for DCFS remained proportionate to each county's 'need', but the*

*basis for establishing a county's 'need' reflected constructively - such as the number of successful family reunifications, rather than destructively - the number of substantiated cases, as our current forum proffers. Although this is a simplified ideology, it illustrates society's continuing need to "hunt", no matter what banner it flies under; sexual harassment, religious tolerance (or more appropriately today's 'intolerance'), child abuse, substance abuse, alcoholism, campaign funding, political social improprieties, excessive force, etc., etc.)*

▶ **Police entering Ms. Brown's private upstairs bathroom while she was taking a bath with her infant daughter - without a warrant and without probable cause - was an invasion of Ms. Brown and her daughter's privacy and a violation of 4th amendment rights.**
**If the police had notified Ms. Brown of Yunker's concerns PRIOR to forcefully entering her home, Brown could have provided the following information supported by evidence and witnesses, and the entire mayhem could have been prevented from the beginning.**

> ☑ **Amendment IV**: The right of the people to be secure in their persons, houses,
>
> papers, and effects, against unreasonable searches and seizures, shall not be
>
> violated, and no Warrants shall issue, but upon probable cause, supported by Oath or
>
> affirmation, and particularly describing the place to be searched, and the persons or
>
> things to be seized.

> ☑ **LACK OF PERSONAL KNOWLEDGE:** FEDERAL RULE EVIDENCE 602. A witness
>
> may not testify to a matter unless evidence is introduced sufficient to support a finding
>
> that the witness has personal knowledge of the matter. Evidence to prove personal
>
> knowledge may, but need not, consist of the witness's own testimony. This rule is
>
> subject to Rule 703, relating to opinion testimony by expert witnesses.
>
> ☑ **BIAS OF WITNESS:** Federal Rule Evidence 616: For the purpose of attacking the
>
> credibility of a witness, evidence of bias, prejudice, or interest of the witness for or
>
> against a party to the case is admissible.

> ● *From August 2004 to November 22nd 2004, personal encounters between Brown and Yunker were brief; limited to their agreed upon visitation schedule of which Yunker frequently missed.*

> ● *After Yunker was arrested for Domestic Violence on November 22nd 2004, he brought a family member with him to every visit. His explanation was, "In case Ms. Brown jumps out of a 2nd story window, I won't go to jail." No remorse, no concern, only revenge. After he was arrested, Yunker's program of projection and isolation quickly escalated.*

"Jim is about control. After trying several ways to achieve that goal, he figured it out the day he was arrested for domestic violence on November 22, 2003 (there was a prior incident on Easter 2003 in which Brown should have called police but thought t give him one chance). Any time Jim failed to show up for an agreed upon visitation, he would simply show up whenever he wanted to make it up. But one day I tried telling him several

times I had family plans. I came home to dozens of threatening messages and the next morning, I was in my garage/office and heard noises by front door. I sneaked around to see what it was, and found Jim hiding in the bushes in front of LR window. Mad that he was discovered and really angry I had not followed his orders, I tried to quiet him by talking in my office. It worked for a bit until Mr. Hyde appeared and Jim stormed out the side door. As he was leaving through the gate, he suddenly stopped, thought for a moment and said, "I know !! . . . I know how to get to you!!!!!! IT'S KAYLIE!!!!! I'M GONNA TAKE KAYLIE!!!" That's when he threw Brown down the stairs and into a wall crashing her into a picture and smashing the glass. That was how Brown got injured, and why Yunker was arrested."

And, that's when the goal to control Brown through her daughter began. After charges were curiously 'dropped' following Yunker hiring an attorney he supposedly met in jail, Richard Hurley, Brown called the Dist. Attorney, Molly Maroukian, 23 times trying to press charges against Yunker. At no time did the Dist. Attorney return a phone call over the 2 months of messages. After receptionist's frustration and sympathy for Brown's efforts, the receptionist did some research on behalf of Ms. Brown. The receptionist, Nancy, said the code entered indicated "Victim unavailable / unwilling to testify. A year + later, when Brown read the laws, Brown discovered it is customary for the D.A. to correspond via mail. Brown suspects that Yunker interfered with Brown's mail as he had on numerous other occasions.

- *Each time Yunker saw Brown from November 22, 2003 to his filing for custody beginning of January; at least a dozen traumatic incidents took place. The following describes the final incident in which Yunker was no longer allowed into Brown's home. As punishment, Yunker started police welfare checks.*

On a Saturday morning in early January, Yunker trespassed into Brown's home uninvited, ran upstairs into the mother's bedroom where she was asleep with her infant daughter and a 14 year old girl who was visiting for the weekend along with her 9 year old brother – who was asleep in the other bedroom. Brown, the 14 year old, and the infant, awoke to Yunker screaming to the point the 2 visiting children were so scared they ran downstairs and hid in a closet. Yunker forcefully grabbed the infant out of her mother's arms claiming he had called 3 times that morning and that Brown refused to answer his calls. The time was 9:05 am when Yunker left Brown's residence without stating where he was taking the child or when he would return. Yunker claimed it was his right to visit with his daughter anytime he felt like it and since he missed several of his visitations (playing pool with his friends) he said Brown owed it to him. This incident was the last in a series of events indicating his anger was not diminishing after his domestic violence arrest 2 months prior, but clearly escalating; in frequency, without warning and without cause. Combined with his unscrupulous new attacks financially, emotionally, and professionally, in unison with his ongoing theme to undermine Brown's integrity, character and reputation, she no longer allowed Yunker into her home.

▶ **Yunker lacked personal knowledge to assert allegations against Brown due to the fact that Yunker had only been around Brown with a witness present between November 22, 2003 and the time he was no longer admitted into Brown's home. Since personal knowledge of Brown's personal lifestyle would have had to be gained prior to August, it is not reasonable that Yunker would wait 6 months – subsequent to filing his custody suit - to claim Brown was substance abusing and neglect her child**

⇨ *January 10, 2003:    Baby born. Yunker couldn't take Brown to hospital –been partying, needed sleep.*

⇨ *January 21, 2003:    Yunker haselective surgery to straighten penis shduled 3 months in advance*

⇨ *March 2003:        First domestic violence incident, explained below.*

⇨ *April 2003:*    *Yunker leaves with no communication for 1 month, re-nigs on support for*
*nanny.*

⇨ *May – July 2003:*    *Yunker works 6am to 10 or 12pm, difficult for Brown to continue her business.*

⇨ *August 2003:*    *Yunker moves out, Brown discovers Yunker failed to ay his share of bills*

⇨ *Nov. 23, 2003:*    *Yunker arrested for domestic violence, family members accompany visitatons*

⇨ *January 7, 2004:*    *Yunker files suit, fires nanny, evicts renter, takes car keys, buys listening device*

⇨ *January 11, 2004:*    *Yunker starts weekly / bi-weekly police welfare checks tey continue for 10 weeks*

⇨ *February 17, 2004: Yunker files complaint with DCSF*

▶ **Yunker was an adversarial party involved in a custody suit and therefore inherently biased.**
**Police welfare checks were just the beginning of a series of preemptive strike designed to**
**impede Brown's access to the system –a system supposedly established to protect.**

▶ **Police conducting weekly and bi-weekly welfare checks for 2.5 months at all hours of the day and**
**night - without probable cause - is excessive. The only purpose it served was to further harass**
**Brown and degrade her defensive abilities.**

- *Yunker told Ms. Brown if she did not answer his call by the third ring, he would call the*
*police.*
- *Yunker's phone records indicate he called Brown as many times as 30 calls in one day.*
- *Yunker parked daily up the street from Brown's residence.*
- *Brown put up sheets to cover vaulted ceiling windows to prevent Yunker watching from his*
*truck parked up the hill. Brown covered her backyard 'view' windows to avoid seeing Yunker*
*peering over the 2 foot short fence (shortened to allow for picturesque views).*
- *A nanny using the downstairs bathroom opened the medicine cabinet to get soap to wash*
*her hands. As the mirror side of the medicine cabinet was opened, Yunker's face was*
*reflected from where Yunker was standing - right outside the bathroom window. The nanny*
*never returned.*
- *By subjecting Brown to weekly and bi-weekly welfare checks Yunker started his newest*
*series of attacks by employing the help of law enforcement. When he saw that was failing,*
*he pursued further actions by employing the use of DCFS in late February.*

▶ **Police and DCFS conducting separate investigations on the same person, for the same reasons,**
**initiated by the same party and conducted at the same time is just plain absurd. Let's not forget**
**that while all this was going on, Brown was fighting two separate family law cases, caring for her**
**infant full-time, running her business full time, maintaining a 3000 sq.ft. home full time,**
**amending her taxes (for the Albright case), dealing with her mother's cancer, her daughter's**
**traumas, and trying to refinance her property so she could pay off Albright, hire an attorney, and**
**hire a nanny since she wasn't receiving any support.**

- *Jurisdictional Issues: There should be explicit boundaries established between police and*
*DCFS. Police welfare checks and assessing exigent circumstances should be sufficient. If*

*police find probable cause to initiate an investigation then DCFS should follow up and investigate. Conversely, if DCFS receives a complaint, local police should be contacted to check it out first. DCFS should be the investigative agency for family crisis just as detectives are the investigative agency specifically trained to follow up on crime.*

- *This overlap is a complete waste of taxpayer's money, burdens the courts, and wastes countless hours of needed law enforcement. For Ms. Brown it was harassment, it was unfounded, it was excessive. It violated Brown's privacy rights, equal protection of the law, and most importantly ... it could have been prevented if police had informed Brown of Yunker's allegations.*

- *Even if the police followed constitutional law and obtained a warrant based on probable cause, NO WARRANT is big enough to allow weekly searches on a private residence FOR 10 WEEKS – just to try to find some sort of wrongdoing which, of course, they never found. THAT is purely and simply . . . witch-hunting, in its most basic form.*

- *And, if the police try to fill their reports with evidence in contradiction of what Brown has claimed, she posses several copies of her criminal history and police reports stating they found no evidence of wrongdoing on the part of Ms. Brown.*

**EXCESSIVE USE OF PUBLIC AGENCIES AND PUBLIC FUNDING:**

෨

# DCFS

*By the time Yunker reported to DCFS, the police had conducted several welfare checks without finding substance abuse or neglect. Conclusion: DCFS didn't ask for Yunker's personal knowledge and they didn't check with local police before initiating their investigation. Herein lies and interesting observation. DCFS is afforded absolute immunity similar to prosecutors and judges. Police on the other hand, are protected by qualified immunity. Prosecutor and judges are not directly accessed by the community and interface only with the police. Therefore DCFS should either be a prosecutor or law enforcement – not both, and certainly not allowed to violate constitutions provisions under the protection of absolute immunity.*

*DCFS did not provide a basic, minimum duty of care. DCFS intervention should have immediately stopped the ongoing police witch hunts instead of adding to Brown's system abuse. DCFS also should have established whether Yunker had personal knowledge to lodge his complaint, DCFS should have established probable cause, DCFS should have obtained a warrant, and DCFS should have notified Brown of the allegations made against her. Once again, if any of these minimum duties required by the constitution were followed, the insurmountable losses and harm to Brown and her daughter would not have occurred. And, in case a different set of facts suddenly materialize, bear in mind that Brown has the original reports and none of the previously mentioned items were contained in any of the reports submitted by DCFS, the mediator or the police. And it is also important to remember that it makes fiscal sense for DCFS to substantiate as many cases as possible . . . family breakups are rewarded, not family reunifications.*

*Since no one informed Ms. Brown of what these weekly /bi-weekly police stops and DCFS investigation were for, Yunker told Brown it was due to the condition of Brown's home. So in the middle of fighting 2 legal battles, obtaining a refinance to pay off Albright\*\*, caring for her infant full-time, running her business full time, being visited by police every week, being investigated by DCFS, stalked and harassed by Yunker daily – sometimes hourly, Brown successfully installed new carpets, new floor and crown molding, new interior paint, new tile, and started on new hardwood flooring. This exhausted all*

remaining financial reserves for Brown – especially needed for legal counsel – while at the same time increasing profits for Albright due to Brown's fraudulent eviction / possession / sale that was just around the corner. Therefore, by DCFS withholding the truth from Brown only served to further her victimization.

To Brown it seemed appropriate when Albright offered to take property tax deductions and give the refund to Brown to help offset the costs for carpets, etc., so she would not have to worry about welfare checks or DCFS investigation any longer. As you may have figured out by now, this was a ploy all along. Brown would never receive any refund, Albright was now officially deducting property taxes per IRS, Brown was haggardly fighting her battles at home, with police, with the courts, with DCFS, with Albright, with Yunker, with her refinance, with her finances, with her taxes, spreading Brown so thin she could slide through cob web. While Brown was draining her resources - her adversaries were profiting; legally, financially, socially, professionally. Brown had no idea she had been played all along and that soon she would lose a lifetime's worth of achievement . . . her home, her business of 13 years (and sole source of income), her memoirs, her personal possessions, her friends, her family, her reputation, all of her evidence, her sanctuary of safety, and her daughter . . . because the integrity of the system designed to protect her had been breached.

▶ **No probable cause to justify DCFS investigation. Ms. Brown asserts this as an innocent party who suffered serious injustices, injuries, and prejudice as a result. DCFS cannot claim exigent circumstances or even reasonable suspicion existed since they took 2 weeks before showing up at Ms. Brown's residence. Therefore nothing whatsoever warranted weekly police searches and impromptu DCFS visits at Ms. Brown's private residence.**

- *When the welfare checks weren't working, Yunker falsified an allegation against Ms. Brown with DCFS. Due to lack of access and self-imposed restrictions, Mr. Yunker's personal knowledge of Ms. Brown's alleged substance abuse and child neglect would have had to been gained prior to August 2003. If Yunker felt his daughter was truly in danger It is not reasonable to wait 6 months to file a report with DCFS when he could be in violation of "failing to protect" his child.*

- *DCFS should have followed proper procedures as instructed by our constitution. If DCFS believed exigent circumstances may have existed, then they should have contacted local law enforcement. If they had contacted local law enforcement, they would have learned that several weekly welfare checks had failed to produce probable cause let alone anything to investigate. Exigent circumstances cannot exist if it took nearly 2 weeks before DCFS initiated investigation. Absent exigent circumstances, a warrant is necessary based upon probable cause. And, if Brown had been served with a warrant she would have been informed of the allegations against her. If Brown was notified of the allegations against her she could have stopped the madness by telling DCFS to check with the police. Our system of laws and protections would have worked . . . if they were followed.*

- *And just like the police, BOTH DCFS social workers found no corroboration of substance abuse or child neglect by Brown. But that didn't stop them - finding someone guilty is far more profitable.*

☑ The Fourth Amendment prohibits the police and other government officials from searching people's homes or offices or seizing their property without reasonable

grounds to believe that a crime has been committed. In most cases, police can conduct a search of a person's home or office only after they get a written search warrant from a judge, detailing where they will search and what they expect to find.

▶ **In order for DCFS to substantiate a claim of child neglect, they must first have corroboration. It is easy to corroborate child neglect if a parent/guardian has been found guilty of substance abuse or abusing alcohol. Child neglect is therefore almost always accompanied by a criminal charge. When the police arrest a parent/guardian with a substance abuse related crime, DCFS is notified.**

- *On March 2, 2004, a DCFS social worker visited Brown's home to investigate Yunker's allegation of substance abuse and neglect. The social worker stated the mother and daughter were bonded, the baby was healthy, and the meeting went well. Ms. Brown told the social worker about her only contact with DCFS following an incident with the San Ramon police in February 2003 (for protection, Brown will reveal details only to trusted sources – preferably non government).*

- *At the close of the meeting Ms. Brown asked the social worker when to schedule a follow up visit (in order to check out the condition of Brown's home upon completion of carpet installation). To Ms. Brown's pleasant surprise, the social worker laughed and said he it would not be necessary. (A witness confirmed Brown's 'unfounded' status once per week for 3 weeks.)*

- *However, 3 weeks later - following a private meeting between a DCFS case manager and Yunker, the status was changed to 'substantiated'. Since there had been no further contact with Brown, this changed status was entirely dependent upon the new evidence Yunker presented to DCFS during the private meeting.*

- *The new evidence Yunker provided to DCFS sufficient to corroborate his allegation, was a falsified criminal history report for Brown which included a drug arrest on March 6 – four days after the social worker's visit.*

- *The problem is, DCFS never bothered to verify Yunker's report and went right ahead and substantiated Brown for substance abuse and child neglect. They based their finding on a clearly falsified report indicating Brown was arrested for drugs. Brown was never arrested for drugs. (This can be easily verfied in the mediator's report for May-June 2004 indicated below).*

| *DCFS Report History* | **Brown's Criminal History** | | | *Real Criminal History* |
|---|---|---|---|---|
| 1997 Petty theft | **wrong crime** | **wrong person** | **wrong date** | No such thing |
| 1997 DUI | | | **wrong date** | DUI in 2001 after separation |
| 2003 D.V. arrest | | **wrong person** | | Yunker arrested – NOT Brown |
| 2003 Baby in car | **wrong crime** | | | Brown not arrested or charged |
| 2004 Drug arrest | **wrong crime** | **wrong person** | **wrong date** | Yunker found with drugs |

*March 6, 2004:*     *Brown catches Yunker attempting to break into her home - calls police. Police find Yunker in possession of white, powdery substance.*

*March 21, 2004:*     *Police stop welfare checks and suggest Brown get TRO against Yunker*

*March 23, 2004:*     *Yunker meets with DCFS. Yunker provides falsified criminal report. Report claims, among other things, that it was Brown who was arrested for domestic violence on November 23, and that Brown was arrested for drugs on March 6. DCFS changed their determination to 'substantiated'.*

1. In mediator's report, Yunker states he found drugs in Brown's home on March 6, 2004 but he poured baking soda on the drugs when police arrived. (Was it even drugs?)
2. DCFS testimony in mediator's report states Brown was arrested for illegal substance March 6, 2004, even though Brown's CLETS Criminal History Report shows no such arrest and no evidence of such an arrest exists – anywhere.
3. The ONLY mention of Brown's drug arrest is in statements by DCFS and Yunker.

If we give Yunker's testimony the benefit of doubt it still doesn't add up. Since the police and DCFS both knew Yunker was not allowed in Brown's home, then in order for Yunker to find drugs in Brown's home he would have to 1) break in and 2) know where to find the drugs. If Yunker knew where to find the drugs, why didn't he tell that to the police or DCFS so they could find the drugs on one of their many visits and Brown would get arrested without Yunker's effort or risk?

▶ **Before DCFS can substantiate an allegation they must have independent official corroboration. It is not reasonable for DCFS to rely on a criminal history report submitted by the same person who originally made the allegation (especially when it is inconsistent with both social workers' determinations).**

*Compare this to the days in criminal proceedings when an accused found himself on the gallows after someone called him a horse thief. They strung him up based on hearsay (contradictory to supporting facts); would not inform him of the charges; not allow him to testify on his own behalf; would not allow him to address his accusers, cross examine witnesses, or present exculpatory evidence. All this happened because the Sherriff was in a hurry – his job security and compensation relied on guilty verdicts.*

▶ **Yunker falsified / manufactured evidence resulting in Brown being charged with a crime.**

**Falsifying Records / Intent to Commit Fraud - Yunker**

☑ 115. (a) Every person who knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States, is guilty of a felony.

☑ (b) Each instrument which is procured or offered to be filed, registered, or recorded in violation of subdivision (a) shall constitute a separate violation of this section.

(c) Except in unusual cases where the interests of justice would best be served if

probation is granted, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, any of the following persons:

☑ (2) Any person who is convicted of more than one violation of this section in a single proceeding, with intent to defraud another, and where the violations resulted in a cumulative financial loss exceeding one hundred thousand dollars (\$100,000).

☑ (d) For purposes of prosecution under this section, each act of procurement or of offering a false or forged instrument to be filed, registered, or recorded shall be considered a separately punishable offense.

### Separate Acts of Procurement

1) DCFS allegation and falsified criminal history report
2) Mediator's 1st Report
3) Coerced custody agreement / Conspiracy
4) July 23 Change of Custody//Abduction Prevention Order (section 8)
5) Mediator's 2nd Report (section 7)
6) Final Judgment (section 9)

### Perjury: by Indirect or Direct Evidence:

☑ Penal Code 118. Every person who, having taken an oath that he or she will testify, declare, depose, or certify truly before any competent tribunal, officer, or person, in any of the cases in which the oath may by law of the State of California be administered, willfully and contrary to the oath, states as true any material matter which he or she knows to be false, and every person who testifies, declares, deposes, or certifies under penalty of perjury in any of the cases in which the testimony, declarations, depositions, or certification is permitted by law of the State of California under penalty of perjury and willfully states as true any material matter which he or she knows to be false, is guilty of perjury.

### False Accusation of Child Abuse

☑ FC 3027.1 (a) If a court determines, based on the investigation described in Section 3027 or other evidence presented to it, that an accusation of child abuse or neglect made during a child custody proceeding is false and the person making the accusation knew it to be false at the time the accusation was made, the court may impose reasonable money sanctions, not to exceed all costs incurred by the party accused as a direct result of defending the accusation, and reasonable attorney's fees incurred in recovering the sanctions, against the person making the accusation. For the purposes of this section, "person" includes a witness, a party, or a party's attorney.

**6. A matter is void when the local rules of the special court are not complied with.**

▶ Due to DCFS failure to pull a criminal history report for Brown and instead relied on hearsay claims made by Yunker, DCFS is responsible for falsifying evidence with intent to commit fraud resulting in irreparable harm, prejudice and cruel and unusual punishment. Furthermore, the reprehensibility factor is further aggravated by DCFS denial of equal protection of the law, equal access to justice, due process, right to be free from illegal searches, right to be notified of charges and opportunity to be heard, consistent with a pattern and practice - under the color of law – against a target group of citizens for the profitability of federal, state, and private funding.

1) *Failure to discharge official duty: Besides failing to obtain a criminal history report for Brown, DCFS claimed in their report that Brown admitted to using drugs. When Brown questioned DCFS about the false criminal history used as corroborative evidence required to 'substantiate' Brown, DCFS told Brown that since she DID have a DUI on her record (even though the year was wrong), it is considered substance abuse Ms. Brown told DCFS that the DUI was for alcohol not drugs. DCFS said that alcohol is a drug. When Brown told DCFS the DUI occurred 2 years before the child was born making it impossible to be used corroborate a child abuse claim, Brown was then told that she admitted to the social worker to using drugs throughout her pregnancy. Not only is it unreasonable for Brown (or anyone for that matter) to admit to doing drugs throughout their pregnancy to a DCFS social worker no less, it is also unreasonable for that line of questioning to even come up for the following reasons.*

2) *Right to 6th Amendment protections: It is a well-established pattern and practice employed by DCFS **not** to inform subjects of their investigations of the nature of the allegations against them. If DCFS had informed Brown of Yunker's allegations or asked about drug use, Brown would have directed DCFS toward the police to corroborate both Yunker's lack of personal knowledge AND the police finding no evidence of substance abuse/neglect during any of the 9 welfare checks already concluded.*

> **6th Amendment:** In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district where in the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

3) *The 5th Amendment protects us from self-incrimination. Even if Ms. Brown had a lapse of insanity and admitted doing drugs to DCFS, a person cannot be found guilty of a crime based solely on self-incrimination. Without the required corroborative element of Brown's criminal history, all that is left is Brown's supposed self-incriminating testimony – without Miranda rights, hearsay, not under oath, and no other witnesses. (Besides, Brown possesses factual and documented evidence completely exonerating Brown of any drug abuse allegations).*

4) **Notification Failure:** *Per welfare and institutions code, proper notification regarding DCFS's changed status and Brown's right to appeal should have been sent to Brown. Ether (a) DCFS failed to discharge their statutory duty or (b) Yunker interfered with Brown's mail. Brown notified both social workers of her ongoing mail problem so if DCFS failed to adequately notify Brown with proof of receipt – not proof of service - regarding either her changed status or notices of appeal opportunities. And unless DCFS can prove otherwise, or prove that Yunker intercepted Brown's mail, DCFS failed to discharge their duty per statutory regulations. No notice of charges, no right to appeal, no hearing, no attorney, no cross-examination. The matter was simply 'closed' – guilty as charged.*

5) **No Immunity = No Impunity:** *Since there exists factual evidence on record sufficient to substantiate DCFS falsifying Brown's criminal history in order to further their claim, including a wide assortment of aggravated violations, DCFS is prohibited from exercising any immunity protections - even absolute immunity bars public officials from acting outside their official duty in contravention of federal, state and constitutional law.*

6) **8th Amendment:** *The abusive indifference DCFS applied to Ms. Brown's case under the Color of Law, qualifies as cruel and unusual punishment under the 8th Amendment of the constitution since Brown was punished for a crime she did not commit.*

7) **Equal Protection:** *DCFS violated right to Equal Protection under the law and Equal Access to Justice when they failed to protect my daughter. DCFS records show 2 witnesses other than myself reporting DV, harassment, and possible sexual abuse. They told us they would not investigate claims made during a custody battle. When the custody battle was over, they told me I was prohibited from making any claims against Yunker.*

> ☑ **Penalties for Failure to Report:** Many cases of child abuse or neglect are neither reported nor investigated even when suspected by professionals; therefore, the majority of states impose penalties, in the form of a fine or imprisonment, on those who knowingly or willfully fail to report. Approximately 45 States and the District of Columbia have enacted statutes specifying the penalties for failure to report child abuse or neglect. The majority of States apply a "knowingly," "knows or should have known" and/or "willfully" standard. Other standards include "intentionally" and "purposely." A few States impose penalties without providing a standard.

8) **Expungement:** *Because DCFS is required to file substantiated child abusers with a national registry, Brown continues to be haunted by the prejudice DCFS malfeasance caused. Because law enforcement agencies are also notified of Brown's fraudulently manufactured charges of substance abuse/child neglect, local police refused to follow up on Brown's reports of stolen property, mail fraud, stolen vehicle, custody violations, child abuse, and she was recently pulled over by 3 local police cars at 8:30 am in front of a grocery store because the trailer hitch - which came with the 1991 vehicle - was obstructing the plates. After running her license, the officer asked to search the vehicle for illegal substances.*

☑ The term expungement refers to the procedures used by States to maintain and update their central registries and record-keeping by removing old or inaccurate records. Under the Child Abuse Prevention and Treatment Act (CAPTA), in order to receive a Federal grant, states must submit plans which include provisions and procedures that facilitate the prompt expungement in unsubstantiated or false cases of any records that are accessible to the general public, or are used for purposes of employment or other background checks.

▶ **Brown requests that the stigma-plus test of Paul v. Davis, 424 U.S. 693 (1976) be applied to these facts as they be applied to violations of 14th Amendment claims of equal protection and ex-post facto laws. Furthermore, Ms. Brown asks the court to grant her request to void DCFS allegations of substance abuse and child neglect subject to damages and remove all related traces of listed as a "verified" child abuser in DCFS records and all historical court-related or law enforcement records and information. The DCFS workers, the mediator and the court not only stigmatized her and qualifies under the stigma-plus test, but it created a prejudice so severe it deprived her equal access and equal protection under the law.**

❧

## Mediator

*"Instead of remorse, in every situation blame actually turns around and lands in my lap. Since before the baby was born, and no matter how much I tried to convince myself that his treatment of me has nothing to do with his treatment of his daughter, I instinctively felt I have endured more pain and abuse than anyone should be subjected to. However, I am a strong believer in the family unit, and as long as he didn't treat her in the same manner, I felt I could tough it out. When concerns of potential abuse first surfaced, I made sure she was protected at all times and I was greatly relieved when the Mediator said he was recommending a psychological evaluation for Yunker. I was devastated when that didn't happen. No good deed goes unpunished."*

L. Brown

7. **Mediator: A matter is void when the local rules of the special court are not complied with AND**

8. **Subject matter jurisdiction is lost if the court exceeded its statutory authority.** Rosenstiel v. Rosenstiel, 278 F. Supp. 794 (S.D.N.Y. 1967)

In Elkins v. Contra Costa County Superior Court, the Supreme Court stated the following:

"We also have disapproved rules and procedures adopted In *Hogoboom v. Superior Court* (1996) 51 Cal.App.4th 653, 656, for example, the reviewing court invalidated a trial court rule imposing its own family law mediation fee in addition to fees specifically established by statute. In *McLaughlin v. Superior Court* (1983) 140 Cal.App.3d 473,

481, the reviewing court held that a <u>local rule denied due process of law in purporting</u> <u>to permit a custody mediator to make a written recommendation to the court without</u> <u>providing a factual basis and without facing cross-examination."</u>

- *Contra Costa Superior County Court refused to allow either Brown or Yunker to testify until they had met with court-appointed mediators thereby forcing family law litigants into mediation and subjecting them to additional fees.*

- *Contra Costa's local rule denied due process of law by permitting a court mediator to make written recommendations to the court without reviewing the factual basis and without facing cross-examination. Furthermore, Brown was ridiculed openly in court when she requested to cross-examine the mediator and allowed only 1 week to prepare.*

▶ **First Mediation Report May-June 2004**

**Duty of care** is a legal obligation imposed on an individual requiring that they exercise a reasonable standard of care while performing any acts that could foreseeably harm others

- *Failure to review factual evidence resulting in prejudice. Even though DCFS failed to pull a real criminal history report for Brown, the mediator DID pull a correct report and he included in his report. What he failed to do however, was read it. Even a 10 year old would have noticed the glaring discrepancies.*

- *Impeachment of Witnesses: Lanita Donhowe had a criminal history of nearly 30 felonies and misdemeanors including 'persuading a witness not to testify' which impeaches her testimony as an unfit witness according to the US Code of Evidence. Yunker's testimony is impeached for a variety of reasons mentioned throughout this document. DCFS evidence of 'substantiating' Brown is also impeached for falsifying evidence.*

- *Witness testimony inadmissible: Ms. Brown was 'blind-sided' by the mediator's report. Not once was she informed of the witnesses' statements or that there were any witnesses, let alone provided a chance to present her own witnesses. Statements made out of the presence of the court, not under oath or deposition, to a third party no less, qualifies as the perfect example of what constitutes hearsay, what is not allowed, what is prejudicial, and above all – what is an aberration to the meaning of justice.*

**An affidavit** constitutes a "written declaration under oath, made without notice to the adverse party." (Code Civ. Proc., § 2003.)

**A deposition** constitutes "a written declaration, under oath, made upon notice to the adverse party, for the purpose of enabling him to attend and cross examine." (Code Civ. Proc., § 2004; see Hogoboom & King, Cal. Practice Guide: Family Law, supra, ¶ 13:125, pp. 13-34-13-35 [use of discovery at trial].)

1. *Statements were not properly sworn*
2. *Admissions were not by witnesses who "testified" within the meaning of CCP 2002*
3. *Witnesses were not available for cross-examination*
4. *Witness statements falls within Evidence Code section 1200's prohibition on hearsay evidence.*
5. *There was no hearing, no discovery*
6. *Lack of personal knowledge, bias and credibility of witnesses was not established or considered*

- **Unfair prejudice:** *Yunker falsifying Brown's criminal history was bad enough. Then DCFS failed to discharge their official duty and substantiate Brown based on Yunker's falsified evidence. THEN the mediator doesn't bother to read the obvious factual discrepencies. Bottom line, the mediator allowed unauthorized, highly inflammatory, prejudicial, and inaccurate portions of Brown's record to be introduced as evidence aganst Brown, without notifying Brown, and completely against the law. Additionally, substance abuse is under criminal jurisdiction. Brown was never arrested, never charged and certainly never found guilty of any such crime. Absent proof beynd a reasonable doubt, ALL references to any such crime were in violation of Federal Rules of Evidence 404 (b).*

**Rule 404 (b) Other crimes, wrongs, or acts**.

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show the person acted in conformity therewith. However, it may be admissible for another purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

(c) Determination of admissibility. Evidence is not admissible under subdivision (b) unless:

(1) the proponent gives to all adverse parties reasonable notice in advance of trial, or during trial if the court excuses pretrial notice for good cause shown, of the nature of the evidence the proponent intends to introduce at trial;

(2) if offered against an accused in a criminal case, the court conducts a hearing to determine the admissibility of the evidence and finds:

(A) by clear and convincing evidence, that the other crime, wrong, or act was committed;

(B) that the evidence is relevant to a purpose for which the evidence is admissible under subdivision (b); and

(C) that the probative value of the evidence outweighs the danger of unfair prejudice; and upon the request of a party, the court gives an instruction on the limited admissibility of the evidence pursuant to Rule 105.

**Rule 106. Remainder of, or related, record.** If a record or part thereof is introduced by a party, an adverse party may require the introduction at that time of any

other part or any other record that in fairness ought to be considered contemporaneously with it.

**Comment**

A determination of what constitutes "fairness" includes consideration of completeness and relevancy as well as possible unfair prejudice.

▶ **The trial court's rule ordered that "even if a party's witness refused to sign a declaration, the party was required to file an unsigned declaration." Perhaps this rule opened Pandora's Box by making it OK for mediators and other periphery agencies to present any statement – hearsay or otherwise – whether or not the witness signed it - as long as it was presented by written declaration.**

### ☑ Subornation of Perjury: Yunker, Mediator (Court?)

PC 127. Every person who willfully procures another person to commit perjury is guilty of subornation of perjury, and is punishable in the same manner as he would be if personally guilty of the perjury so procured.

PC 126. Perjury is punishable by imprisonment in the state prison for two, three or four years.

- *Witness Credibility: Lanita Donhowe was fired by Brown for stealing. Lanita Donhowe was stealing Brown's mail, jewelry, and her child's clothing and toys and secretly giving it to Yunker when she took the child on walks. She also advised Yunker on how to 'win' in Contra Costa County simply by interfering with Brown's mail.*

*The other witness supporting Yunker's claim, was a nanny Yunker hired who was the sister-in-law of Yunker's primary laborer. She had just arrived from Mexico, did not speak English, was paid in cash, and an illegal alien supported by her brother - who was dependant upon Yunker's employment. This 'witness' claims to have knowledge of Brown's nighttime activities even though she left daily at 4pm.*

#### Rule 404. Character evidence not admissible to prove conduct

(a) Character evidence generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving the person acted in conformity therewith on a particular occasion, except:

(1) evidence of a pertinent trait of the accused's character offered by an accused, or by the prosecution to rebut that evidence;

(2) evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused, or by the prosecution to rebut that evidence, or evidence of a character trait of peacefulness of the alleged victim offered by the prosecution in a homicide case to rebut evidence that the alleged victim was the first aggressor; and

(3) evidence of the character of a witness, as provided in Rules 607, 608, and 609.

- *Inherent bias, no neutrality: The mediator showed bias by allowing only Yunker to provide witnesses. Brown was not extended the same opportunity. If one carefully reviews the mediator's reports knowing the facts, questioning Yunker's testimony, DCFS, and the credibility of Yunker's biased witnesses,*

> **Rule 105. Limited Admissibility.** If evidence that is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.

## 9. Mediator: Void for Persuading Witness not to Testify by Colorful Lawful Coercion

▶ **Second Mediation Report December 2004**

- *Persuading a witness not to testify under the color of law. This is the most unconcionable action by a public official discussed in later this document (section 9).*

- *Breach of Confidentiality: Placing Brown directly in harm's way by publishing an event to which Ms. Brown was a confidential participant. The detective said, I can't BELIEVE (the mediator) published confidential records. Information like that could get you KILLED!" It did harm to Brown's case and to her person shortly afterward. There was no reason whatsoever to publish confidential reports for crimes which Brown was never charged.*

- *Bias, unfair prejudice throughout entire report, even if one removes the inflammatory language the report looks MUCH different.*

▶ **The abusive indifference applied by DCSF, the court appointed mediator, legal counsel, Contra Costa County Sherriff, and the San Ramon Police Department, deprived Brown of tangible constitutional interests. Brown had a liberty interest in parental rights and a property interest which were previously recognized, not mere expectancy creating prospective rights.**



## System Abuse

*There should be a crime when a person fails to take responsibility for personal shortcomings, vices, or insecurities and instead projects them onto innocent parties through the impossible-to-detect part-truths, half-truths, and the unverifiable - sanctimoniously genuine - pathological games. These 'untruths' are delivered to closest friends, family, and the system with the exclusive authority of system protection, with the sole intent of piercing a critical artery to the human psyche - watching the ones you loved or relied upon, turn their backs on your cries for help. Then, the innocent are forced to watch in agony as information manipulation completely shifts its support from the unfairly prejudiced to the new, self-inflicted hero, who is now basking in his new, self-inflicted heroism, deriving great pleasure from watching an innocent party suffer the consequences of his wrongdoings*

*Yunker parked up the street day and night. Yunker was there so frequently he could tell Brown which sprinkler heads weren't working and which garbage cans were put out for the past 6 weeks (months later Yunker would admit the reason Yunker had purchased the same brand of baby monitor as Brown was using inside the house he parked up the hill so he could tune his monitor to the same frequency Brown was using to hear Brown's conversations and plans). He used it to isolate her from any remaining holdouts of her support system by listening in on private conversation then later telling Brown "I heard about xxxx" or "what's the deal with xxxxx?" Of course Brown scrambled to find out who was her 'Judah, but just as soon as she thought she had discovered the culprit, Yunker would tell a different story he heard, making her start to question another friend. Eventually, she withdrew completely, not knowing who to trust anymore. And with unwitting charm, Yunker could sell Brown's 'confusion / paranoia' as a symptom of drug abuse to further her isolation . . . exactly as planned. But, Yunker was just warming up (there are far too many incidents to report, but you have been provided a few examples). Yunker used the time to harass anyone who came to see Brown including her clients, friends, and helpers. One nanny opened the medicine cabinet to floss her teeth (after using the facilities) and as the mirror swung open she screamed - Yunker's face was reflected in the mirror - he was standing right outside the window of the guest bathroom.*

*By this point, Brown rarely left the house. She shopped for groceries online, did her work over the internet, and put a peephole in the garage door to make sure Yunker wasn't there before leaving. A friend of 30+ years and a radiologist at Kaiser Permanente, had recently moved from Tennessee - a friend Yunker had not known about and Brown made every effort to keep it that way. Dr. Marsden would park down the hill in an obscure court and Brown would drive down and pick him up quickly. Yunker found out about Brown's long-time friend by listening to conversations through the baby monitor and tried several times to intimidate Dr. Marsden as Yunker had already done to many of Brown's acquaintances and support system. Yunker tried bashing in the front door when Dr. Marsden and his children were visiting. On another occasion he frightened Dr. Marsden's 12 year old son by repatedly calling the child's cell phone.*

*Why didn't Brown go to the police? Yunker's methods of system abuse involved a series of preemptive strikes. By schmoozing the police, DCFS, mediator, implementing welfare checks and filing allegations with DCFS, he was able to turn the system immediately against Brown and put her on the defense. Yunker's falsified criminal history report provided to DCFS reflects the same sentiments Yunker was trying to establish throughout Brown's social and professional networks as well as her critical support system including family. Those sentiments included Yunker's false allegation that Brown was arrested for possession of illegal substance on March 6, 2004 as well as Brown being arrested for domestic violence instead of Yunker. Yunker's ego and need for supremacy could not be tarnished, and the most efficient way to knock out one's adversary is to attack one's core – the epicenter of life.*

*It was therefore critical for Brown to clear her name in court on July 1, 2004 – and equally important for Yunker to prevent it – for it would have unraveled much more than falsified records.*

▶ **The chain of causation (see next section) may have started with Mr. Albright and Mr. Yunker. However, the hot potato got passed to the police, to DCFS, to the mediator, to the attorney, then to the judge(s) who either failed to discharge their official duty or acted outside their official capacity. Each official had a duty to perform and if they had performed their duties lawfully, Ms. Brown and her daughter would not have suffered irreparable harm and injuries, nor would they continue to be subjected to the abusive indifference from the totality of the injustices.**

☙

## Chapter 8: Yunker v. Brown - Void for forfeiture by wrongdoing

Federal Rules Evidence Rule 604 (5) Forfeiture by wrongdoing. A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to and did cause the unavailability of the declarant as a witness. Rule 804(b)(5) has been added to provide that a party forfeits the right to object to the admission of a declarant's statement when the unavailability of the declarant has been procured through a party's wrongdoing or the party's acquiescence in the wrongdoing of another. It is a preventative rule designed to deal with abhorrent behavior that is inconsistent with the system of justice. As adopted the rule is in accord with Rule 804(b)(6) of the Federal Rules of Evidence.

One important fact to remember is the single incident Yunker claims is responsible for ALL of this that occurred. One day, shortly after Christmas 2003, Ms. Brown said 'no' to Yunker. He asked to have Kaylie even though it was Ms. Brown's day to have her daughter and Brown already had plans. Brown was very much aware that "no" is simply not an option with Yunker. However there were serious safety concerns's for her daughter's welfare which took precedence over fear of Yunker's wrath. A year later, in December 2004, Yunker told Brown, "that'll teach you to say 'no' when I ask to have Kaylie".

▶ **June 30:**
*On June 30, 2004, Ms. Brown was evicted from a home she owned 100%, but was not able to provide evidence of her ownership due to a fraudulent cause of action and an illegal default filed 1.5 years too late. Also unlawfully seized was her sole proprietorship of 13 years which provided for her dependent infant daughter. The Sherriff, under authority of the Contra Costa Court, intentionally seized Ms. Brown's evidence, case information, hard drives, and personal files – and turned them over to her opponents the day before trial. Ms. Brown and her infant daughter were forced to the streets with $.42 cents to their name and the clothes on their back. Brown's adversaries were allowed to take anything they wanted even if it was not listed in the writ. After they were finished, Brown's adversaries trashed her home and took pictures of it to be used in the furtherance of both of their cases.*

*Proof: 7 witnesses, phone records, court records, mediator's Dec. '04 report indicating Yunker produced incriminating photos of Brown's home, videotape (possibly)*

▶ **July 1:**
*Outside court room doors, Ms. Brown's opponents used manufactured evidence obtained following Brown's fraudulent eviction to coerce Brown into signing a custody agreement and not to testify in court. Even though Ms. Brown had been robbed of her evidence and personal property by the Sherriff, Brown's plan was to use factual evidence already on record to prove Ms. Brown's innocence to the charges of substance abuse - child neglect by DCFS and that in fact, her adversary provided falsified evidence, perjured testimony, and suborned perjury to procure that finding.*

*Proof: Reasonableness test, 6 witnesses, phone records, court records*

▶ **July 2:**

*Mr. Yunker calls Brown at 8am hysterical, screaming obscenities, saying crazy things, threatening to take the infant, then hangs up. Exactly 2 hours later Yunker called saying 'happy birthday, I can't wait to take you to dinner tonight and spend 4th of July with you and Kaylie and my family" Two hours later . . . the screaming craziness again. Two hours later . . . the lovey dovey. This repeated throughout the day until Brown finally called the Family Court Facilitator's office and explained her immediate situation. The on-call mediator told Brown she MUST take her infant to a place of safety or possibly be charged with failing to protect her child.*

*To avoid abduction charges from being filed, protective shelters unanimously informed Brown she must first seek approval from the District Attorney, Child Abduction Unit, and file a Good Cause Exception Report in accordance with the Uniform Child Custody Jurisdiction Act (UCCJA), (85) the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), (86) the Parental Kidnapping Prevention Act (PKPA), (87) the VAWA, (88) the Violence Against Women Act of 2000 (VAWA 2000), California Family Code 3048 and Penal Code 278.7.*

*The first women's protective shelter she called, Brown asked for the non-emergency number to call back on. The shelter operator asked what the situation was. When Brown briefly explained her situation the operator replied, "If that's not an emergency I don't know what an emergency is!!!" The operator helped Brown for nearly an hour, trying to find an open bed at a shelter but it was the Friday before the 4th of July holiday weekend and many had taken the day off, including Brown's attorney. The first beds would not be available until July 5th so the operator gave Brown her name and name of the contact at the shelter. Additionally, Brown contacted Mr. Ernst - the District Attorney, Child Abduction Unit for Contra Costa County, and spoke to Yunker at great length asking him to please explain why he was acting so crazy – and let her know he was all right. When Yunker continued with his 'Jekyll-Hyde' syndrome Brown informed him that she must take the infant to a place of safety until things calm down.*

*Proof: Brown does not know if emergency calls are logged into the Court Facilitator's office, buts she does have names of contacts at emergency shelters. Phone records show Brown's calls to her attorney, to Mr. Ernst-District Attorney, shelters and court.*

▶ **July 4:**

*Phone records verify that Brown called Yunker twice on this day. For obvious reasons, Brown was prohibited from telling Yunker exactly where she was so Brown simply said she and her daughter were in a safe place until things could be worked out. A few weeks later, Brown questioned Yunker about not telling the truth to the court (Yunker's personal declaration to anyone he meets "I never tell lies"). When Brown questioned Yunker about filing a petition wherein Yunker stated he did not know of Ms. Brown's whereabouts, yet Brown told Yunker of her whereabouts on numerous occasions such as on this day, Yunker's response was as follows: "You told me you and Kaylie were staying at a shelter, but you did not give me the address. Therefore, I did not lie when I said I did not know where you were".*

*Proof: phone records*

▶ **July 5:**

*On the 5th day, Yunker files a report with the police department for Brown's custody violation. Of course, this was entirely dependent on the coerced custody agreement signed on July 1, 2004, for without Brown signing Yunker's agreement Yunker could not claim Brown was violating Yunker's right to custody. Prior to Brown signing the agreement Yunker did not have any legal custody rights.*

*It is interesting to point out that while Brown, Yunker, Brown's attorney, and Yunker's attorney each signed and each dated their signatures on July 1, 2004, the agreement wasn't actually filed until July 9, 2004. Additionally, the minute order for the July 1 hearing states that Yunker, Yunker's attorney, and Brown's attorney were present at the trial. It also states that Brown's attorney claimed she had no idea were Brown was and asked for a continuance. There was no mention of Brown signing the custody agreement. So if the agreement was not filed until July 9, what proof of custody rights did Yunker show the police on July 5th?*

**Proof: court records, court minute order, and police report**

▶ **July 6:**
*No longer safe from threats of violence and forced indigence by the court, Ms. Brown sought protective shelter authorized by the Contra Costa County District Attorney – Child Abduction Unit. A Good Cause Report was filed by Ms. Brown per PC 278.7. Brown spoke personally to Mr. Ernst, Contra Costa District Attorney – Child Abduction Unit and was approved to take her child to a protective shelter. Brown submitted appropriate forms to file a Good Cause report under the guidelines of Penal Code 278.7.*

**Proof: District Attorney Confirmation letter included as exhibit**

> *(For purposes of the following statute, PC 278.5 refers to custodial abductions).*
>
> Penal Code 278.7: (a) Section 278.5 does not apply to a person with a right to custody of a child who, with a good faith and reasonable belief that the child, if left with the other person, will suffer immediate bodily injury or emotional harm, takes, entices away, keeps, withholds, or conceals that child.
>
> (b) Section 278.5 does not apply to a person with a right to custody of a child who has been a victim of domestic violence who, with a good faith and reasonable belief that the child, if left with the other person, will suffer immediate bodily injury or emotional harm, takes, entices away, keeps, withholds, or conceals that child. "Emotional harm" includes having a parent who has committed domestic violence against the parent who is taking, enticing away, keeping, withholding, or concealing the child.

▶ **July 8:**
*While the mother is busy with the DA and getting admitted into a shelter - the court meanwhile sells the mother's home and signs her grant deed, only 7 days after her fraudulent eviction. Ms. Brown knew she had 15 days to recover her personal property from her residence and 10 days to stay the writ. However, instead of her personal property being protected as required by law, personal and business property was divided between various parties and the remainder placed into storage without her knowledge or consent. In fact, before the 10 day period expired, the court sold her home and signed her grant deed before the 8th day. To this day, Ms. Brown has yet to have her day in court, cross-examine witnesses for fraud, lack of personal knowledge, conspiracy, and most important of all . . . factual evidence that Ms. Brown owned her home exclusively – effective January 2001.*

- *To this day, Ms. Brown is prohibited from discovering who received the proceeds from the sale of her $900,000.00 home since she didn't sign the grant deed - the court did.*

- *(FYI: Brown had earnings of nearly $475,000 in equity, $275,000 in outstanding accounts receivable, and $200,000.00 in equipment and personal property – not to mention ruined credit ratings). Why rob a bank when you can get money legally through a corrupt and illegal court – besides, even if one gets caught they'll just slap on the wrist since its within family law division where punishment is nearly non-existent?)*

- *This happened while Ms. Brown and her infant daughter were in a protective shelter trying to get free legal assistance since they were suddenly without money - but legal services would not handle such a complex situation.*

- *For obvious reasons, Brown no longer trusted her attorney of record and was desperately trying to find a replacement to help her through this madness. (Even though her home was sold July 8, and her attorney was not relieved until September 23 – it wasn't until August that Brown discovered by accident that her home was sold.*

- *Even though Brown's home was sold, she won't learn of it until mid-August when a friend informs her. The last official communication she would receive pertaining to her home, was the notice of eviction she found taped to her door on June 23, 2004 - one week before she was forced out.*

**Proof: court records, business records, and several witnesses**

▶ **July 9:**

*Brown finalizes shelter interviews and speaks at length with shelter's legal counsel representative. Brown's attorney is extremely upset (again) for Brown not contacting her BEFORE seeking protective shelter. Brown explained that she made a last minute decision under the advice of the court facilitator's office and the District Attorney. Brown informs her attorney that she did in fact try to reach her attorney several times that Friday and Brown's attorney admitted she took the day off and was away through the holiday weekend including Monday, the legal holiday. Brown's attorney also informs Brown that she received a call from Yunker's attorney regarding Yunker filing for an ex-parte change of custody and Brown's attorney had expected to receive it on July 8. Brown's attorney said she was still waiting for it (this is also supported by Yunker's declaration in which the official date states "signed the 5th day of the 20th day of July). This may or may not be important. But the way things played out, it appears that Brown threw a wrench into Yunker's game plan. Yunker's Jekyll-Hyde craziness on July 2 does not make sense after he got what he wanted by blackmailing Brown the day before. It does make sense however, that he wanted to scare Brown into taking the child away so he could file abduction charges against Brown. However, Yunker and Brown's attorney had not considered Brown getting district attorney approval and therefore protection against abduction charges. Their plan needed re-adjusting – hence the editing error.*
*At this point Brown's attorney is also still the attorney of record on Brown's eviction case, but says nothing to Brown about her home being sold. In fact, the conversation on the day of Brown's eviction was the last communication Brown would have with her attorney regarding her home*

**Proof: Phone records, 3 witnesses (not Brown or attorney), Yunker's July 23 declaration**

▶ **July 9:**

> *The custody agreement signed on July 1, 2004 was filed in the court of Contra Costa. This is the agreement that Brown signed under duress by way of coercion in front of courtroom doors to hr custody trial the day after her eviction.*

> **Proof: court records**

▶ **July 13-14:**

> *Brown continued to call her attorney every other day to find out if Yunker had filed anything. "Still no word" was the answer Brown's attorney repeated on every occasion. Brown had several conversations with Courtenay about how ex-parte filings work and Brown became frustrated at Courtenay's continued reluctance to answer her questions. Brown is reassured by District Attorney Ernst who claims he has never seen a judge order an ex-parte change of custody without a 30 day notice.*

> **Proof: Phone records and 2 witnesses (not Brown or attorney)**

▶ **July 15:**

> *Danville police officer Sutherland phones Dr. Marsden. Dr. Marsden agrees to get a message to Ms. Brown to contact Officer Sutherland. Sutherland says he got Dr. Marsden's phone number from Yunker (Dr. Marsden's phone number is unlisted). An unnamed witness later verifies that Yunker got Dr. Marsden's phone number from the prescription bottles he picked up the night before Brown's eviction – June 29th (this explains Yunker's odd behavior when he was ADAMANT about picking up Brown's prescription even though Brown was already parked and entering the pharmacy). This explains Yunker's odd behavior and supports pre-meditation.*
> *This also makes sense in light of the following: Even though Dr. Marsden and Brown had known each other since pre-teen years at their church youth group, Dr. Marsden had been in Tennessee raising his family for 20 years. Brown and Dr. Marsden were re-acquainted on May 9, 2004. Though Yunker tried to get Dr. Marsden away from Brown on several occasions (part of Yunker's plan isolate Brown – not discussed in this document), Dr. Marsden's friendship with Brown prevailed. And, due to dubious undercurrents neither of them could understand yet were ever-present, Brown and Dr. Marsden continually exercised great caution whenever they communicated or met personally.*

> **Proof: Phone records and 3 witnesses (Sutherland, Dr. Marsden and 1 other)**

▶ **July 19:**

> *Brown and her daughter go back to Brown's parents' house in Danville California. Brown's parents were still away on their 3 week vacation (which is why Brown did not feel safe staying there after her horrifying eviction/blackmail/Jekyll-Hyde experience). Brown parks in a cul-de-sac 3 blocks away and keeps the lights off inside the house.*
> *Earlier that day, Brown called Yunker to test his temperament. Not once did Yunker ask about his daughter. Yunker's only concern was what Brown supposedly told someone about a beach incident when Yunker ejaculated on the baby in front of Brown (this is an example of the type of stories Brown is NOT including in this document)*

> **Proof: There is an additional story to be told on this day but will wait. 3 witnesses / phone records.**

▶ **July 20:**

*Brown meets with Officer Sutherland in the morning and briefly explains her situation. She provides Sutherland with copies of what was filed with the district attorney. Sutherland leaves for a short time to verify Brown's story with District Attorney Mark Ernst. Sutherland returned with Brown's documents and said that everything checked out and he would be filing in his report that Brown "was in compliance with the law and was not in violation of custody". Sutherland suggested that it would look good if Brown allowed Yunker to have a visitation with his daughter. If Brown agreed Sutherland promised to be there when Yunker picked up the child at 5pm on the 21st and also when Yunker retuned with the child at 8pm. Upon Brown's consent, Sutherland confirmed with Yunker. It was 1 pm.*

*It is important to note that this day - the 20th - is the date Yunker signed his declaration . . . The declaration where Yunker claims he had no idea of Brown's whereabouts . . . The declaration claiming Brown had abducted the child . . . The declaration that was intentionally falsified . . . The declaration Yunker filed in court the very next day.*

***Proof: Police report, 2 witnesses (Sutherland and District Attorney Ernst), Yunker's recorded declaration***

▶ **July 21:**

*Yunker files for Ex-parte Change of Custody with Abduction Prevention Orders against Brown. Yunker states that the mother and daughter's whereabouts was unknown, that Yunker could not reach Brown at her normal phone numbers, that irreparable harm would be caused if the mother continued to have physical custody of the infant, that he feared she would abduct the child since she had recently sold her home, got out of a lease, got rid of assets, had a history of custody violations, had a criminal history, and had relatives living outside the US. Therefore, he should be granted custody by emergency order and the mother's contact with her infant be limited to professionally supervised visitations ($120 for two hour visit).*

*Ex-parte is an emergency order. It allows 24 hours for the other party to respond to the court. Ex-parte request are to be personally served upon the party, service upon attorney is not sufficient. Yunker faxed Brown's attorney at 1pm. No notice was sent to Brown. At 4:47pm, Brown called her attorney once again. Brown's attorney, Ms. Courtenay, told Brown nothing has been filed. Officer Sutherland shows up, Yunker picks up the child and returns her back to Officer Sutherland. Brown is unaware the 24 hour clock is already ticking.*

***Proof: Police report, 1 witness (Officer Sutherland), Yunker's EX-Parte Request, and phone records confirming Brown's call to Courtenay.***

    ☑ Contempt 7- Abuse of the process or proceedings of the court, or falsely pretending to act under authority of an order or process of the court.

    **Contempt CCP 1209 (a):**

    ☑ 7. Unlawfully detaining a witness, or party to an action while going to, remaining at, or returning from the court where the action is on the calendar for trial;

    ☑ 8. Any other unlawful interference with the process or proceedings of a court;

▶ **July 23:**

*Once again, Brown calls her attorney before Yunker arrives for visitation at 4:51pm. And just as before, Courtenay tells Brown nothing has been filed. When Yunker arrives at 5pm, Brown is*

*surprised to see Yunker's mother instead of Sutherland. Yunker informs Brown that Sutherland does not work Friday through Sunday, so he thought Brown would be comforted if his mother came in Sutherland's place.*

*At 6:30pm, Yunker's sister arrives and serves Brown with the change of custody papers signed by the judge hours earlier (since Brown did not appear in the 24 hour period).*

*Brown would not see her infant for nearly 5 weeks.*

*During those 5 weeks some horrifying events took place which Brown will not discuss at this point. Suffice to say, Yunker let Brown know he had taken the child to an undisclosed location. That he took a week off work to be alone with the child. (Yunker did not take a day off when the baby was born, in fact he refused to take Brown to the hospital when she went into labor – he had been partying earlier and was too tired to go). Yunker informed Brown he had made sure there was no way Brown could impose police welfare checks on Yunker. Yunker frequently left voicemail messages with the infant screaming in the background - Mommy . . . Mommy . . . Mommy!!*

***Proof: 2 police reports: Yunker's and Brown's July 23rd report, affidavit of personal service to Brown dated July 23rd, July 23 Change of Custody with Abduction Prevention Orders, 3 witnesses, and phone records confirming Brown's call to Courtenay.***

**IMPORTANT**

*When abduction is claimed by a party such as Yunker, the instructions are to take the court order to the District Attorney – Child Abduction Unit so that law enforcement agencies are notified. Upon receiving the court order, the district attorney checks confidential records to find out if a Good Cause report is on file for the alleged 'abducting' parent. If a Good Cause report is on file with the district attorney the report contains the reason(s) the parent concealed the child along with the child's location and phone number. The process immediately stops and law enforcement is NOT notified. So when Yunker learned that Brown had filed a Good Cause Report with the district attorney, his plan would therefore fail and he would be unable to take the child away from Brown without police help. That is why Yunker's change of custody never came through on July 8th. Yunker had to wait until he knew where Brown was. That is also why he never intended to follow instructions on the court order because he knew he couldn't go to the District Attorney. That is why Yunker was so persistent with Officer Sutherland to contact Brown and get her to resume visitations. That is why Yunker waited to file until Brown was back in town. That was why Yunker waited until July 21st to file with the court – AFTER Sutherland had confirmed Brown's location and scheduled a visitation. And, THAT is why Brown was not served until AFTER Yunker had taken the child.*

▶ **Credibility may be determined without an evidentiary hearing where it is possible to "conclusively" decide the credibility question based on "documentary testimony and evidence in the record." Watts v. United States, 841 F.2d 275, 277 (9th Cir. 1988)**

*One needs only to consider 2 important facts:*

*1) Yunker filed his ex-parte change of custody / abduction order with the court on Wednesday July 21st based on the premise that Yunker "had no knowledge of the whereabouts of Brown and the child" yet Sutherland (and the police report) indicate Yunker knew of Brown's whereabouts and agreed to resume visitation the day before – July 20th*

*2) On Friday July 23rd the judge signed the order – in the absence of Brown's appearance – based on the same premise that "the whereabouts of Brown and her daughter were unknown" yet Yunker already had a visitation 2 days earlier and definitely knew the whereabouts of Brown and the child.*

*After the court order was signed Yunker did not proceed directly to the district attorney, instead he went directly to Brown's location to pick up the child. The only witnesses to this event of course are Brown, the infant, Yunker and Yunker's mother. However, 1.5 hours later Yunker's sister personally served Brown with the court documents – and that IS on record. So . . . If Brown's whereabouts was unknown – how was Yunker able to personally serve Ms. Brown at 6:30pm? And . . . why didn't Yunker take the judge's order to the district attorney as required? The converse is also true. If Brown wasn't personally served, why didn't Brown call the police when Yunker failed to return the child at 8pm?*

*Ironically, the same court that wrongfully evicted Brown then ordered the sale of Brown's home, turned around and used the sale of Brown's home as an indication of abduction and also ordered Brown's infant daughter to be taken, handing the infant into the hands of the very person from whom Brown had gained protection even though court records show the father's arrest for domestic violence, 3 reports of possible sexual child abuse or misconduct, and the mother's reports of stalking, intimidation, violence, sexual objectification, smelling semen in child's hair, etc. made to CPS and the mediator. To this day Ms. Brown has yet to meet the judge and provide exculpatory evidence necessary to clear her name.*

There are now 350,000 reports of parental abductions per year, of which 160,000 involve serious attempts to make a permanent change in the child's living situation. "In 80 percent of these cases, children are not taken out of love - they are taken out of anger or revenge. Most of these are a byproduct of acrimony between parents," he said. "In three-quarters of cases, the abductor is male and in most cases children are taken when very young."

☑  "Custodial interference in the first degree: Class D felony. (a) A person is guilty of custodial interference in the first degree when he commits custodial interference in the second degree as provided in section 53a-98: (1) Under circumstances which expose the child or person taken or enticed from lawful custody or the child held after a request by the lawful custodian for his return to a risk that his safety will be endangered or his health materially impaired;

☑  PC 118. (a) Any person who, in any affidavit taken before any person authorized to administer oaths, swears, affirms, declares, deposes, or certifies that he will testify, declare, depose, or certify before any competent tribunal, officer, or person, in any case then pending or thereafter to be instituted, in any particular manner, or to any particular fact, and in such affidavit willfully and contrary to such oath states as true any material matter which he knows to be false, is guilty of perjury. In any prosecution under this section, the subsequent testimony of such person, in any action involving the matters in such affidavit contained, which is contrary to any of the matters in such affidavit contained, shall be prima facie evidence that the matters in such affidavit were

false.

(b) Proof of falsity may be established by direct or indirect evidence.

☑ PC 123. It is no defense to a prosecution for perjury that the accused did not know the materiality of the false statement made by him; or that it did not, in fact, affect the proceeding in or for which it was made. It is sufficient that it was material, and might have been used to affect such proceeding.

☑ PC 125. An unqualified statement of that which one does not know to be true is equivalent to a statement of that which one knows to be false.

☑ PC 126. Perjury is punishable by imprisonment in the state prison for two, three or four years.

*(There are several acts of perjury included in Yunker's declaration under oath presented to the court on July 23, 2004. For proof one merely needs to follow inconsistencies in Yunker's subsequent testimony in written declarations and also the mediator's second report, December 2004. As additional proof, review the facts on record - this will be discussed further in the following section. Other acts of perjury include statements made to police, to DCFS and the mediator.)*

▶ **July 26:**
*Brown calls her attorney, Ms. Courtenay, to ask about what transpired with Yunker's emergency change of custody at 5pm before the weekend. Courtenay is surprised and claims she had no idea about what happened even though court records confirm that Courtenay received a fax notification on Wednesday July 21st at 1pm. Furthermore, right before Yunker's attorney disappeared into thin air and shut off all phones and fax numbers without any forwarding numbers, Yunker's attorney called Ms. Brown personally. There were several subjects discussed including warnings about Yunker. One of those subjects included Courtenay's knowledge of the fax she claimed not to have received. Yunker's attorney confirmed that Couurtenay called to confirm receipt of the fax at 1:30pm July 21st. This was the last communication Brown would have with her attorney of record. Psychological survival and her daughter safety took over Brown's life.*

*Proof: Phone records, court documents and possibly Yunker's former attorney.*

▶ **July 31:**
**Brown's journal entry prior to custody change:**
*"I cannot imagine how a parent could allow his own baby to suffer such pain. I don't care what the circumstances, if the roles were reversed, I could not bear to witness it. I have tried to set a precedent since the baby's birth, of continued visitation, weekly outings as a family, and have encouraged both families (maternal and paternal) to enjoy holidays, memories, and share in Kaylie's experiences together. I have included Jim in most every decision regarding Kaylie; her achievements, new decisions, her health, her milestones, and parenting decisions. It's important to maintain a stable environment, not only for nurturing and emotional well-being, but for education and discipline as well. I am deeply saddened that Jim has no desire to share in child-rearing and seems to propone 2 separate lifestyles for her. Additionally, during the*

*time he has had custody of Kaylie, he has turned our families against one another, does not support family outings, continually puts Kaylie's best interest after his own, does not communicate or involve me in anything she does, any place she goes, new achievements she makes, and is uncooperative in sharing responsibilities. He will not answer my phone calls, so when I see him briefly while dropping child off for visitation, I try to ask about potty training, etc. He refuses to talk on 'his time'."*

**Infants should not be passed from caretaker to caretaker**
"Even infants can sense that something is wrong as they experience the grief of their primary caretaker. Although a death in the family other than that of the mother may generally affect an infant, the absence of the mother may cause a clear biological reaction.
An older infant will grieve for the lost relationship through anger, crying, searching, lack of appetite, and finally, quiet resignation. The child's grief is bound up in his complete dependence for life support and in his loss of security. He is just beginning to see himself as a separate person from the mother or major caretaker, and that separation can be frightening.
A child often senses loss and suffers the feelings that go with loss, but she cannot comprehend what absence is. The child will pick up on the grief and anxiety in her surroundings and will need significant." touching and holding.

*Yet this . . . is exactly what the Superior Court of Contra Costa did. The applied abusive indifference when they failed to review factual evidence and statutory notification laws before ordering a change of custody. They allowed Brown to regain custody again in August. Then the custody changed a third time when Brown showed up to court on the wrong day (slippery circumstances involved). Three custody changes in three months without ever reviewing the facts!!!! Instead they subjected the child to cruel and unusual punishment, chronic health problems and fatigue, emotional regression, nightmares, kicking and screaming tantrums, intentionally forcing the infant to go through a grieving process similar to adults grieving the death of a parent, psychological trauma, emotional abuse, self mutilation, excessive separation anxiety, insecurities, and emotional blocking for starters.*

▶ **On April 10, 2005, the final judgment ordered supervised visitation not because of the threat of abduction (as originally claimed), but for substance abuse. Considering the totality of the circumstances especially as they pertain to Contra Costa County's trial rule and order and judges making orders without reviewing factual evidence, it is reasonable to assume that Yunker simply 'checked' the box requiring supervised visitation for Ms. Brown due to substance abuse with that fact in mind. It is unreasonable to assume the judge suddenly changed Brown's supervised visitation due to the threat of abduction to supervised visitation due to substance abuse on the final judgment on his own accord (hopefully, anyway). There are several motives to support this theory, although there is no way for Brown to determine for certain what really transpired between Yunker and Judge. This is resulting collateral damage . . . on April 10, 2005 – Final Judgment Day.**

> 1) *Yunker knew Brown could get her hands on factual evidence (such as the District Attorney letter or the Sutherland police report) that would exonerate Brown and incriminate Yunker. To prevent exposure it therefore made sense for Yunker to change the condition of Brown's supervised visitation from abduction to substance abuse. In Contra Costa County this was easy to do because if a party is represented by counsel then the judge automatically signs the order without review.*

2) *In Contra Costa this extremely easy-to-obtain legal judgment for substance abuse, rendered Brown mentally incapacitated while severely impeaching her credibility with administrative agencies, legal counsel, the court, and law enforcement. This resulted in a Pandora's Box of additional injures NOT reviewed in this document. As mentioned earlier, a judgment of substance abuse is equivalent to hanging a sign around a person's neck which reads, "Caution: Mentally Handicapped Person. It is socially acceptable to abuse them and you won't get caught because no one will believe them anyway". Most damaging of all, it dissolved whatever remaining support structure Brown may have had – while reinforcing Yunker's heroism and adoration needed to satisfy an insatiable ego.*

If you think Ms. Brown's opinion of substance abuse prejudice is a bit skewed you might try substituting the words 'mentally handicapped' for 'junkie' when you watch *CSI* or *Law and Order*. Then ask yourself if the 'junkie' was treated the same manner as you would expect a person with 'mental retardation' to be treated. Mental disorders range from retardation to dementia to depression and . . . substance / alcohol abuse. For some reason as a society, we even symbolize suicide as being somehow more courageous than someone abusing drugs or alcohol even though the same precipice may have launched their self-destructive behavior. In reality, the abuser has more self-esteem and self-restraint and therefore recovery IS possible - that is, if their self-esteem doesn't continue to diminish thanks to society's treatment of them.  Ms. Brown believes the same principal that applies to her 5 year old applies to nearly all mental ailments: "When they behave the worst is when they need love the most". Just how does society expect to fix these ailments which increase exponentially each year? . . . Obviously society's idea of disrespect, isolation and prejudice DOES NOT – in fact, it reinforces and justifies their problems. While our laws may embrace this concept on paper, society has a lot of catching up to do. Perhaps if we followed the law and treated abusers as if they had mental retardation, it might remove some of its glamour and appeal.

**Alive and ruined is far worse than dead and martyred. This was Yunker's goal for Brown.
There should be a crime for imprisonment  . . .  without requiring four walls, but there isn't one.**

3) *A threat of abduction is one of 4 reasons a parent deprived of parental rights would not be afforded reunification services. To give you a comparison of the harshness Yunker's claim of abduction had on Brown, the other three reasons for not receiving reunification services include; if a parent has killed another child, the parent has several felony charges of child abuse or is currently on death row or serving a life sentence.*
*On the other hand, substance abuse DOES require reunification efforts. Therefore it made sense for Yunker to first file against Brown for abduction then change to substance abuse later on to avoid any reunification services being offered to Brown.*

4) *Supervised visitation for substance abuse on top of abduction dramatically increases the complexity of Brown's ability to unwind an already complicated situation. Brown needs to file in court and obtain custody of the child BEFORE Yunker, Albright of Courtenay is notified. This additional hurdle of substance abuse nullifies that possibility - she cannot even go back to the DA and get permission to take the child then file her claims due to supervised visitation restrictions. Bear in mind that it has been made perfectly clear to Brown, that any attempt to redress grievances will be met with punishment to her daughter (a videotape is available to confirm such threats which show 2 six inch long burn marks above the child's*

genitals and a compelling description of other horrific encounters directly from the mouth of a four year old). And, when Brown tried to go to the police, her dog was killed.

**Aware that Ms. Brown has evidence against them; her opponent/conspirators continue to use threats of harm to keep secure their well-planned and highly profitable efforts.**

5) Brown's position is further complicated by the fact that any new evidence, recovery of Brown's stolen property, or any of Brown's illegally seized evidence likely to be destroyed or confiscated immediately upon notification of Albright, Courtenay or Yunker discovering Brown is taking action.

▶ **Domestic violence: malicious plan to take, keep, withhold, and conceal the child from lawful custodian**

☑ 3044. (a) Upon a finding by the court that a party seeking custody of a child has perpetrated domestic violence against the other party seeking custody of the child or against the child or the child's siblings within the previous five years, there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child, pursuant to Section 3011. This presumption may only be rebutted by a preponderance of the evidence.

(b) In determining whether the presumption set forth in subdivision (a) has been overcome, the court shall consider all of the following factors:

☑ (1) Whether the perpetrator of domestic violence has demonstrated that giving sole or joint physical or legal custody of a child to the perpetrator is in the best interest of the child. In determining the best interest of the child, the preference for frequent and continuing contact with both parents, as set forth in subdivision (b) of Section 3020, or with the noncustodial parent, as set forth in paragraph (1) of subdivision (a) of Section 3040, may not be used to rebut the presumption, in whole or in part.

▶ **Yunker did not have a right to custody since the agreement that first authorized his right to custody was coerced - signed by Ms. Brown under duress. It was not an agreement made by mutual consent and therefore invalid by process of law. It also means the change of custody order was part of Yunker's malicious plan to take, keep, withhold, and conceal the child from the lawful custodian**

☑ 278. Every person, not having a right to custody, who maliciously takes, entices away, keeps, withholds, or conceals any child with the intent to detain or conceal that child from a lawful custodian shall be punished by imprisonment in a county jail.

▶ **Yunker also maliciously deprived Ms. Brown of her right to custody, right to be free from supervised visitation, and nearly terminated Brown's parental rights. The final custody order is no defense to the crime charged.**

☑ 278.5. (a) Every person who takes, entices away, keeps, withholds, or conceals a child and maliciously deprives a lawful custodian of a right to custody, or a person of a right to visitation, shall be punished by imprisonment in a county jail not exceeding one year, a fine not exceeding one thousand dollars ($1,000), or both that fine and imprisonment, or by imprisonment in the state prison for 16 months, or two or three years, a fine not exceeding ten thousand dollars ($10,000), or both that fine and imprisonment.

☑ (b) Nothing contained in this section limits the court's contempt power.

☑ (c) A custody order obtained after the taking, enticing away, keeping, withholding, or concealing of a child does not constitute a defense to a crime charged under this section.

▶ **Per Penal Code 278.6, the court shall consider the following relevant factors and circumstances in aggravation in addition to others presented in this document.**

☑ (1) The child was exposed to a substantial risk of physical injury or illness.

☑ (2) The defendant inflicted or threatened to inflict physical harm on a parent or lawful custodian of the child or on the child at the time of or during the abduction.

☑ (3) The defendant harmed or abandoned the child during the abduction.

☑ (5) The child has not been returned to the lawful custodian.

☑ (6) The defendant previously abducted or threatened to abduct the child.

☑ (7) The defendant substantially altered the appearance or the name of the child.

(8) The defendant denied the child appropriate education during the abduction.

☑ (9) The length of the abduction.

☑ (10) The age of the child.

▶ **The child has not been returned to Ms. Brown, the lawful custodian.**

☑ 279.5. When a person is arrested for an alleged violation of Section 278 or 278.5, the court, in setting bail, shall take into consideration whether the child has been returned to the lawful custodian, and if not, shall consider whether there is an increased risk that the child may not be returned, or the defendant may flee the jurisdiction or, by flight or concealment, evade the authority of the court.

Civil Rights, Constitutional Law, Evidence, Habeas Corpus, Government Contracts, Government Law - 132

▶ **Let's briefly review the facts - substantiated either by factual record, know fact, or witness corroboration.**

1. Yunker arrested for domestic violence November 22, 2003.
2. Yunker files for custody January 7, 2004.
3. Yunker starts police welfare checks mid January.
4. When that failed, Yunker files allegation with DCFS.
5. When that failed, Yunker falsifies Brown's criminal history to persuade DCFS to change their 'unfounded' status to 'substantiated', therefore prejudicing Brown to DCFS, the Mediator, the Family Court Judges, attorneys, family and friends.
6. When that failed, a second allegation is made to DCFS by Donhowe who has a felony for 'persuading witness not to testify.'
   a. Both Yunker and Donhowe have felony convictions for drugs.
   b. Donhowe worked on a trial basis for Brown four months before Yunker filed for change of custody.
   c. Donhowe refused payment from Brown therefore she must have received income from some other source.
   d. Witnesses state that Donhowe took Brown's mail and other stolen property (primarily the child's clothing and toys) and gave them to Yunker on secret meetings while talking child for walks.
7. When that failed, he perjured testimony and suborned testimony to mediator.
8. When that failed, Petitioner first gained custody rights by blackmailing Brown into signing custody agreement outside the courtroom doors prior to July 1 Long Cause Hearing. This also prevents Brown from testifying against Yunker.
   a. Yunker used 'incriminating' photos of Brown's home immediately after she was evicted
   b. Albright invited Yunker to Brown's home after he fraudulently had her evicted and Brown's personal property was stolen. Of primary importance was Brown's evidence and case info.
   c. Yunker took Brown's property including all of the child's clothing, toys, photos and memoirs.
9. The following day, Yunker used threats and acts of 'craziness' forcing Brown to seek refuge at a shelter, therefore filling 3 objectives:
   a. Preventing Brown from filing in court to recover her property from Albright.
   b. Brown's home was sold without her knowledge within the next 3 working days, and because she didn't sign off on her own grant deed, she is prevented from finding out who got the money.
   c. Yunker used the custody agreement signed under duress and the fact that she had left her home (involuntarily) as an indication of abduction.
10. Yunker perjured his testimony to the court by stating he did not know where Brown and child were when he filed for Temporary Change of Custody even though Danville Police Officer Sutherland witnessed visitations (prior to the filing of the Temporary Order).
11. Forced Brown to be denied maternal rights and forced her to 'supervised visitation' by providing perjured testimony to justify abduction prevention orders.
12. Used threats to harm child if Brown did not comply since Yunker knew she had evidence against him especially authorization to take the child per the District Attorney, Child Abduction Unit.
13. Subjected child to irreparable harm. Child suffered emotionally and psychologically, and possibly physically. Child showed signs of such abuse through tantrums, nightmares, screaming and pulling out hair, incessantly crying for 'mommy', loss of vocabulary, regression, pallid and withdrawn appearance, and loss of appetite.

**182. (a) If two or more persons conspire**:

☑ (1) To commit any crime.

☑ (2) Falsely and maliciously to indict another for any crime, or to procure another to be charged or arrested for any crime.

☑ (3) Falsely to move or maintain any suit, action, or proceeding.

☑ (4) To cheat and defraud any person of any property, by any means which are in themselves criminal, or to obtain money or property by false pretenses or by false promises with fraudulent intent not to perform those promises.

☑ (5) To commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws.

When they conspire to commit any other felony, they shall be punishable in the same manner and to the same extent as is provided for the punishment of that felony.

☑ **Title 18, U.S.C., Section 241: Conspiracy against Rights**

**1569. Duress consists in:**

☑ 1. Unlawful confinement of the person of the party, or of the husband or wife of such party, or of an ancestor, descendant, or adopted child of such party, husband, or wife;

☑ 2. Unlawful detention of the property of any such person; or,

☑ 3. Confinement of such person, lawful in form, but fraudulently obtained, or fraudulently made unjustly harassing or oppressive.

**1570. Menace consists in a threat:**

☑ 1. Of such duress as is specified in Subdivisions 1 and 3 of the last section;

☑ 2. Of unlawful and violent injury to the person or property of any such person as is specified in the last section;

☑ 3. Of injury to the character of any such person.

▶ Lastly, Ms. Brown continues to be punished for a crime she did not do, a crime she was never even charged with. There wasn't a hearing. There wasn't any factual evidence. In fact, the evidence clearing her name and pointing to the real culprits was in the case file all along. But no one bothered to read the file, not even the judge. Ms. Brown lost her home, her business, her family. The Sherriff allowed her personal items to be stolen, seized her evidence and turned it over to her opponents. She lost her reputation, her memoirs, her dog Sara – and to this day . . . BROWN HAS NEVER BEEN BEFORE THE COURT!!!!!!!



## Chapter 9: Void for fraud committed in the procurement of jurisdiction, and judges lose subject-matter jurisdiction for not following the law.

Thereafter, their orders are null and void. In all courts, whether in courts of general jurisdiction or in courts of limited jurisdiction, the judge deprives the court of jurisdiction if the judge does not comply with the law. When the local rules of the special court are not complied with. (One Where the judge does not act impartially, Bracey v. Warden, U.S. Supreme Court No. 96-6133(June 9, 1997). Fraud committed in the procurement of jurisdiction, Freedman Brothers Furniture v. Dept. of Revenue, 109 Ill. 2d 202, 486 N.E. 2d 893(1985).

**The following Contra Costa County Superior Court rule and order were both found to be unlawful according to the Supreme Court's opinion in Elkins v. Contra Costa County Superior Court (2007).**

"[D]irect examination on factual matters shall not be permitted except in unusual circumstances or for proper rebuttal. The Court may decide contested issues on the basis of the pleadings submitted by the parties without live testimony." (Super. Ct. Contra Costa County, Local Rules, former rule 12.5(b)(3), eff. July 1, 2005.) In addition, the rule provided that "[s]ubject to legal objection, amendment, and cross-examination, all declarations shall be considered received in evidence at the hearing." (Ibid.) Under the rule, a party's failure to file responsive pleadings, including declarations, in the time prescribed by the rules authorized the court to "permit the matter to proceed as a default," or order a continuance and impose a monetary sanction on the "untimely party." (Id., former rule 12.5(b)(4).)

A trial scheduling order (TSO or order) imposed additional restrictions and sanctions. Like the rule, it ordered that all direct testimony at trial be presented prior to trial in the form of declarations "filed in lieu of oral direct testimony, subject to cross-examination." Indeed, even if a party's witness refused to sign a declaration, the party was required to file an unsigned declaration.

Sanctions for failure to comply with the TSO were severe. "Failure to provide initial declarations may result in there being no direct testimony on that issue and issue sanctions may result. Failure to file a trial brief indicates to the court that no cases are being relied on by that side. Failure to provide a declaration because a witness refused to sign it shall not excuse the filing of [any] unsigned declarations." The TSO directed the parties to file responsive declarations and exhibits five court days prior to trial, along with any objections to exhibits, as well as responsive briefs and any demands for the production of declarants for the purpose of cross-examination. The TSO concluded with the following warning: "Failure to comply with these requirements will constitute good cause to exclude evidence or testimony at trial

and/or to make adverse inferences or findings of fact against the non-complying party."

### The following is the Supreme Court's opinion in Elkins v. Contra Costa Superior Court (2007) regarding Contra Costa County Superior Court's suppression of live testimony.

"A recent decision by this court demonstrates the limited application of Code of Civil Procedure section 2009, and also illuminates the policy underlying application of the hearsay rule when questions of credibility arise, as they certainly do in dissolution trials. (People v. Johnson (2006) 38 Cal.4th 717 (*Johnson*).) In *Johnson*, we concluded that at a pretrial hearing on a motion to suppress evidence in a criminal case (Pen. Code, § 1538.5), the prosecution cannot carry its burden by submitting affidavits in lieu of live testimony. The pertinent statute, Penal Code section 1538.5, did not provide for such a procedure, and the historic practice long had been to require oral testimony. (*Johnson, supra*, 38 Cal.4th at pp. 726, 728.) Moreover, as we explained in *Johnson*, "allowing a prosecutor to oppose a suppression motion with written affidavits in lieu of live testimony would be inconsistent with the trial court's vital function of assessing the credibility of witnesses." (*Johnson, supra*, 38 Cal.4th. at p. 729, fn. 8; see *id*. at p. 726.) A suppression motion "presents issues as to which the credibility of witnesses often is of critical significance" (*id*. at p. 731), and the witness's personal presence and oral testimony is significant because it "'enable[s] the trier of fact to consider the demeanor of the witness in weighing his testimony and judging his credibility.' " (*Id*. at p. 733.) We also observed in *Johnson* that, unlike a pretrial suppression motion, the motions referred to in Code of Civil Procedure section 2009 are on "preliminary or ancillary procedural matters" that historically have been decided on the basis of affidavits alone, whereas it is well settled that section 2009 does not change the rules of evidence. (*Johnson, supra*, 38 Cal.4th at p. 730.) Quoting *Lacrabere, supra*, 141 Cal. 554, we confirmed that section 2009 " 'has no relation to proof of facts the existence of which are made issues in the case, and which it is necessary to establish to sustain a cause of action.' " (Johnson, supra, at p. 730, italics added.)

### The following is the Supreme Court's opinion in Elkins v. Contra Costa Superior Court (2007) regarding Contra Costa County Superior Court's reliance on hearsay declarations.

"(T)there is no general statutory exception to the hearsay rule for contested marital dissolution trials. On the contrary, the existence of a specific statutory exception for default judgments, where an adversary proceeding is waived or forfeited, only serves to support the general rule that hearsay declarations are inadmissible at contested

marital dissolution trials. Another statutory exception to the hearsay rule permits courts

to rely upon affidavits in certain motion matters." (Code Civ. Proc, § 2009.)

"Although affidavits or declarations are authorized in certain *motion* matters under

Code of Code of Civil Procedure section 2009 provides: "An affidavit may be used to

verify a pleading or a paper in a special proceeding, to prove the service of a

summons, notice, or other paper in an action or special proceeding, to obtain a

provisional remedy, the examination of a witness, or a stay of proceedings, and in

uncontested proceedings to establish a record of birth, or *upon a motion*, and in any

other case *expressly permitted by statute.*" (Italics added.) ["The fact that section

2009 permits [the admission of affidavits] 'upon a motion' does not mean that the

issues in a contested case may be determined and a judgment rendered on the basis

of written statements of parties not before the court"]; Hogoboom & King, Cal. Practice

Guide: Family Law, *supra*, ¶ 13:106, p. 13-30.)

It is IMPORTANT to bear in mind the dates of the all the events as they relate to this

entire document and both Brown's cases, and that they all occurred against the same

person, in the same court, using the same attorney, in the same county, under the

influence of the same unlawful rules.

▶ As previously illustrated, it is one thing to enter a default judgment against the introduction of new
evidence where an adversary proceeding is waived or forfeited. It is quite another thing to render the
entire trial to proceed 'by default' without requiring a request to enter default, an entry of default
judgment, opportunity to set aside the default, and available remedies and protections as provided by
law. However, in Contra Costa County this was an established pattern and practice for several years and
affected thousands of families. And over time, this lack of accountability exposed the judicial system to
abuse, fraud and corruption.

*To use the game Monopoly as an analogy, in rendering a 'default' without actually ordering a 'default
judgment' allowed Contra Costa to circumvent deeply rooted traditions of American justice by allowing
one litigant to proceed directly to 'go' based upon hearsay written declarations (usually the person filing
the complaint) while the adversary proceeds directly 'to jail' without the benefit of live testimony,
production of evidence, cross-examination, factual evidence, or even a cursory review of the merits of
the case. Furthermore, the rule and order removed the trial court's obligation to read case files at all -
favoring adjudication based entirely on written 'hearsay' declarations "even if a witness refused to sign
it" over a trial on the merits. All for the sake of expediency . . . or as Ms. Brown puts it - evil done in the
name of good.*

In *Lammers v. Superior Court* (2000) 83 Cal.App.4th 1309, for example, a local court

rule governing family law proceedings required the parties to file a timely request that

the court review the case file prior to a hearing on a contested matter. In order to avoid

obvious constitutional issues, the reviewing court refused to endorse the trial court's

view that the local rule relieved the court of the obligation to read the case file at all when the request to do so was untimely. The Court of Appeal explained that "a measure implemented for the sake of efficiency cannot jeopardize the constitutional integrity of the judicial process [citation].

▶ In trials decided by a judge, it is an absolute absurdity and against all principles of natural law and justice dating back for centuries, to require litigants to file a request for the judge to review their case prior to a hearing. Because if- as in Ms. Brown's case she didn't receive the proper notifications let alone in time to file timely responses to the court - according to the trial court's rule and order Ms. Brown would not only be prohibited from direct oral testimony, but the judge also would not have received a request to review the case file prior to the hearing. No oral testimony + No review of case file = Decisions decided entirely by the offerings of only one party.

*Justice should be seen to be done. If the community is satisfied that justice has been done,*
*they will continue to place their faith in the courts.*

▶ ANY time a court of law hears only one side of a matter automatically makes any decision inherently biased . . . impartiality becomes futile, and removes 4 of the 6 elements of fundamental natural justice. As a result, the community's faith in the courts (especially family law litigants) – has significantly declined.

▶ The following statutory violations are important for four reasons:

1. *Any one of the following 10 violations listed below is sufficient to render the entire judgment void ab initio since the judge failed to follow the law.*
2. *By far the most heinous example of judicial abuse is that the judge CLEARLY did not even look at the file. Even if the judge had given the file a cursory review it would have been easy to determine that the facts on record were in direct contradiction with Yunker's hearsay declaration. And if the judge had followed the law, it would have been clear that Brown was a victim, not a criminal and Yunker was a criminal not the victim . . . but the lack of integrity of the Contra Costa County Court is what Yunker, Albright and Courtenay relied upon*
3. *Another reason the judge could not have weighed the evidence is because Yunker did not provide ANY EVIDENCE TO WEIGH. Yunker simply checked off boxes on the Abduction Prevention Attachment form and the judge signed off on it.*
4. *The order was based SOLELY on Yunker's written (hearsay) declaration, even though the judge KNEW Brown had not been properly notified in accordance with the law and constitutional due process.*

▶ It is an obscenity to justice that a judge would treat the lives of a mother and an infant in her tender years with less care than one would a poker game  . . .  the judge placed a bet without even looking at his hand.

According to Contra Costa County's Trial Scheduling Order (TSO):

The TSO provided that the declarations were to "explain" the appended complete set of trial exhibits, and that "[a]ny required evidentiary foundation for admission of the proposed exhibits shall be completely set forth in the declaration(s)."

▶ Even though the Supreme Court rendered Contra Costa County's TSO unlawful in 2007, it offers no defense or claims of immunity when the judge couldn't even follow the unlawful trial court's TSO. As you will see, the laws require a substantive showing of evidence when a threat of abduction is claimed (for obvious criminal liabilities). However, the Trial Scheduling Order (above) ALSO required evidentiary foundations to support Yunker's exhibit – the Abduction Prevention Attachment (Family Code 3048) - yet no evidence whatsoever was presented by Yunker . . . and in fact the evidence already on record CLEARLY contradicted every single element of Yunker's claim.

▶ The trial court judge landed a solid 1-2 knockout punch resulting in danger creation for Ms. Brown and her infant daughter. Clearly, there exists a problem when failure to review the facts already on record resulted in the trial court's failure to protect by usurping its authority, exceeding jurisdiction, violating statutory, federal and Constitutional law, and depriving Ms. Brown and the infant of constitutional liberties, fundamental rights, and equal protection under the law. This reprehensible act, implemented for the sake of efficiency and profit, jeopardized the integrity of the entire judicial process.

## 1. Yunker v. Brown: Void where service of process was not made pursuant to statutory law

### Family Code 215:

☑ No modification of an order, and no subsequent order in the proceedings, is valid unless any prior notice otherwise required to be given to a party to the proceeding is served, in the same manner as the notice is otherwise permitted by law to be served, upon the party. For the purposes of this section, service upon the attorney of record is not sufficient.

▶ Violation of FC 215: The judge unlawfully authorized Yunker's July 23, 3004 request for Ex-Parte Change of Custody even though the filing clearly indicates service was served upon Ms. Brown's attorney, not Ms. Brown. Where the court finds an order void based on a violation of statutory procedures or procedural due process, Ms. Brown is asserting the following violations as an innocent party. That is, she was powerless to do anything about the orders entered against her because she was not served with proper notice. Therefore all orders and suborders are void on their face.

The custody order of July 23, 2004 was null and void because Brown's procedural due process rights were violated. Without notice that custody was at issue on the date of the ex-parte hearing, she was denied the opportunity to be heard on the issue. Ayala, 344 Ill. App. 3d at 587.

"Prior to entry of a new order, a party must give notice that a motion will be presented to the court*** An order entered without notice is void." A.W., 343 Ill. App. 3d at 399, citing Maras v. Bertholdt, 126 Ill. App. 3d 876, 881, 467 N.E.2d 599 (1984).

## 2. Void where the judge violated statutory law - FC 3048 Abduction:

(a) Notwithstanding any other provision of law, in any proceeding to determine child custody or visitation with a child, every custody or visitation order shall contain all of the following:

(1) The basis for the court's exercise of jurisdiction.

(2) The manner in which notice and opportunity to be heard were given.

(3) A clear description of the custody and visitation rights of each party.

(4) A provision stating that a violation of the order may subject the party in violation to civil or criminal penalties, or both.

(5) Identification of the country of habitual residence of the child or children.

▶ The court cannot claim they based their decision on findings, when there were no findings presented or reviewed. In addition to violation of family code 215, there are also laws governing ex-parte (emergency) request that require 24 hour notification. It is interesting that this July 23rd order involved 2 notifications: the first was service by fax to Brown's attorney when the request was first presented to the court on July 21st, and then personal service to Brown by Yunker's sister AFTER the judgment was ordered and AFTER the child was in Yunker's possession. Clearly, as mentioned in the previous section, it is IMPOSSIBLE for Yunker to claim a threat of abduction existed based on the fact he did not know the whereabouts of either Brown or the infant yet Brown was personally served at the exact same residence listed on Yunker's declaration – the same address registered with the court – less than 3 hours after the order was issued.

▶ Even though Yunker refers to filing a police report with the Danville police department, Yunker did not include a copy of that report in his request to the court for 3 reasons (Brown has no idea why the judge didn't request to see it before issuing such a potentially dangerous order):

1. The police report by Sutherland found Brown in compliance with the law and Brown did not . . . repeat, *DID NOT* violate custody.

2. It would have provided proof that Yunker's claim was fraudulent because Officer Sutherland notified Yunker of Brown's location and scheduled a visitation for Yunker on the 20th – ONE DAY PRIOR to Yunker filing his request with the court.

3. It would have provided further proof of Yunker's criminal intentions because Sutherland personally witnessed Yunker's visitation with the child on the same day Yunker filed a claim that Brown had abducted the child and their whereabouts was unknown.

▶ It is also interesting to note the following: Yunker claimed in his fraudulent declaration that he tried to reach Brown by telephone but that none of the numbers were working. Yet, if the court clerk had dialed the number listed on the face of the request – Brown would have answered the call personally. (Incidentally, Brown's residential phone number is actually a VOIP phone number therefore she has maintained the same numbers since September 2000.)

▶ Lastly, there was absolutely NO ATTEMPT BY THE COURT TO VERIFY IF BROWN AND THE CHILD WERE MISSING. IF THE COURT HAD TRIED, THEY WOULD HAVE DISCOVERED BROWN AND THE CHILD WERE EXACTLY WHERE THEY WERE SUPPOSED TO BE!!

Yunker's intentional fraud, perjury, conspiracy, and other crimes were already discussed in the previous section therefore this section will be devoted exclusively to the fundamental miscarriage of justice and fraud upon the court by the illegal actions of a judge.

### 3. Void when the judge does not follow the law - FC 3048 (b)(1): Abduction

☑ (b) (1) In cases in which the court becomes aware of facts which may indicate that there is a risk of abduction of a child, the court shall, either on its own motion or at the request of a party, determine whether measures are needed to prevent the abduction of the child by one parent. To make that determination, the court shall consider the risk of abduction of the child, obstacles to location, recovery, and return if the child is abducted, and potential harm to the child if he or she is abducted. To determine whether there is a risk of abduction, the court shall consider the following factors:

▶ *No evidentiary basis provided by Yunker to substantiate a risk of abduction by Brown.*

### 4. Void when judge does not follow law - FC 3048 (b)(1)(A):

☑ Whether a party has previously taken, enticed away, kept, withheld, or concealed a child in violation of the right of custody or of visitation of a person.

**Family Code 3048 (b) (1) (B): Abduction**
☑ Whether a party has previously threatened to take, entice away, keep, withhold, or conceal a child in violation of the right of custody or of visitation of a person.

▶ In addition to Yunker having no factual evidence to support any indicators for abduction, there EXISTED evidence contained in request AND in the case file directly contradicting Yunker's allegation. If the judge even glanced at the case file OR the Yunker's ex-parte request, the judge would have discovered the IMPOSSIBILITY for Brown to have a prior history of concealing child, or threatening Yunker's visitation rights - due to a singular fact: Yunker's right to custody had only been legally valid for 11 days!!!!

### 5. Void when judge does not follow law - FC 3048 (b)(1)(C):

☑ Whether a party lacks strong ties to this state.

▶ Ironically, Brown's strongest ties to this state – her business and her home – had just been fraudulently seized by this very same court 2 weeks earlier.

### 6. Void when judge does not follow law - FC 3048 (b)(1)(D):

☑ Whether a party has strong familial, emotional, or cultural ties to another state or country, including foreign citizenship. This factor shall be considered only if evidence exists in support of another factor specified in this section.

▶ No factual evidence to support this indicator for abduction contained in the court record or substantiated in Yunker's declaration.

## 7. Void when judge does not follow law - FC 3048 (b)(1)(E):

☑ Whether a party has no financial reason to stay in this state, including whether the party is unemployed, is able to work anywhere, or is financially independent.

▶ REPEAT . . . Brown's strongest ties to this state – her business and her home – had just been fraudulently seized by this very same court 2 weeks earlier.

## 8. Void when judge does not follow law - FC 3048 (b)(1)(F):

☑ Whether a party has engaged in planning activities that would facilitate the removal of a child from the state, including quitting a job, selling his or her primary residence, terminating a lease, closing a bank account, liquidating other assets, hiding or destroying documents, applying for a passport, applying to obtain a birth certificate or school or medical records, or purchasing airplane or other travel tickets, with consideration given to whether a party is carrying out a safety plan to flee from domestic violence.

▶ REPEAT . . . Brown's strongest ties to this state – her business and her home – had just been fraudulently seized by this very same court 2 weeks earlier.
▶ Hidden or Destroyed Documents: It is a fact that on June 30, 2004, Yunker trespassed onto Brown's personal residence with the sole purpose of grand theft larceny, obstruction of justice, destruction of Brown's key evidence and her personal property aggravated by conspiracy, extortion, and fraud resulting in great bodily injury. If that isn't enough, Yunker's hideously sociopathic disposition allowed him to satisfy his egalitarian self-interest by claiming it was Brown who destroyed documents – Brown had no documents left to destroy or hide!!!

## 9. Void when judge does not follow law - FC 3048 (b)(1)(G):

☑ Whether a party has a history of a lack of parental cooperation or child abuse, or there is substantiated evidence that a party has perpetrated domestic violence.

▶ While Yunker had a history of domestic violence; his arrest record, DCFS report, and the mediator's report - Brown on the other hand had a history of cooperation. And as before, there was evidence of this contained in the court records AND Yunker's ex-parte request, but NO factual evidence in Yunker's declaration to contradict this. In fact, if one were to read Yunker's declaration with all facts considered, it is clear that Yunker is a predator who delights in stalking, controlling and harassing his prey.

## 10. Void when judge does not follow law - FC 3048 (b)(1)(H):

☑ Whether a party has a criminal record.

▶ OBVIOUSLY the judge never bothered to read Yunker's request or the records filed in the case because Brown's criminal history report ONLY contains a DUI in 2001 - two years before the child was born - hardly sufficient to establish grounds for criminal abduction, a change of custody, and termination of Brown's custodial rights.

## 11. Void when the judge does not follow the law - FC 3048 (b)(2)(A-G):

(2) If the court makes a finding that there is a need for preventative measures after considering the factors listed in paragraph (1), the court shall consider taking one or more of the following measures to prevent the abduction of the child:

(A) Ordering supervised visitation.

(B) Requiring a parent to post a bond in an amount sufficient to serve as a financial deterrent to abduction, the proceeds of which may be used to offset the cost of recovery of the child in the event there is an abduction.

(C) Restricting the right of the custodial or noncustodial parent to remove the child from the county, the state, or the country.

(D) Restricting the right of the custodial parent to relocate with the child, unless the custodial parent provides advance notice to, and obtains the written agreement of, the noncustodial parent, or obtains the approval of the court, before relocating with the child.

(E) Requiring the surrender of passports and other travel documents.

(F) Prohibiting a parent from applying for a new or replacement passport for the child.

(G) Requiring a parent to notify a relevant foreign consulate or embassy of passport restrictions and to provide the court with proof of that notification.

(H) Requiring a party to register a California order in another state as a prerequisite to allowing a child to travel to that state for visits.

▶ Without and factual evidence to support Yunker's claim, at a MINIMUM the judge should have considered one of the above alternatives. Perhaps, the court clerk could have called Ms. Brown at the number listed on the face of Yunker's declaration, or the number on record with the court – Brown would have answered the call personally? Perhaps the court should have sent a notice to the address of record for Brown asking her to appear in person with the child? For that matter, why didn't the judge require facts? Why didn't the judge review facts on record? Why didn't the judge check to see that Brown had been notified? Basically, the judge ordered this severe action just because . . . Yunker said it was so.

## 12. Void when judge does not follow law - FC 3048 (b)(2)(J):

☑ Including provisions in the custody order to facilitate use of the Uniform Child Custody Jurisdiction and Enforcement Act (Part 3 (commencing with Section 3400)) and the Hague Convention on the Civil Aspects of International Child Abduction (implemented pursuant to 42 U.S.C. Sec. 11601 et seq.), such as identifying California as the home state of the child or otherwise defining the basis for the California court's exercise of jurisdiction under Part 3 (commencing with Section 3400), identifying the United States as the country of habitual residence of the child pursuant to the Hague Convention, defining custody rights pursuant to the Hague Convention, obtaining the express agreement of the parents that the United States is the country of habitual residence of the child, or that California or the United States is the most appropriate forum for addressing custody and visitation orders.

▶ No matter what trial court rule and orders were in place, it did not authorize the judge to directly and intentionally violate state, federal and international laws specifically the Uniform Child Custody Jurisdiction and Enforcement Act.

## 13. Void when the judge did not consider the law - FC 3048 (b)(2)(K) and (b)(4):

☑ (K) Authorizing the assistance of law enforcement.

(3) If the court imposes any or all of the conditions listed in paragraph (2), those conditions shall be specifically noted on the minute order of the court proceedings.

☑ (4) If the court determines there is a risk of abduction that is sufficient to warrant the application of one or more of the prevention measures authorized by this section, the court shall inform the parties of the telephone number and address of the Child Abduction Unit in the office of the district attorney in the county where the custody or visitation order is being entered.

▶ Perhaps a prudent and fundamental measure might be for the judge (or clerk) to pick up the phone and call the District Attorney – Child Abduction Unit and find out if the party has filed a Good Cause Report as required by Penal Code 278.7 which authorizes a party to conceal the child due to safety concerns, threats of harm, and domestic violence. If protective shelters require a Good Cause Report be filed with D.A, one would expect a court to check with D.A. before issuing abduction orders.

▶ In the court's defense, the system was designed for the non-criminally minded. The abduction prevention / change of custody order included specific instructions to contact the District Attorney – Child Abduction Unit. Had that happened, the district attorney would have looked up Brown's name and discovered she did have a Good Cause Report on file. At that point the process would have stopped, and Brown could have appeared in person to the court and show why the concealment was authorized by the district attorney and in full compliance with the law.

▶ But as with any law made, there is a criminal out there who finds a way to break it. In this case is was Mr. James Yunker, who never intended to take the order to the district attorney – because he already knew Brown had a Good Cause report on file.

## 14. Void when judge does not follow law - FC 3048 (b)(4)(d):

> (c) The Judicial Council shall make the changes to its child custody order forms that
>
> are necessary for the implementation of subdivision (b). This subdivision shall become
>
> operative on July 1, 2003.
>
> ☑ (d) Nothing in this section affects the applicability of Section 278.7 of the Penal Code.

▶ Refer to attached exhibit which is a letter written by the District Attorney – Child Abduction Unit confirming that Ms. Brown had filed a timely Good Cause Report and was in compliance of the law per Penal Code 278.7. Ms. Brown has listed this violation as a 'reprehensibly aggravated violation' because the Contra Costa County court ignored Brown's declaration in which she asserts this claim. After the court ignored her, Ms. Brown asked the district attorney to write a letter of confirmation. District Attorney Ernst was surprised at Brown's request since the Good Cause Report contains highly confidential information. Mr. Ernst told Brown, "This is very unusual. All the court had to do is call."

## 15. A judgment is void on its face where the public policy of the state is violated - FC 3020:

> (a) The Legislature finds and declares that it is the public policy of this state to assure that the
>
> health, safety, and welfare of children shall be the court's primary concern in determining the
>
> best interest of children when making any orders regarding the physical or legal custody or
>
> visitation of children. The Legislature further finds and declares that the perpetration of child
>
> abuse or domestic violence in a household where a child resides is detrimental to the child.
>
> (b) The Legislature finds and declares that it is the public policy of this state to assure that
>
> children have frequent and continuing contact with both parents after the parents have
>
> separated or dissolved their marriage, or ended their relationship, and to encourage parents to
>
> share the rights and responsibilities of child rearing in order to effect this policy, except where
>
> the contact would not be in the best interest of the child, as provided in Section 3011.   (c)
>
> Where the policies set forth in subdivisions (a) and (b) of this section are in conflict, any court's
>
> order regarding physical or legal custody or visitation shall be made in a manner that ensures
>
> the health, safety, and welfare of the child and the safety of all family members.

▶ The court should have considered the "detriment to the child" which includes "the harmful removal from a stable placement of a child" with a parent "who has assumed, on a day-to-day basis," the role of both parents, "fulfilling both the child's physical needs and the child's psychological needs for care and affection," and who has assumed that role since the birth of the child.

## 16. A judgment is void on its face where the public policy of the state is violated FC 3011

☑ In making a determination of the best interest of the child in a proceeding described in Section 3021, the court shall, among any other factors it finds relevant, consider all of the following: (a) The health, safety, and welfare of the child. (b) Any history of abuse by one parent or any other person seeking custody against any of the following: (1) Any child to whom he or she is related by blood or affinity or with whom he or she has had a caretaking relationship, no matter how temporary. (2) The other parent. (3) A parent, current spouse, or cohabitant, of the parent or person seeking custody, or a person with whom the parent or person seeking custody has a dating or engagement relationship. As a prerequisite to the consideration of allegations of abuse, the court may require substantial independent corroboration, including, but not limited to, written reports by law enforcement agencies, child protective services or other social welfare agencies, courts, medical facilities, or other public agencies or private nonprofit organizations providing services to victims of sexual assault or domestic violence. As used in this subdivision, "abuse against a child" means "child abuse" as defined in Section 11165.6 of the Penal Code and abuse against any of the other persons described in paragraph (2) or (3) means "abuse" as defined in Section 6203 of this code. (c) The nature and amount of contact with both parents, except as provided in Section 3046

▶ The judge should have considered that even though there were several allegations of Yunker's abuse from different parties, no investigation was ever commenced. It should have been obvious however, that some serious concerns must have existed if one considers the following; even though DCFS substantiated Brown for substance abuse / child neglect (regardless of the fact it was fraudulently obtained), BOTH DCFS and the court appointed mediator still recommended the infant remain in the custody of the mother.

## 17. Void when judge does not follow law FC 3046 (a) (1):

(a) If a party is absent or relocates from the family residence, the court shall not consider the absence or relocation as a factor in determining custody or visitation in either of the following circumstances:

☑ (1) The absence or relocation is of short duration and the court finds that, during the period of absence or relocation, the party has demonstrated an interest in maintaining custody or visitation, the party maintains, or makes reasonable efforts to maintain, regular contact with the child, and the party's behavior demonstrates no intent to abandon the child.

▶ The judge obviously did not take time to consider that the custody agreement authorizing Yunker's custodial rights had only been filed 11 days earlier. The judge did not even attempt to determine whether or not custody had been violated. The judge did not check if visitations had been resumed. The judge did not check the police report. The judge did not check with the district attorney. The judge did not check with Brown. The only thing the judge was sign whatever document was put in front of him without even opening the file. Hmmm . . . expediency . . . or a child's safety. (Well, we know the answer).

## 18. VOID FOR JUDCIAL ABUSE OF SYSTEM FC 3046 (a) (2):

> (a) If a party is absent or relocates from the family residence, the court shall not consider the absence or relocation as a factor in determining custody or visitation in either of the following circumstances:
>
> ☑ (2) The party is absent or relocates because of an act or acts of actual or threatened domestic or family violence by the other party.

▶ A MINIMUM duty of care by any judge, in any court, in any county, in any proceeding, in any state should include awareness of other proceedings against the same party (this happens automatically in criminal courtrooms). It is ludicrous, reprehensible, and disgusting, that the same court could forcibly remove a mother and her infant from their home simultaneously seizing the mother's business, sole source of income, and evidence, and while the mother and child are in a protective shelter as a result –sell the mother's home – THEN turn around and take away the infant from the mother because she has relocated. There is no word to describe how reprehensible that is and ESPECIALLY grotesque when a history of domestic violence exists on record.

> **The eggshell skull rule** (or thin-skull rule) is a legal doctrine used in both tort law and criminal law that holds an individual liable for all consequences resulting from his or her activities leading to an injury to another person, even if the victim suffers an unusually high level of damages (e.g. due to a pre-existing vulnerability or medical condition). The term implies that if a person had a skull as delicate as the shell of an egg, and a tortfeasor or assailant who did not know of that condition were to hit that person on the head, causing the skull unexpectedly to break, the responsible party would be held liable for all damages resulting from the wrongful contact, even though they were not foreseeable. The general maxim is that defendants must "take their victims as they find them", a quotation from the judgment of Lawton LJ in the criminal case of R v. Blaue.

▶ It is interesting that DCFS refused to investigate any of the sexual abuse concerns made by different witnesses. DCFS told Brown that they would not investigate such claims when brought up in the middle of a custody dispute. Evidently it was OK for Yunker but not OK for Brown. Perhaps if they treated Yunker the same way Brown wouldn't have faced extreme prejudice as a result. It is more likely that DCFS merely reflects the same impartiality and bias inherent in the Contra Costa County Court.

## 19. Void when judge does not follow law Family Code 3027

(a) If allegations of child sexual abuse are made during child custody proceeding and the court has concerns regarding the child's safety, the court may take any reasonable, temporary steps as the court, in its discretion, deems appropriate under the circumstances to protect the child's safety until an investigation can be completed. Nothing in this section shall affect the applicability of Section 16504 or 16506 of the Welfare and Institutions Code.

☑ (b) If allegations of child sexual abuse are made during a child custody proceeding, the court may request that the local child welfare services agency conduct an investigation of the allegations pursuant to Section 328 of the Welfare and Institutions Code. Upon completion of the investigation, the agency shall report its findings to the court.

▶ It is interesting that DCFS refused to investigate any of the sexual abuse concerns made by different witnesses. DCFS told Brown that they would not investigate such claims when brought up in the middle of a custody dispute. Evidently it was OK for Yunker but not OK for Brown. Perhaps if they treated Yunker the same way Brown wouldn't have faced extreme prejudice as a result. It is more likely that DCFS merely reflects the same impartiality and bias inherent in the Contra Costa County Court.

## 20. Void when judge does not follow law Family Code 3064:

☑ The court shall refrain from making an order granting or modifying a custody order on an ex parte basis unless there has been a showing of immediate harm to the child or immediate risk that the child will be removed from the State of California. "Immediate harm to the child" includes having a parent who has committed acts of domestic violence, where the court determines that the acts of domestic violence are of recent origin or are a part of a demonstrated e and continuing pattern of acts of domestic violence.

▶ Yunker did not provide any showing of immediate harm to the child or immediate risk that the child would be removed from the state of California. In fact, Yunker made no showing of any of the required conditions for either the ex-parte change of custody or the abduction prevention attachment requiring supervised visitation for Ms. Brown.

In our lack of commitment to our children they are deprived of the human attachment that is their biological and genetic "expectation" at birth. We deny them the biological mothering experience that is the basis for human sociability and often, parcel their care off to strangers, who usually have even less of a commitment to them than we do. Because our children are not our first priority, the best some of us can give them is "quality time". In a nation of individuals whose major priority is "me," we perceive caring for another, including our own children, as self-sacrifice and loss of self. We seek more and better day-care centers but not the types of help that could enable us to stay at home to care for our children. Nor does our government offer financial help, as other nations do, that allows at least one parent to be at home to care for their infant.

## Chapter 10: Void - no presumption of jurisdiction and no due process

In all actions governed by the rules of limited jurisdiction, there is no presumption that the judge has jurisdiction. Jurisdiction in special statutory proceedings is never presumed. It must affirmatively appear from the record. Nothing will be presumed in favor of jurisdiction in the face of facts appearing in the record showing it did not exist.

▶ **On July 23, 2004, the same court that ordered Ms. Brown and her infant daughter forcibly evicted and her home sold, turned around and took her daughter from her and used the sale of her home as an indication of abduction. Brown was now very limited as to what she could do without risking harm to her daughter.**

- *For the next few months Yunker did a number of things to keep Brown out of the courtroom. For example; before a hearing, Yunker's attorney excused himself to take care of a separate matter in another courtroom promising to return in 30 minutes. Brown decided to use the time to go downstairs and make some copies. Upon returning to the courtroom she passed Yunker who told her the judge had continued the matter and informed Brown of the new court date. Months later Brown reviewed the 'walk-in report' which is a summary of the hearing dates. Brown was amazed at what had clearly been going on. And on that particular day, the records stated Yunker appeared without his attorney, Brown was a 'no-show'. So while Brown was making copies, and his attorney was busy in another courtroom, Yunker took it upon himself to appear pro per – by himself - thus preventing Brown from testifying while slowly, yet effectively, destroying her credibility. There are numerous examples of this.*

▶ **Supervised visitation incident, August 2004.**

- *After nearly five weeks, Brown was finally allowed to her infant under the supervision of a court mandated agency. By law, a list of supervised visitation agencies is to be provided so that a party may select their agency of choice. The court order however, indicated one specific agency. The agency refused to make arrangements with Brown until Yunker contacted them. Yunker claimed the reason for he 5 week delay is that the agency would not return his calls. After Yunker finally contacted the agency, Brown was scheduled to see her daughter the following day.*
- *For several agonizing minutes, the infant sat on the mother's lap completely motionless - staring with a ghastly, blank expression. Then, the tearful and joyous reunion jubilee began. After all the months of Yunker's isolation, one positive result was an incredibly strong bond between mother and daughter.*
- *Then the horrifying diaper changing incident. The child screamed at the top of her lungs in a blood-curdling cry, "MOMMIE, NO! NO! NO! Mommy . . . NOOOOO!!! . . . and kept twisting and turning and blocking the mother from taking off her diapers.*
- *It was so horrible that at the end of the visit, the supervisor said, I want you to know that in the 5 years working here as manager, I have yet to witness something so disturbing. Right now, I am writing a report of the incident, and I strongly encourage*

*you to pay the company $75.00 for the report to be sent to the court before your next hearing".*

- *The supervisor never came back to work again.*
- *Ms. Brown paid the $75 to have the report sent to court.*
- *Prior to the hearing however, Yunker and Brown had a second mediation appointment.*

▶ **Mediator: Persuading a witness not to testify under the color of law.**

- *Ms. Brown received a letter from the court informing her scheduled appointment at 1pm.*
- *The morning of her appointment, Brown called to confirm certain tems to bring wth her. The mediator informed her that her appointment was at 8:30 am, not 1pm, she was late, and said she better be there in 30 minutes. It takes nearly 30 minutes driving time, so Brown did not have time to grab all of her information. Unfortunately, it was not until she returned that she found the appointment letter from the court confrming that her appointment was in fact 1pm (she has included a copy of this letter). Brown suspects that Yunker had someone call in and re-schedule the appointment, just like he had done previously. Unfortunately, the damage was already done and is clearly apparent from the temperature of the mediator's inflammatory remarks.*
- *Ms. Brown tried to show the mediator a letter from the District Attorney authorizing Brown to take the child to a protective shelter. The mediator refused to read it by stating, "if you haven't given Yunker a copy, I can't read it either." On the other hand, the mediator had no problem allowing Yunker to introduce photos of Brown's home of which to date, Brown has never seen and does not even know if was her home in the pictures.*
- *In the mediator's report, Yunker completely refuted the story he provided to the court in order to gain custody in July - because "the whereabouts of Brown and the child were unknown". Six months later however, Yunker admitted that Albright contacted him early in June about Brown's eviction – and told the mediator the reason Yunker pursued custody of the child was due to the condition of Brown's home,* **NOT EVEN CLOSE** *to what he presented to the court under oath. More importantly, Yunker's statement confirms his complicity in the eviction /blackmail / abduction sham.*
- *Ms. Brown told the mediator about the diaper changing incident and that the supervisor's report was being submitted to the court.*
- *The following day, the supervisor agency informed Brown that they were suspending their services because Brown had called their office too many times. Consequently, they were returning the $75 for the report Brown had requested.*
- *When Brown asked why they would not send the report to the court, they said they received a call from the mediator (during his private meeting with Yunker). The agency was told by the mediator that they must not submit any such report since they were not qualified. In reality, the witness (supervisor) was required by law to report such an incident since failure to do so can result in a jail time*

> **Duty to report:** Legally mandated reporters includes A child visitation monitor - any person who, for financial compensation, acts as monitor of a visit between a child and any other person when the monitoring of that visit has been ordered by a court of law.

1    • *It is important to mention, that supervisor agencies receive 100% of their referrals from the court and mediator's office.*

2    • *Brown is challenging the mediator for persuading a witness not to testify by abusing his official duty under the color of law.*

3

4    **Section 1985: Conspiracy to interfere with civil rights**

5

6    **Void when trial court exceeds jurisdiction by granting relief that it had no power to grant.**

7    ▶ Surprisingly, on April 10, 2005, the final judgment suddenly changed the conditions for supervised visitation from a threat of abduction (as originally claimed) to substance abuse. Both abduction and substance abuse are penal code violations required to be adjudicated in a criminal court of law, NOT I repeat, NOT handled in family law jurisdictions. And, just as the court exceeded its authority by depriving Brown of her home, her belongings, her business, and her evidence, the same court continued to take away her parental rights, without corroboration, without factual evidence, without a hearing, without due process, and without constitutional authority. Ms. Brown was deprived of these fundamental rights by the court's excessive use of force.

8

9

10

11

12    • *The abduction prevention orders changed to substance abuse due to a single box that was checked.*

13

14    • *Substance abuse charges are handled in criminal courts of law requiring proof beyond a reasonable doubt. In civil courts the burden of proof is a preponderance of the evidence. It is therefore not logical to adjudicate a matter based on a preponderance of the evidence when that evidence requires proof beyond a reasonable doubt.*

15

16    • *Substance abuse had not been an issue before the court at any time.*

17

18    ▶ Clearly, there is a problem when someone can be found guilty and punished for a criminal offense by a court of limited jurisdiction without a valid charging instrument.

19

20    Where there is no valid charging instrument, and yet the defendant is convicted in a court of limited jurisdiction, there is a void judgment of conviction in the court of limited

21    jurisdiction. The conviction of a person for a crime with which he was never charged

22    constitutes a clear violation of the right to due process. *Allen v. State,* 310 Ark. 384,

23    838 S.W.2d 346 (1992). When there is no valid charging instrument, and yet the

24    defendant is convicted in a court of limited jurisdiction, there is a void judgment of

25    conviction in the court of limited jurisdiction. *Rector v. State,* 6 Ark. 187 (1845).

26    ▶ There are two possible explanations for this sudden turn of events. The first explanation is that the judge DID review the facts before rendering a final judgment based on substance abuse instead of abduction. If that is the case then the following issues must be addressed:

27

28

29    1) If the court incorrectly presumed that Ms. Brown had been substance abusing and neglecting her child, then there also exists an inconsistent presumption of fact that the mother was not substance abusing and neglecting her child (at least to the point that she presented any danger to her daughter's welfare) since both CPS and the Mediator still supported the mother retain custody - over

30

the father - with full knowledge that the mother had been substantiated with child neglect and substance abuse.

> **Federal Rules of Evidence 302(b)** If presumptions are inconsistent, the
>
> presumption applies that is founded upon weightier considerations of policy. If
>
> considerations of policy are of equal weight, neither presumption applies.

2) According to the Daubert Standard, family court mediators and DCFS social workers would not be considered 'expert' witnesses in determining substance abuse or child neglect.

> **The Daubert standard** is a legal precedent set in 1993 by the Supreme Court of the
>
> United States regarding the admissibility of expert witnesses' testimony during legal
>
> proceedings.

3) Surely at some point Brown should have been charged with a crime, entitled to a hearing, afforded legal counsel, allowed to address her accusers and cross-examine witnesses. Of course this never happened and there is nothing in Brown's REAL criminal history report to support such a verdict. This is also why corroborative evidence (such as an arrest/conviction) is required before DCFS can substantiate substance abuse / child neglect. This is also why it was important for Yunker to falsify Brown's criminal history report and present it to DCFS. In the end, it became a presumed fact.

> **Presumed Fact: Rule 303**
>
> If a presumed fact establishes guilt, is an element of the offense, or negates a defense,
>
> the court shall instruct the jury that its existence, on all the evidence, must be proved
>
> beyond a reasonable doubt.

▶ Perhaps a more reasonable explanation for this surprising turn of events is that the judge DID NOT review the judgment before signing off on it. This is would also be consistent with the onging pattern and practice of the Contra Costa County Court AND consistent with the supporting facts.

1) Yunker tried to get either DCFS or the police to corroborate his substance abuse allegations. When that failed, he falsified evidence to DCFS. Even though he was able to get Brown falsely substantiated for substance abuse / neglect, both the mediator and DCFS still did not give him want he wanted – control over Kaylie and therefore, control over Brown. In fact, they STILL supported Brown retain physical custody. The other problem was, even if Brown's custody rights were somehow affected due to his false accusations, reunification services automatically take place when substance abuse is involved. Yunker knew it would not take long before DCFS discovered Brown wasn't abusing drugs and the child returned to Brown.

2) Since abduction is one of 4 situations in which reunification services would not be offered, it made more sense for Yunker to go for the abduction scenario first then slip in the substance abuse later. On the surface this might appear extreme, and in any other court of law abduction and substance abuse charges are taken seriously, evidence is carefully weighed, and the circumstances involving the safety of child in their tender years a priority. This was not so in Contra Costa County. Mail

interference played a critical role giving Brown's adversaries complete control over their trials since the trial court relied exclusively on written declarations sent (without proof of receipt) through the mail.

> To give you an idea of how harshly the law views abduction: Reunification services are not offered to any parent who has killed another child, has a history of repeated felony child abuse charges, is serving a life sentence / on death row, or has abducted a child.

3) Yunker knew there existed evidence in police reports and with the district attorney to exonerate Brown from any abduction claim. Yunker needed to keep Brown from testifying and slowly change the flavor of his testimonies away from abduction in preparation for the final judgment wherein he could 'check-off' the substance abuse box. There was little danger Yunker that the 'error' would be caught since a judge only reviewed cases upon prior written request. And since mail interference prohibited Brown from submitting written declarations, the judge simply signs off on it, without even a cursory review. Yunker (and others) were well aware of how the court operated and used it to their advantage – after all, Yunker and Albright had already made out like bandits without breaking a sweat.

**Most important of all . . . Yunker now had Brown's daughter in his possession to keep secure his well-planned efforts.**

> ☑ **236.** False imprisonment is the unlawful violation of the personal liberty of another.
>
> ☑ **266b.** Every person who takes any other person unlawfully, and against his or her will, and by force, menace, or duress, compels him or her to live with such person in an illicit relation, against his or her consent, or to so live with any other person, is punishable by imprisonment in the state prison.
>
> ☑ **236.1 (d) (1)** For purposes of this section, unlawful deprivation or violation of the personal liberty of another includes substantial and sustained restriction of another's liberty accomplished through fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out.
>
> ☑ **(2)** Duress includes knowingly destroying, concealing, removing, confiscating, or possessing any actual or purported passport or immigration document of the victim. **(Birth certificate?)**

▶ Ms. Brown continues to be punished for crimes she did not do - crimes she was never even charged with - which is tantamount to cruel and unusual punishment. In fact, the evidence clearing her name and pointing to the real culprits was in the case file all along. But no one bothered to read the file.

> Procedural protections provided by the Eighth Amendment to the United States Constitution guarantee reliable procedures that protect innocent people from being punished, which would be tantamount to cruel and unusual punishment (refer to sections 3, 5, 8, 9). Herrera v. Collins, 506 U.S. 390 (1993).

▶ Ms. Brown contends that these constitutional deprivations were the direct result of a pattern and practice employed by Contra Costa County Superior Court by allowing "testimonial" hearsay statements that had not been tested by the crucible of cross-examination and therefore in violation of Brown's constitutional right to be confronted with the witnesses against her.

#### Confrontation clause and 804 (b)(3)

In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Court, in determining that the original intent of the Confrontation Clause was not to exclude unreliable hearsay evidence per se, but rather to exclude "testimonial" hearsay statements, held that the admission of the Petitioner's spouse's recorded statement made during a police interrogation under Washington's statement against interest Rule 804(b)(3) violated his Sixth Amendment right to be confronted with the witnesses against him on the ground that the statement was "testimonial" in nature which had not been tested by the crucible of cross-examination.



# Chapter 11: Void where an order/judgment is based on a void order/judgment.

The Fifth Amendment provides five important protections against arbitrary government actions. First, no one may be prosecuted for a federal crime without first being indicted (formally accused) by a grand jury. Second, a criminal suspect may be prosecuted only once for each crime. If a jury acquits the accused person, there can be no retrial. Third, a person cannot be forced to testify against himself or herself in any criminal case. This is the right against self-incrimination. Fourth, the due process clause bars the government from arbitrarily depriving anyone of life, liberty, or property. Fifth, the government may not take anyone's private property unless it is necessary for a public purpose and unless the government pays a fair price for it.

- The final judgment was void because it was based on the void order of July 23, 2004.
- The void order of July 23, 2004 was based on a void custody agreement of July 1, 2004.
- The July 1, 2004 order was void due to the OSC filed was forfeiture by wrongdoing.

▶ Ms. Brown has established by a preponderance of evidence, that the judgments and orders outlined herein were not based on the merits and are wholly void for lack of jurisdiction of the subject matter and person, for excess of jurisdiction, and obtained by extrinsic fraud. Therefore they have no binding force.

"Obviously a judgment, though final and on the merits, has no binding force and is subject to collateral attack if it is wholly void for lack of jurisdiction of the subject matter

or person, and perhaps for excess of jurisdiction, or where it is obtained by extrinsic fraud. [Citations.]" (7 Witkin, Cal. Procedure, supra, Judgment, § 286, p. 828.).

▶ Not only does res judicata prevent a void order from further review, but 'double jeopardy' prevents Brown from being tried for substance abuse allegations since she was found guilty and punished by an illegal process of law.

▶ Double jeopardy also poses an interesting issue since Brown's eviction was used in two separate court proceedings. In other words, the same foundation was used to punish Brown twice = double jeopardy.



In 1773, Benjamin Franklin published Rules by Which a Great Empire May Be Reduced to a Small One.

**"A great Empire, like a great Cake, is most easily diminished at the Edges"**

1. Remote Provinces must have Governors, and Judges, to represent the Royal Person, and execute every where the delegated Parts of his Office and Authority. You Ministers know, that much of the Strength of Government depends on the Opinion of the People; and much of that Opinion on the Choice of Rulers placed immediately over them. If you send them wise and good Men for Governors, who study the Interest of the Colonists, and advance their Prosperity, they will think their King wise and good, and that he wishes the Welfare of his Subjects. If you send them learned and upright Men for Judges, they will think him a Lover of Justice. This may attach your Provinces more to his Government. You are therefore to be careful who you recommend for those Offices. – If you can find Prodigals who have ruined their Fortunes, broken Gamesters or Stock-Jobbers, these may do well as Governors; for they will probably be rapacious, and provoke the People by their Extortions. Wrangling Proctors and petty-fogging Lawyers too are not amiss, for they will be for ever disputing and quarrelling with their little Parliaments. If withal they should be ignorant, wrong-headed and insolent, so much the better. Attorneys Clerks and Newgate Solicitors will do for Chief-Justices, especially if they hold their Places during your Pleasure: -- And all will contribute to impress those ideas of your Government that are proper for a People you would wish to renounce it.

2. To confirm these Impressions, and strike them deeper, whenever the Injured come to the Capital with Complaints of Mal-administration, Oppression, or Injustice, punish such Suitors with long Delay, enormous Expence, and a final Judgment in Favour of the Oppressor. This will have an admirable Effect every Way. The Trouble of future Complaints will be prevented, and Governors and Judges will be encouraged to farther Acts of Oppression and Injustice; and thence the People may become more disaffected, and at length desperate.

3. When such Governors have crammed their Coffers, and made themselves so odious to the People that they can no longer remain among them with Safety to their Persons, recall and reward them with Pensions. Make them Baronets too, if that respectable Order should not think fit to resent it. All will contribute to encourage new Governors in the same Practices, and make the supreme Government detestable.

*History is not made by kings and parliaments, presidents, wars and generals. It is the story of people, their love, honor, faith, hope and suffering. Today, history is being foraged by legislature of this land for we no longer have a destination, a dream ....kindred spirits unified to survive the frontier of our nation and the human race.*

Civil Rights, Constitutional Law, Evidence, Habeas Corpus, Government Contracts, Government Law - 155



# CONTRA COSTA COUNTY
## Office of the District Attorney

*Robert J. Kochly*
*District Attorney*



October 22, 2004

To Whom It May Concern:

RE:     Good Cause Report

On July 10, 2004 Lisa D. Brown filed a Good Cause Report with our office. The following is a description of when a Good Cause Report would be filed.

> It is against the law to conceal a child from a person who has a legal right to custody of or visitation with the child. However, if the concealing parent is concealing the child because of a reasonable and good faith fear of either domestic violence against the concealing parent that will cause the child emotional harm, or of actual physical harm to the child, the concealing parent may take the child to a place of safety.

The Good Cause Report is held in file in my office. The reports list Kaylie Brown as the protected child and James Yonker as the child's father.

Thank you,

Mark Ernst

Senior Inspector Mark Ernst
Contra Costa County District Attorney's Office
627 Ferry St
Martinez, CA 94553
(925) 646-2266

---

Special Operations Division
627 Ferry Street
Martinez, California 94553-1125

Consumer Fraud (925) 646-4620
Worker's Comp/Auto Insurance (925) 646-2585
Fax (925) 646-4683